UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GENLYTE THOMAS GROUP LLC,
a Delaware Limited Liability Company
                    Plaintiff,

v.

ARCHITECTURAL LIGHTING SYSTEMS, a
division of ARCH LIGHTING GROUP, a
Rhode Island Corporation

                    Defendant.

Civil Action No. 05-CV-10945 WJY

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AND FOR ATTORNEY FEES**

      Plaintiff/patent owner Genlyte Thomas Group LLC ("Genlyte"), by counsel, submits this

Memorandum in opposition to the motion of Defendant Arch Lighting Group, Inc. ("ALS") for

summary judgment of non-infringement of the patent-in-suit, U.S. Patent No. 5,038,254 ("the

'254 Patent").  Additionally, in response to Defendant's Statement of Undisputed Facts

("Defendant's Statement"), Genlyte files contemporaneously herewith its Response to

Defendant's Statement and Counterstatement of Facts ("Response and Counterstatement").

## I.      INTRODUCTION

      The '254 Patent was the first ceiling-mounted integrated hospital patient room light

containing multiple light fixtures.  The '254 Patent was issued by the U.S. Patent & Trademark

Office ("PTO") on August 6, 1991 from Application Serial No. 629,436 filed December 18,

1990.  ('254 Patent, Exhibit 1 to Genlyte's Opening Markman Statement, Docket Number

("DN") 17).  The PTO thought the inventions disclosed and claimed in the '254 Patent were so

unique it was issued a rare First Office Action Allowance, without any amendments.   (Notice of

Allowance, dated 3/20/91, Exhibit 2 to Genlyte's Opening Markman Statement).  The broadest

claim, claim 1, of the '254 Patent is as follows:

> **1.** A medical lighting system comprising:
> a body;
> means for ceiling-mounting said body;
> a first light fixture within said body oriented to direct
> light downwardly to a selected reading area under
> said body;
> a second light fixture within said body oriented to
> direct light downwardly and outwardly to a verti-
> cal wall surface outwardly adjacent from said body
> whereby light is reflected back to a broad area
> under said body.

On June 30, 2006, this Court held a Markman Hearing ("the Hearing") in which the

Court addressed three terms of the '254 Patent: "means for ceiling-mounting said body,"

"oriented to direct," and "downwardly and outwardly."  (Joint Statement of Claim Construction

("Joint Statement"), DN 22; Markman Hearing Transcript ("Transcript"), DN 23, pp. 4-5).

During the Hearing, the Court accepted with respect to "oriented to direct" and "downwardly and

outwardly" [1] a prior construction from Judge Ruben Castillo of the Northern District of Illinois.[2]

(Transcript, pp. 7 and 9).  Using the Court's construction, claim1 of the '254 Patent reads as

follows:

> What is claimed is:
> 1.  A medical lighting system comprising:
> a body;
> means for ceiling-mounting said body;
> a first light fixture within said body ~~oriented~~ set or arranged to
> ~~direct~~ aim light downwardly to a selected reading area under said
> body;
> a second light fixture within said body ~~oriented~~ set or arranged to
> ~~direct light downwardly and outwardly~~ aim more light in a
> downward and outward direction than in an upward direction to a
> vertical wall surface outwardly adjacent from said body whereby
> light is reflected back to a broad area under said body[3].

---

[1] The claim element "means for ceiling-mounting said body" was left for further consideration.  This Court stated that it believed that it was better to address the term in the context of a summary judgment motion.  (Transcript, p. 29).  However, ALS for purposes of its motion for summary judgment has conceded that its accused products contain a "means for ceiling-mounting said body."  Therefore, Genlyte does not address the term in this brief.
[2] It should be noted that this ruling was ordered vacated and depublished.  (Order, attached hereto as Exhibit A).
[3]  ~~strike through~~ = terms as appearing in original claim;
red = as strike-through claim terms have been interpreted by the Court.

In its motion for summary judgment, ALS only asserts that its accused products do not contain the "first light fixture" and/or "second light fixture" element. (ALS' Memorandum in Support of its Motion for Summary Judgment ("Memorandum"), p. 5). Consequently, this opposition addresses only those two elements of the claims of the '254 Patent.

In an attempt to avoid this broad claim of the '254 Patent, ALS' urges the Court to adopt ALS' version of the facts and apply those facts to ALS' version of the Court's construction of the patent claim terms. ALS' Motion should be denied because:

- There are disputed facts, including disputed facts related to the accused products and their infringement of the '254 Patent;

- ALS' infringement analysis is based upon erroneous facts and an overly narrow reading of the claims, including those claim terms construed by the Court; and

- ALS' "facts" are based on a declaration by the owner of ALS, Scott Davis, which gives expert opinion testimony without being identified and/or qualified as an expert.[4]

As will be shown below, and as confirmed by ALS' own product literature, ALS' MulTmed products contain the disputed claim elements and, consequently, violate the patent rights owned by Genlyte. As a result, Genlyte respectfully requests the Court to enter the tendered Order denying ALS' Motion. *SRI Intern. v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1116 (Fed. Cir. 1985) ("Because . . . infringement is itself a fact issue, a district court must approach a motion for summary judgment of infringement or non-infringement with a care proportioned to the likelihood of its being inappropriate.").

## II.    ARGUMENT

ALS bases its motion for summary judgment on the contention that the claims of the '254 Patent require "two different directions" and the photometric reports show that the "reading" and "ambient" fixtures of the accused products emit the "highest intensity" of light straight down.

---

[4] Therefore, Genlyte submits the Declaration of Roy Crane, Director of Engineering and co-inventor of the '254 Patent, attached as Exhibit 1 to the Response and Counterstatement.

(Memorandum, pp. 6-7). Under this false premise, ALS wrongfully concludes that both the "reading" and "ambient" fixtures aim their light "downward" and, therefore, its accused products do not direct light in "two different directions" -- the other direction being "downwardly and outwardly" – and, consequently, do not satisfy the "second light fixture" element of the '254 Patent. (Memorandum, pp. 7-8).

However, in making its argument, ALS (1) attempts to impose upon the '254 Patent and this Court an unjustified narrow interpretation of the claim terms, (2) ignores the claim terms as actually construed by this Court, (3) mischaracterizes the light distribution from its products by misinterpreting the photometric reports and ignoring what the photometric reports actually reveal, (4) ignores how the accused products actually perform when installed, and (5) ignores Federal Circuit precedent.

### A.  ALS' POSITION IS BASED UPON ITS NARROW INTERPRETATION OF THE CLAIMS AND IGNORES THE CLAIM TERMS AS ACTUALLY CONSTRUED BY THIS COURT

In its Markman papers ALS unjustifiably argued that the phrase "downwardly and outwardly" requires the light to go "in a single direction below and outside of the body." (*See e.g.,* Joint Claim Statement, p. 1). Keeping with this unwarranted narrow construction of the claim term (and ignoring the actual Markman ruling by this Court), ALS now argues in its motion for summary judgment that "downwardly and outwardly" is a "different direction" than "downwardly." (Memorandum, pp. 6-7). In making this assumption, ALS wrongfully concludes that since both the "reading" and "ambient" fixture of ALS' accused products emit "[t]he maximum amount of light . . . directly below the fixture," neither fixture "aims more light in a downward and outward direction to a vertical wall." (Memorandum, p. 8). In reaching this conclusion, however, ALS ignores the claim terms as construed and wrongly attempts to turn the

infringement analysis into a determination of which angle from the fixture has the highest intensity of light (i.e., is the highest intensity straight down or at some angle which intersects the vertical wall).

In other words, ALS treats the light emitting from the "first" and "second" light fixtures as if emitted by a laser. Such treatment by ALS is contrary to the acknowledged physics of light (i.e., light is emitted from a source in a 360 degree volume of energy), and ignores the large outward light component (directed toward the vertical wall or headwall) of both its "reading" and "ambient" fixtures.  Instead, ALS focuses its non-infringement argument on the so-called "highest intensity" of light which is claimed to be "straight down" in both fixtures.  ALS' non-infringement argument is at odds with the teachings of the '254 Patent and the Court's claim construction.

1.    "Downwardly and Outwardly" Is Not A Single Direction Toward A Vertical Wall.

The basic premise of ALS' motion is that "downwardly" and "downwardly and outwardly" must be different directions (i.e., a direction toward the bed versus a direction toward a vertical wall). [5]  (Memorandum, pp. 6-7).  This contention by ALS is based upon the presence of the terms "downwardly" and "downwardly and outwardly" in the same patent claim.  *Id.* However, ALS misses the point and its reliance on *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1579 (Fed. Cir. 1996) is flawed.

*Ethicon* merely found that two different terms used in the same clause were not synonymous.  *Id.*  Genlyte does not contend, nor did the Court find, that the term "downwardly"

---

[5] Judge Castillo rejected this same argument presented by the accused infringer in that case.  Judge Castillo held that "[t]here is no support in the '254 Patent, the extrinsic evidence, or common sense for [the accused infringer's] argument that downwardly and outwardly means only one direction:  outwardly, toward the wall." (Judge Castillo's Markman Order, Exhibit P to Expert Declaration of Thomas M. Lemons ("Lemons Report"), attached as Exhibit 2 to the Response and Counterstatement, p. 18).

was synonymous with "downwardly and outwardly." And, contrary to ALS' assertions, Federal Circuit precedent dictates that "downwardly" and "downwardly and outwardly" are not to be construed so that they are mutually exclusive. In other words, these claim terms do not refer to two totally different and distinct directions as argued by ALS.

In *Inverness Medical Switz. GmbH v. Princeton Biomeditech,* 309 F.3d 1365, 1370-71 (Fed. Cir. 2002) the Federal Circuit refused to construe two terms used in the same claim such that the meaning of one term excluded the other. The *Inverness* Court held: "That 'mobility' and 'migration' are used in the same claim, however, does not suggest that mobility excludes migration. . . . The claim language is equally consistent with the notion that 'migration' is subsumed within 'mobility'." *Id.* at 1371. Similarly, nothing in the '254 Patent suggests that "downwardly" and "downwardly and outwardly" are mutually exclusive or that such terms must be construed so that one excludes the other.

What is more, despite the fact that the "second light fixture" element requires light to be directed toward a vertical wall such does not mean that the term "downwardly and outwardly" must be construed to mean a single direction toward that wall. In fact, "downwardly and outwardly" includes the direction of "downwardly" and such claim terms are not referring to two different and distinct directions (i.e., a single direction toward the bed and a single direction toward the vertical wall) as argued by ALS. A fixture which directs light "downwardly and outwardly" is also directing light "downwardly." In other words, the "second light fixture" element provides that light is not only directed "downwardly" below the fixture, but also "outwardly" toward a vertical wall. (Declaration of Roy Crane ("Crane Dec."), Exhibit 1 to the Response and Counterstatement, ¶¶ 11-12). Therefore, assuming *arguendo* that the "reading"

and "ambient" fixtures of the accused products have the same light distribution pattern, ALS

nonetheless cannot avoid infringement as a matter of law, as will be shown below in Part C.3.

        2.     The "second light fixture" element of the claims of the '254 Patent does
not require such fixture to have the "highest intensity" of light aimed
<u>toward a vertical wall.</u>

ALS' position would dictate that the "second light fixture" must have its "highest

intensity" of light directed to the vertical wall. Such a position is contrary to the teachings of the

'254 Patent and this Court's construction of the claim terms.

As mentioned above, ALS' position is akin to arguing that the "second light fixture"

claimed in the '254 Patent emits light like a spotlight, flashlight or even a laser (i.e., producing a

narrow well-defined beam of light), and that such fixture emits this narrow beam of light in a

single direction at some angle toward the vertical wall. However, the "second light fixture"

disclosed and claimed in the '254 Patent does <u>not</u> emit a narrow beam in a single direction such

as a spotlight or flashlight. ('254 Patent; Crane Dec., ¶¶ 11-12). Instead, the '254 Patent teaches

and claims a "second light fixture" that requires light to be directed downwardly and outwardly

to, and reflected off of, a vertical wall – nothing more, nothing less. *Id.* And, as further

discussed below in Part C.3., the '254 Patent does not teach, nor do the claims require, that the

"second light fixture" exclude light from being directed to areas other than a vertical wall.

Further, nothing in the claims or in the Court's construction requires the "highest

intensity" of the "second light fixture" to be aimed in any one direction. Similarly, there is no

requirement, as ALS implies, that a larger "amount" of light be aimed at the vertical wall than

aimed "directly downward." (Memorandum, p. 8). All that the "second light fixture" element

requires, as construed by the Court, is that more light be directed in a downward and outward

direction than in an upward direction to a vertical wall. Such attempts by ALS to further narrow

or limit the claim terms by adding non-recited limitations (e.g., "highest intensity" or "larger amount") must fail. *See McCarty v. Lehigh Valley R.R. Co.*, 160 U.S. 110, 116 (1895) ("[I]f we once begin to include elements not mentioned in the claim in order to limit such claim . . .we should never know where to stop").

3.    <u>ALS ignores the claim construction set forth by this Court.</u>

ALS would like this Court to grant summary judgment because, according to ALS, its "reading" and "ambient" fixtures direct more light in a downward direction and, consequently, for both fixtures, "the amount of light at directions downward and outward – towards a wall – is less than directly downward." (Memorandum, p. 8). However, such an analysis ignores this Court's construction of "downwardly and outwardly." This is reason enough to deny ALS' motion for summary judgment.

What this Court stated is that the "second light fixture" element, as construed in the context of the claim, means that the second light fixture is set or arranged to aim more light in a downward and outward direction <u>than in an upward direction</u> to a vertical wall. (Transcript, p. 7; emphasis supplied). ALS' motion fails to address the claim term as construed. Nonetheless, it is undisputed that the "reading" and "ambient" fixtures of the MulTMed products have outwardly directed light and that such fixtures do not emit any light in an upward direction. (Response and Counterstatement, ¶¶ 27, 30). Therefore, even assuming *arguendo* that the "reading" and "ambient" fixtures direct more light "downwardly" than towards a wall, such fixtures nonetheless direct "more light downwardly and outwardly than upwardly to a vertical wall." Consequently, ALS' contention that the "reading" and "ambient" fixtures both "aim light downwardly" is irrelevant to a proper infringement analysis.

As a result, ALS' motion for summary judgment must fail because it is based upon an unjustified narrow interpretation of the claims, which is at odds with the '254 Patent and this Court's claim construction, and ignores the claim term as actually construed by the Court.

4.    ALS' motion assumes a construction of a claim term not addressed by this Court.

Further, ALS takes the position that if the "reading" and "ambient" fixtures of the accused products were determined to aim more light "in a downward and outward direction," then they cannot aim more light in a "downward" direction as required by the "first light fixture" element. (Memorandum, p. 9). In taking this position, ALS assumes that this Court has adopted Judge Castillo's construction of "downwardly."[6] However, this is not the case. This Court only addressed for purposes of claim construction the terms "oriented to direct" and "downwardly and outwardly." (Transcript, pp. 4-5, 29). Regardless, ALS' position is without merit.

First, as discussed above, "downwardly" and "downwardly and outwardly" are not two separate and distinct directions. Second, ALS has conceded that the fixtures emit at least some outwardly directed light (Memorandum, p. 8) and there can be no dispute that the fixtures do not emit any upwardly directed light. Consequently, assuming *arguendo* that both the "reading" and "ambient" fixtures direct more light downwardly, as argued by ALS, such fixtures likewise direct more light downwardly and outwardly than upwardly.

**B. ALS ATTEMPTS TO AVOID INFRINGEMENT BY MISCHARACTERIZING THE LIGHT DISTRIBUTION OF THE ACCUSED PRODUCTS**

ALS mischaracterizes the light distribution of its "reading" and "ambient" fixtures of the accused products by contending that such fixtures aim light downward. (Memorandum, p. 8). In doing so, ALS ignores the light output of the "reading" and "ambient" fixtures of the accused

---

[6] Judge Castillo held that the "first light fixture" element means "set or arranged to direct more light in a downward direction than in an upward or outward direction." However, nothing in the '254 Patent recites or requires "more" light be directed in one direction compared to any other.

products other than that portion of the light that is directed straight down. However, as evidenced by the photometric reports relied upon by ALS, and ALS' own product literature, such fixtures not only direct light downwardly, below the fixture, but also outwardly, away from the fixture toward a vertical wall. (Response and Counterstatement, ¶ 228-29; Crane Dec., ¶¶ 20-22). Moreover, the photometric reports reveal that the fixtures emit light in many directions other than straight down. To this end, those skilled in the art know that light from a fixture is emitted in three dimensions -- at many angles and in many planes. (Lemons Report, pp. 4-5). Consequently, ALS has mischaracterized the light distributions of the "reading" and "ambient" fixtures of the accused products. In other words, the "reading" and "ambient" fixtures of the accused products do not just direct light "downwardly," they likewise direct light "outwardly" to a vertical wall. (Crane Dec., ¶¶ 20-22).

Further, those skilled in the art would not reach a conclusion (as ALS did) that "more light is directed downwardly simply because the highest intensity is straight down. (Crane Dec., ¶ 22). In fact, with respect to the "ambient" and "reading" fixtures of the accused products, there is much more light being emitted between the angles of 40 and 45 degrees, for example, than straight down toward the bed. (*Id.*).

Additionally, ALS attempts to solely rely on photometric reports and unjustly ignores the actual performance of the fixtures as installed. The photometric reports identified by ALS measure the light output of the fixture in a vacuum. In other words, the photometric reports which ALS relies upon for its motion do not take into account how the fixture actually performs when installed. (Crane Dec., ¶ 19). In particular, the photometric reports fail to account for the performance of the fixture when it is installed in the ceiling, adjacent to a vertical wall, and above the patient bed. (*Id.*).

As shown in the IESNA Lighting Handbook (Figs. 7-40 and 7-41, attached hereto as Exhibit B), positioning a fixture next to or near (adjacent) the head-wall orients the fixture in such a way that produces a light pattern that illuminates that wall and causes that illuminance to be reflected off the wall.  It is undisputed that ALS' accused products are designed and recommended by ALS to be ceiling mounted so they are adjacent to the headwall.  (Deposition of Scott A. Davis, 9/6/06 ("Davis Transcript"), excerpts attached hereto as Exhibit C, 36:16-24, 37:1-15; s*ee also e.g.,* Exhibit 1 and 2 to Crane Dec.).  When this instruction is followed, ALS' accused products are "set or arranged" (oriented) so that at least the "ambient" fixture will (and does) not only direct light "downwardly," but also "outwardly" to the headwall, whereby light is reflected back to a broad area under the fixture.  This is indisputably shown in photographs of ALS' 2x4 MulTmed:

 

(Exhibit M to Lemons Report, Bates Nos. 00676-677).  Further, this performance of the fixtures in use is confirmed by ALS' own testimony.  During a Rule 30(b)(6) deposition of ALS, the President and owner, Scott Davis, testified as follows:

> Q.    Does the amount of light being reflected off
>       the headwall depend on how close the body, the
>       ceiling-mounted body, is to the wall?
>
> A.    In our design, clearly, yes.

Q.      And the closer you have to the wall, the more
        the light reflects off the wall?

A.      Yes.

Q.      And that can be controlled by the placement of
        the body?  If you place it in the middle of the room,
        you don't get the same amount of light reflected off the
        headwall, you had it placing it closer to the headwall?

A.      Yeah, I don't think there's any circumstance
        where the headwall would stay pitch black.  It would
        always pick up some amount of reflected light, but it
        would be increasingly more noticeable as the body got
        closer to the wall.

Q.      And at least with respect to the reading
        light, the effectiveness of the light is increased by
        the fact that it reflects off the headwall?

A.      Well, because the reading light is the closest
        to the wall, it gets the greatest benefit.

Q.      Any light would get benefit by being reflected
        off the headwall; is that correct?

A.      Yes, unless there was some reason why you
        didn't want reflected light.

(Davis Transcript, 90:5-24, 91:1-5).  ALS' accused products are designed to be placed adjacent

to a vertical wall, and ALS instructs its customers to install them adjacent to a vertical wall.

Consequently, ALS' accused products, as installed, have a "second light fixture . . . oriented to

direct light downwardly and outwardly to a vertical wall surface" as claimed in the '254 Patent.

*See Rawlplug Co., Inc. v. Illinois Tool Works, Inc.*, 11 F.3d 1036, 1041 (Fed. Cir. 1993) (where it

is clear from the context of the patent that a claim refers to an invention in an installed condition,

the accused device should be analyzed for infringement purposes in its installed condition).

What is more, ALS relies on the "highest intensity" argument which is gleaned from the

photometric reports (but <u>not</u> from the '254 Patent) to support its summary judgment position.

However, ALS has testified that it is not the photometric numbers that count, but how the fixture visually performs.  In addition to the testimony above, Mr. Davis testified that it is not his preference to design fixtures based upon where and how many footcandles or candela a fixture emits, but visually how the fixture performs.  (Davis Transcript, 160:6-24, 161:1-24, 162:1).  This is reason enough to deny ALS' motion for summary judgment.

Nonetheless, as shown below, ALS' accused products contain all of the elements and limitations of at least claim 1 of the '254 Patent.

### C.      THE ACCUSED PRODUCTS INFRINGE THE '254 PATENT

As previously mentioned, ALS has conceded for purposes of its motion that all the accused products contain all elements of claim 1 of the '254 Patent, except for the "first light fixture" and "second light fixture" elements.

1.      The accused products contain all the limitations of the "second light fixture" element.

As construed by the Court, the "second light fixture" element is as follows:  a second light fixture within said body set or arranged to aim more light in a downward and outward direction than in an upward direction to a vertical wall surface.  (Transcript, p. 7).  As evidenced by the photographs above, the "ambient" fixture of the accused products do not emit any upwardly directed light.  Moreover, the "ambient" fixture has a significant outward light component that when installed as instructed by ALS strikes the vertical wall.  Consequently, the "ambient" fixture "aims more light in a downward and outward direction than in an upward direction" to a vertical wall.  (Response and Counterstatement, ¶ 31).

Moreover, ALS' own product literature confirms that both its "reading" and "ambient" fixtures of the accused products direct more light in a downward and outward direction than an upward direction to a vertical wall:





(ALS MulTmed Literature, attached hereto as Exhibit D).

Further, ALS does not dispute, nor can there be any dispute, that such fixtures of the accused products emit more light downward and outward than upward to a vertical wall. In fact, neither fixture emits any "upward" light. (Response and Counterstatement, ¶¶ 27, 30; Declaration of Scott Davis, Exhibit 2 to Defendant's Statement of Undisputed Facts, ¶ 10). Consequently, contrary to ALS' assertions, the "ambient" and/or "reading" fixtures of the

accused products emit more light in a downward and outward direction than in an upward direction to a vertical wall, meeting the limitations of the "second light fixture" claim element. (Response and Counterstatement, ¶ 31).

2.    The accused products contain the "first light fixture" element.

Despite the fact that both the "reading" and "ambient" fixtures of the accused products satisfy the "second light fixture" claim element, such fixtures also satisfy the "first light fixture element." As construed by the Court, the "first light fixture" element is as follows: a first light fixture within said body set or arranged to aim light downwardly to a selected reading area. As shown above in ALS' own product literature and as instructed by ALS, the MulTmed products are installed directly over the patient bed. Moreover, in this position, both fixtures as conceded by ALS to direct light downwardly to a reading area. (Memorandum, p. 8). Consequently, both the "reading" and "ambient" fixture are "set or arranged to aim light downwardly to a selected reading area." (Response and Counterstatement, ¶ 25; Crane Dec. ¶ 22).

Therefore, regardless of the nomenclature ALS "assigns" its fixtures (i.e., "reading" or "ambient"), the fixtures satisfy both the "first light fixture" and "second light fixture" claim elements. ALS' "reading" fixture contains all of the limitations of the "first light fixture" element and the "ambient" fixture contains all of the limitations of the "second light fixture" element, or vice versa.

> 3.    It is irrelevant whether the "reading" and "ambient" fixtures of ALS' accused products have similar distribution patterns as long as all of the elements and limitations of one claim of the '254 Patent are contained in <u>the accused products.</u>

What is more, it is irrelevant to the infringement analysis whether the light distributions of the "reading" and "ambient" fixtures of the accused products are identical. Such is true

because as discussed above, the "downwardly" and "downwardly and outwardly" elements are not mutually exclusive.

For example, the "reading" fixture of the accused products, despite directing light "downwardly and outwardly to a vertical wall" likewise directs light "downwardly to a selected reading area" as required by the '254 Patent.  And, it is irrelevant to the infringement analysis whether the "reading" fixture of the accused products is capable of satisfying both claim elements.  In other words, any contention by ALS that the "reading" fixture, for example, cannot satisfy the "first light fixture" element if it satisfies the "second light fixture element" is without merit.  In that scenario, Federal Circuit precedent holds that any additional elements contained by the "reading" fixture -- directing light "outwardly" -- is irrelevant to an infringement analysis. All that matters is for the "reading" fixture of the accused products to contain all the elements of the "first light fixture" of claim 1 of the '254 Patent.  *See Stiftung v. Renishaw PLC*, 945 F.2d 1173, 1178 (Fed. Cir. 1991) ("fundamental that one cannot avoid infringement merely by adding elements if each element recited in the claims is found in the accused device"); *Loctite Corp. v. Ultraseal, Ltd*., 781 F.2d 861, 865 (Fed. Cir. 1985), *overruled on other grounds by*, *Nobelpharma AB v. Implant Innovations, Inc.,* 141 F.3d 1059 (Fed. Cir. 1998) (including additional features not required by the claims does not avoid infringement); *A.B. Dick Co. v. Burroughs Corp*., 713 F.2d 700, 703 (Fed. Cir. 1983)("fundamental" that accused device "cannot avoid infringement merely by adding elements if each element recited in the claims is found in the accused device"); accord, *Radio Steel & Mfg. Co. v. MTD Products, Inc*., 731 F.2d 840, 848 (Fed. Cir. 1984).

Moreover, in *SunTiger v. Scientific Research Funding Group*, 189 F.3d. 1327, 1336 (Fed. Cir. 1999) the Federal Circuit stated:

> [W]e have never required that a claim read on the entirety of an
> accused device in order to infringe.

Consequently, regardless of which fixture of the accused products (i.e., "reading" or "ambient")
is found to satisfy the "first light fixture" element, it is of no significance to the infringement
analysis that the same fixture contains additional elements (e.g., also emits light outwardly). In
*Northern Telecom Ltd., v . Samsung Elect. Co., Ltd.*, 215 F.3d 1281 (Fed. Cir. 2000) the Federal
Circuit held in the infringement context that "if a patent requires A, and the accused device or
process uses A *and* B, infringement will be avoided only if the patent's definition of A excludes
the possibility of B." *Id.* at 1296-97 (citing *Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d
931, 945 (Fed. Cir. 1990)) (other citations omitted). Further, the Federal Circuit explained that
"[s]tatements simply noting a distinction between A and B are thus unhelpful: what matters is
not that the patent describes A and B as different, but whether, according to the patent, A and B
must be mutually exclusive." *Id.* at 1297. Therefore, ALS' argument that both of its fixtures
(i.e., "reading" and "ambient") of the accused products have the same light distribution pattern is
inapposite and cannot form the basis of a finding of non-infringement.

Moreover, contrary to ALS' assertions, neither the claims of the '254 Patent, nor this
Court's claim construction, states anything about comparing from the "second light fixture" the
quantity of light toward the vertical wall surface to the quantity of light being emitted toward
other areas (such as the patient bed). ALS' assertion that the infringement analysis, with respect
to the "second light fixture" element, is an inquiry into the quantity of light emitted toward the
vertical wall versus any other area is a red herring. Regardless of any amount of light directed
elsewhere, all that matters is that the "second light fixture" element of the '254 Patent is met
because the "ambient" or "reading" fixture of the accused products direct more light downwardly

and outwardly than upwardly to the vertical wall surface. *Northern Telecom*, 215 F.3d at 1296-97.[7]

           4.     Even if ALS' accused products do not literally infringe the '254 Patent, <u>they infringe under the doctrine of equivalents</u>.

Even if the Court were to determine that ALS' accused products do not literally infringe claim 1 of the '254 Patent, there is still infringement under the doctrine of equivalents ("d/o/e"). Although not a rigid formula, infringement under d/o/e is present if the infringer substitutes a component that performs the same function in substantially the same way to achieve substantially the same result as the claim element or limitation. *Warner-Jenkinson Co. v. Hilton-Davis Chem. Co.*, 62 F.3d 1512, 1518 (Fed. Cir. 1997 *en banc*)("*Hilton Davis I*"), <u>rev'd on other grounds</u>, 520 U.S. 17, 28, 39-40 (1997)("*Hilton Davis II*). The Supreme Court has stated the purpose of d/o/e is to prevent the "piracy" of an invention. *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 607 (1950). The Court recently has <u>twice</u> reaffirmed the viability of the doctrine of equivalents. *Hilton Davis II*; *Festo Corp. v. Shoketsu KKK Co.*, 535 U.S. 722 (2002). Here, d/o/e coverage is available because there were no amendments to claim 1 (or any claim) because the '254 Patent was issued by the PTO on a First Office Action. *See Festo*, 535 U.S. at 740 (d/o/e only barred where there is a substantive amendment to the claims).

The Federal Circuit instructs that d/o/e is most applicable where the accused infringer makes only "insubstantial" changes from the patented invention. *Hilton Davis I*, *supra*, 62 F.3d at 1519-20. Here, ALS admits that its accused products contain all the elements of claim 1 of the '254 Patent, except the "first [reading] light fixture" and "second [ambient] light fixture"

---

[7] Moreover, ALS' "identical distribution" argument in essence seeks to avoid infringement by showing that its "reading" and "ambient" fixtures do not perform as well as those disclosed in the '254 Patent. However, the Federal Circuit holds that "imperfect practice of an invention does not avoid infringement." *Paper Converting Mach. Co. v. Magna-Graphics, Corp.,*, 745 F.2d 11, 20 (Fed. Cir. 1984); *SunTiger, Inc. v. Scientific Research Funding Group*, 189 F.3d 1327, 1336 (Fed. Cir. 1999) (If a claim reads merely on part of an accused device, that is enough for infringement).

elements.  However, no substantial changes have been made in the accused products.  The "ambient" fixture performs the same function (provide general illumination, in part by reflecting light off of the headwall) in substantially the same way (light from the ambient fixture directs light downwardly and outwardly to the headwall whereby light reflects or bounces off the headwall as shown in the photographs above) to achieve substantially the same result (illuminance of a broad area under the fixture).  This is confirmed by ALS' own product literature and the testimony of Mr. Davis.  (Exhibit C; Davis Transcript, 90:5-24, 91:1-5).

Additionally, the "reading" fixture performs the same function (provide light to a reading area) in substantially the same way (light from the reading fixture is directed downwardly to a reading area) to achieve substantially the same result (illuminance of an area in which a patient would read) as confirmed by ALS' product literature.  (Exhibit D).

Infringement under d/o/e is patently factual, requiring a trial, so summary judgment of non-infringement as requested by ALS cannot be granted.  *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1117 (Fed. Cir. 1996) (questions of technological equivalence are not questions of claim construction; they are questions of fact).

### D.    ALS' REQUEST FOR ATTORNEY FEES IS A NONISSUE AND MUST BE DENIED

Pursuant to 35 U.S.C. § 285, attorney fees can only be awarded to a <u>prevailing</u> party.  As demonstrated above, ALS' MulTmed products contain the disputed "first light fixture" and "second light fixture" elements of the '254 Patent.  Consequently, ALS is not entitled to summary judgment and, therefore, not entitled to its attorney fees.

Even if this Court were to find for ALS, 35 U.S.C. § 285 only allows for an award of attorney fees in "exceptional circumstances."  And, the prevailing party must prove that the case is "exceptional" by clear and convincing evidence.  *Perricone v. Medicis Pharm. Corp.*, 432 F.3d

1368, 1380 (Fed. Cir. 2005) (other citations omitted).  Moreover, if the Court were to find the case "exceptional," it must then determine whether awarding attorney fees is appropriate.  *Id.*

ALS argues that the present litigation is vexatious, unjustified and frivolous because Genlyte, as ALS contends, knew that ALS' MulTmed products did not infringe the '254 Patent. In making such a claim, ALS must show by clear and convincing evidence that "both the litigation [was] brought in subjective bad faith and [that] the litigation is objectively baseless." *Serio-US Indus., Inc. v. Plastic Recovery Tech., Corp.*, 459 F.3d 1311, 1322 (Fed. Cir. 2006) (citing *Professional Real Estate Investors v. Columbia Pictures Indus.*, 508 U.S. 49, 60-61 (1993)).  ALS, however, did not produce any evidence to meet this standard, nor could it. Contrary to ALS' assertions, Genlyte confirmed through installing and viewing the ALS MulTmed in use, and testing the product, that it infringed at least claim 1 of the '254 Patent. (Lemons Report, pp. 10-11).  Further, such conclusions were communicated to counsel for ALS prior to the initiation of this lawsuit.  (Letter from Robert Theuerkauf to Elliot Salter, dated 2/22/05, attached as Exhibit 3 to Response and Counterstatement).  Indeed, this conduct, along with the foregoing reasons justifying the denial of ALS' motion for summary judgment, proves that Genlyte brought this action in good faith and that this lawsuit is not baseless.  Consequently, ALS' request for attorney fees must respectfully be denied.

### III.    CONCLUSION

For the foregoing reasons, the factual premise of ALS' motion for summary judgment is both disputed and demonstrably incorrect.  Accordingly, ALS' motion for summary judgment of non-infringement must respectfully be denied.

Respectfully submitted,

 /s/ John L. Capone
James E. Milliman (Pro hac vice)
James R. Higgins, Jr. (Pro hac vice)
Robert J. Theuerkauf (Pro hac vice)
MIDDLETON REUTLINGER
2500 Brown & Williamson Tower
Louisville KY  40202
Telephone:  (502) 584-1135
Facsimile:  (502) 561-0442

-and-

Thomas C. O'Konski  BBO#337475
John L. Capone  BBO#656150
CESARI AND MCKENNA, LLP
88 Black Falcon Avenue
Boston, MA  02210
Telephone:  (617) 951-2500
Facsimile:  (617) 951-3927

*Counsel for Plaintiff, Genlyte Thomas Group LLC*

<u>Certificate of Service</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on this 18th day of May, 2006.

 /s/ John L. Capone
*Counsel for Plaintiff, Genlyte Thomas Group LLC*

# EXHIBIT A

## TO

## GENLYTE THOMAS GROUP LLC'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND ATTORNEY FEES

Order Form (01/2005)

*/H*

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Sidney I. Schenkier | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 05 C 1138 | **DATE** | 10/26/2006 |
| **CASE TITLE** | Kenall Manufacturing vs. Genlyte Thomas Group | | |

### DOCKET ENTRY TEXT

The parties' joint motion for entry of consent judgment and dismissal order (doc. # 138) is GRANTED. Enter attached consent judgment and dismissal order. Pursuant to the consent judgment and dismissal order, the case is dismissed with prejudice and without costs, with the Court retaining jurisdiction for purposes of enforcing the consent judgment and the parties' settlement agreement. The two opinions issued in this case that are reported at 439 F. Supp. 2d 854 (N.D. Ill. 2006) and 413 F. Supp. 2d 937 (N.D. Ill. 2006) are hereby vacated and de-published. The status conference set in the case for 11/02/06 is STRICKEN.

■ [ For further detail see separate order(s).]

Docketing to mail notices.

U.S. DISTRICT COURT

| | Courtroom Deputy Initials: | mm |
|---|---|---|

2006 OCT 27 PM 8:53

FILED-PH

# EXHIBIT B
## TO
## GENLYTE THOMAS GROUP LLC'S
## MEMORANDUM IN OPPOSITION TO
## DEFENDANT'S MOTION FOR
## SUMMARY JUDGMENT
## AND ATTORNEY FEES

NINTH EDITION

THE IESNA

# LIGHTING HANDBOOK

REFERENCE
& APPLICATION

MARK S. REA, Ph.D., FIES
EDITOR-IN-CHIEF

ILLUMINATING ENGINEERING
SOCIETY OF NORTH AMERICA

*Managing Editor:* Judith Block
*Production Manager:* Judith Block
*Editorial Assistants:* John Bullough, Mariana Figueiro, and Marilyn R. P. Morgan
*Copyeditor:* Seth A. Maislin
*Illustrator:* Joseph R. Gilmore
*Indexer:* Specialized Scientific Indexing
*Typesetting:* Eastern Composition
*Marketing:* PamelaWeess
*Cover Design:* Tony Picco

The IESNA LIGHTING HANDBOOK, Ninth Edition

Copyright © 2000 by the Illuminating Engineering Society of North America.

All rights reserved. Authorization to photocopy items for internal or personal use, or the internal or personal use of specific clients, is granted by IESNA provided that the base fee of $5.00 per copy plus $2.00 per page per copy is paid directly to CCC, 27 Congress Street, Salem, MA 01970. When submitting payment please indicate the publication material was taken from, the page numbers, and the ISBN of the publication.
  This consent does not extend to any other kinds of copying and the publication may not be duplicated in any other way without the express written consent of the publisher. This includes, but is not limited to, duplication in other publications, databases or any other medium for purposes of general distribution for resale. Making copies of this book, or any portion for any purposes other than personal use, is a violation of United States copyright laws and will be subject to penalty.

ISBN 0-87995-150-8

Library of Congress Catalog Card Number: 99-76610.

Printed in the United States of America.

The Illuminating Engineering Society of North America welcomes your comments. Please send all correspondence to:

Publications Department
IESNA
120 Wall Street, 17th Floor
New York, NY 10005-4001

| Luminaire Description | Luminous Intensity Distribution | Horizontal Illuminance | Vertical Illuminance | Visual Effect (Luminaire in Center of Ceiling) | Visual Effect (Luminaire at Edge of Ceiling) |
|---|---|---|---|---|---|
| Recessed troffer with two fluorescent lamps prismatic lens. Used for general lighting. | | | | | |
| Recessed troffer with two fluorescentlamps and louvers. Sharp cutoff for lighting spaces where VDTs are used. | | | | | |
| Downlight using a compact fluorescent lamp and baffles for general lighting. | | | | | |
| Downlight using a compact fluorescent lamp for general lighting. | | | | | |
| Downlight using a 100-W A-19 lamp for general lighting. | | | | | |

"Sharp cutoff" refers to an abrupt fall off, usually to zero, of the intensity in a distribution. Essentially no light is emitted above this cutoff angle.

**Figure 7-40.** Interior downlight luminaire luminous intensity distributions.

| Luminaire Description | Luminous Intensity Distribution | Horizontal Illuminance | Vertical Illuminance | Visual Effect (Luminaire in Center of Ceiling) | Visual Effect (Luminaire at Edge of Ceiling) |
|---|---|---|---|---|---|
| Recessed wall washer with a compact fluorescent lamp, spun reflector, and "kicker" to produce an asymmetric distribution. | | | | | |
| Ceiling surface-mounted linear wall washer with single fluorescent lamp. | | | | | |
| Recessed cove wall washer using one fluorescent lamp. | | | | | |
| Recessed linear wall washer using one T-8 fluorescent lamp. | | | | | |
| Downlight using a compact fluorescent lamp and asymmetric reflector for lighting corridors. | | | | | |



**Figure 7-41.** Interior wall-wash luminaire luminous intensity distributions.

# EXHIBIT C

## TO
## GENLYTE THOMAS GROUP LLC'S
## MEMORANDUM IN OPPOSITION TO
## DEFENDANT'S MOTION FOR
## SUMMARY JUDGMENT
## AND ATTORNEY FEES

00001

1                      Volume:  I

2                      Pages :   1 - 165

3                      Exhibits: 1 - 13

4           UNITED STATES DISTRICT COURT

5           DISTRICT OF MASSACHUSETTS

6               CIVIL ACTION NO. 05-CV-10945 REK

7  - - - - - - - - - - - - - - - - - - - - - x

8  GENLYTE THOMAS GROUP, LLC,

9  a Delaware Limited Liability Company,

10          Plaintiff,

11    V.

12  ARCHITECTURAL LIGHTING SYSTEMS

13  a division of ARCH LIGHTING GROUP,

14  a Rhode Island Corporation,

15          Defendants.

16  - - - - - - - - - - - - - - - - - - - - - x

17       VIDEOTAPED 30(b)(6) DEPOSITION OF ALS

18         Through SCOTT A. DAVIS

19    Wednesday, September 6, 2006,  9:12 a.m.

20          Cesari and McKenna LLP

21          88 Black Falcon Avenue

22          Boston, Massachusetts

23     Reporter:  Rosemary F. Grogan, CSR, RPR

24   LegaLink Boston, a Merrill Communications Company

**Davis, Scott A. 9/6/06                    Page 1**

00036

1    A.   My association with Salter & Michaelson was in

2   regard to this case.

3    Q.   Right, and they sent letters in 2004 and 2005.

4   They had correspondence with Jim Higgins of our law firm

5   representing Genlyte.

6           Do you recall those?

7    A.   Yes.

8    Q.   And I'm asking aside from these when you

9   developed the design for MulTMed, did you have any

10  infringement analysis done to see if your product would

11  infringe on the Genlyte product --

12   A.   No, I didn't --

13   Q.   -- on the Genlyte patent?

14   A.   -- what you're referring to, was after the

15  design process.

16   Q.   When ALS sells the MulTMed product, does ALS

17  recommend where the fixture should be placed in the

18  hospital room; that is should it be a certain distance

19  from the headwall?

20   A.   We do recommend that.

21   Q.   And what do you recommend?

22   A.   One to two feet.

23   Q.   One to two feet from the headwall?

24   A.   Yes.

**Davis, Scott A. 9/6/06**                **Page 36**

00037

1    Q.  Why one to two feet?

2    A.  It provides the best performance for our

3  product.

4    Q.  It could be put in the middle of the room,

5  couldn't it?

6    A.  I've seen worse, but...

7    Q.  The middle of the room doesn't give you very

8  good performance --

9    A.  No.

10    Q.  -- does it?

11         And is that put in spec sheets or how is

12  that communicated to the specifier?

13    A.  It's in our, what we call, our black and white

14  specification sheets that accompany the color literature

15  with more technical details.

16    Q.  We'll look at those in a little bit.

17         What is the function of a reading light?

18    A.  Is there something not self-explanatory about

19  that?

20    Q.  I know it sounds silly.  But we want the

21  patient to read, but in what type of setting?  What do

22  we want the reading light to do?

23         I mean it's obvious.  I mean can read in

24  certain kind of light and certain kind of light is

**Davis, Scott A. 9/6/06**                    **Page 37**

00090

1    A.  Okay.

2    Q.  And I guess this is just the layout of the

3  hospital showing where the MulTMed could be used?

4    A.  Correct.

5    Q.  Does the amount of light being reflected off

6  the headwall depend on how close the body, the

7  ceiling-mounted body, is to the wall?

8    A.  In our design, clearly, yes.

9    Q.  And the closer you have to the wall, the more

10  the light reflects off the wall?

11    A.  Yes.

12    Q.  And that can be controlled by the placement of

13  the body?  If you place it in the middle of the room,

14  you don't get the same amount of light reflected off the

15  headwall, you had it placing it closer to the headwall?

16    A.  Yeah, I don't think there's any circumstance

17  where the headwall would stay pitch black.  It would

18  always pick up some amount of reflected light, but it

19  would be increasingly more noticeable as the body got

20  closer to the wall.

21    Q.  And at least with respect to the reading

22  light, the effectiveness of the light is increased by

23  the fact that it reflects off the headwall?

24    A.  Well, because the reading light is the closest

**Davis, Scott A. 9/6/06**                    **Page 90**

00091

1  to the wall, it gets the greatest benefit.

2  Q.  Any light would get benefit by being reflected

3  off the headwall; is that correct?

4  A.  Yes, unless there was some reason why you

5  didn't want reflected light.

6  Q.  I'm want to turn now, talking about the sales

7  of the MulTMed product, and get away from design and go

8  into the sales area.

9     Just so I understand this, I take it your

10  customers are really what you call, I guess, the

11  specifiers?  They're the architects, the contractors,

12  the electrical contractors that make decisions as to

13  what lighting fixtures are going to go in a hospital;

14  would that be fair to say?

15  A.  Factually, our customers are lighting

16  distributors.  They're the ones that actually buy the

17  product.  Everyone else that you mention is just a chain

18  of influence.

19  Q.  But at the end of the day an architect, who is

20  building a house or in charge of building a hospital,

21  would he specify what kind of fixtures he wants in that

22  hospital patient room?

23  A.  Oh, there's no question an architect would

24  choose the one he wanted.

**Davis, Scott A. 9/6/06**                    **Page 91**

00160

1    Q.   But you recognize that as an authoritative

2  source in the industry?

3    A.   It has its place.

4    Q.   You say, It Has Its Place, it doesn't sound

5  like you put a lot of credence into it?

6    A.   Well, I personally -- IESNA is engineers

7  telling people how to light things.  And there is

8  another viewpoint of designers, more visual people,

9  telling people how to light things.

10         And a little joke I make about some of

11  the IESNA recommendations is that the guys from the IES

12  go to the symphony with a decibel meter and after the

13  symphony you say, How was the symphony?  And they say,

14  It was terrific.  It was 86 decibels the entire time.

15    Q.   That's pretty good.  I like that.

16    A.   So there's a more practical artistic visual

17  approach to lighting and then there's a more mathematic

18  scientific approach.  The IESNA takes a more scientific

19  approach and it has its place.

20         But in my personal opinion, it's not the

21  only answer to a lighting problem.

22    Q.   So what you're saying, I guess, is that I can

23  go to the symphony -- most people go to the symphony and

24  understand what their ears hear --

**Davis, Scott A. 9/6/06          Page 160**

00161

1    A.   Correct, there's a great deal more to lighting

2   than the quantity of light.  There's a quality of light

3   issue and there's -- without getting into a whole

4   lighting lesson here, you know, by creating zones of

5   brightness and darkness and by enhancing surfaces and

6   intentionally leaving certain surfaces dark or whatever,

7   you can create different environments.

8    Q.   In other words, kind of what the eye sees?

9    A.   Correct, which is many times different than --

10  and what creates a sense of comfort or a sense of

11  excitement or any emotion that you're trying to evoke

12  can generally be evoked with a lighting scheme.

13          And by changing that scheme, you can

14  change the emotional sense of a space.

15   Q.   So when you design lighting, you don't sit up

16  there with a light meter and say, I want X number of

17  lumens or foot-candles on this wall; you want something

18  that is pleasing with the eye --

19   A.   I do that any time I can.  There are times

20  where people will just insist -- they'll wave that IES

21  Handbook at you like a Bible and insist on meeting those

22  numbers, and so sometimes you have no choice but to meet

23  them.

24          But it's not my preference as a fixture

**Davis, Scott A. 9/6/06**                **Page 161**

00162

1  designer to work that way.

2      MR. MILLIMAN:  That's it.

3      MR. DORNY:  I have no questions.

4      MR. MILLIMAN:  Thank you very much, Mr. Davis.

5  I appreciate you coming in.

6      THE WITNESS:  Thank you.

7      THE VIDEOGRAPHER:  Here marks the end of

8  videotape No. 3 in the deposition of Scott Davis.

9  The original videotape is going to be retained by

10   LegaLink Boston.

11      Going off the record.  The time is 2:36.

12

13

14

15

16

17

18

19

20

21

22

23

24

**Davis, Scott A. 9/6/06**          **Page 162**

# EXHIBIT D
## TO
## GENLYTE THOMAS GROUP LLC'S
## MEMORANDUM IN OPPOSITION TO
## DEFENDANT'S MOTION FOR
## SUMMARY JUDGMENT
## AND ATTORNEY FEES

# MUL**T**MED

## MULTI FUNCTION PATIENT BEDLIGHT





*We **bring*** ARCHITECTURE

(C) 2003 Arch Lighting Group, Inc.



**ALS Disc 0001**



# MUL**T**MED

**MULTI FUNCTION PATIENT BEDLIGHT**

## Ambient Light (35 FC )

- Soft illumination on patient

- Non glare

- Lamps shielded from patient view

- High patient visual comfort







(C) 2003 Arch Lighting Group, Inc.



**ALS Disc 0003**

# MUL**T**MED

MULTI FUNCTION PATIENT
BEDLIGHT

## Reading Light (15 FC)

• High angle of light provides shadow and glare free illumination…even when bed is fully elevated

• Illumination bounced off headwall further increases effectiveness







(C) 2003 Arch Lighting Group, Inc.



**ALS Disc 0004**

# MUL**T**MED

MULTI FUNCTION PATIENT
BEDLIGHT

## Examination Light (85 FC )

- •Asymmetric reflectors
- •Crossing Beams minimize shadowing







(C) 2003 Arch Lighting Group, Inc.



# MUL**T**MED

MULTI FUNCTION PATIENT
BEDLIGHT

## High-Level Lighting (100 FC)

•Crossing Beams minimize shadowin

•Full length of patient well illuminated







(C) 2003 Arch Lighting Group, Inc.



# MUL**T**MED

MULTI FUNCTION PATIENT
BEDLIGHT

## Nurse / Chart Light (1 FC)

- Kind to patient

- Precise fixed beams on both sides of bed for medical workers

- PL-7 lamp has low energy consumption and ultra-long life







(C) 2003 Arch Lighting Group, Inc.



ALS Disc 0007



# MUL**T**MED

MULTI FUNCTION PATIENT BEDLIGHT

## 2 X 4 Models

- Available with or without nurse light
- Available for lay-in, solid ceiling, or surface mounting

Ambient Light

Exam Light    Exam Light

Nurse

4 Mode
MT2
B

Reading Light

No Nurse Light

3 Mode
MT2
A

(C) 2003 Arch Lighting Group, Inc.

ALS Disc 0008

# MUL**T**MED

## MULTI FUNCTION PATIENT BEDLIGHT

## 2 X 2 Models

- Ideal for use in existing 2X2 suspended ceilings

- Can be used:

  - individually

  - together, to simulate performance of our 2X4 models

  - in combination with other lay-in fixtures



**Ambient & Reading**
MT1D

**Ambient & Exam**
MT1E

**Reading & Nurse**
MT1F



(C) 2003 Arch Lighting Group, Inc.

**ALS Disc 0009**

# MUL**T**MED

**MULTI FUNCTION PATIENT
BEDLIGHT**

## BX39 lamp



## One Lamp Type *

- BX39 lamp used throughout

* Excluding PL night light



(C) 2003 Arch Lighting Group, Inc.



**ALS Disc 0010**

# MUL**T**MED

### MULTI FUNCTION PATIENT BEDLIGHT

Top Feed

Side Feed

5 ¼"

## Ultra-Shallow Design

- Least height of any fixture in it's class

- Top or side electrical feed points add installation flexibility



(C) 2003 Arch Lighting Group, Inc.



**ALS Disc 0011**

# MUL**T**MED

**MULTI FUNCTION PATIENT
BEDLIGHT**

## Service & Maintenance Friendly



- Integral electrical cabinet
  - All ballasts and other electrical gear centrally housed
  - Room-side accessible without tools



- Hinged lamp diffusers
  - Swing open without tools for fast lamp replacement and cleaning



(C) 2003 Arch Lighting Group, Inc.



**ALS Disc 0012**

# MUL**T**MED

**MULTI FUNCTION PATIENT**
**BEDLIGHT**

## Sani-Shield Option

• Easy to clean

• Triple gasketed





(C) 2003 Arch Lighting Group, Inc.



**ALS Disc 0013**

# MUL**T**MED

**MULTI FUNCTION PATIENT BEDLIGHT**

## Where to use MUL**T**MED?

- •Procedure Rooms
- •Patient rooms
- •Recovery rooms
- •Emergency rooms
- •Ambulatory day surgery clinics

*Perfect for both short term and extended stay environments*





(C) 2003 Arch Lighting Group, Inc.

ALS Disc 0014

# ARCHITECTURAL LIGHTING SYSTEMS



We *bring* ARCHITECTURE

*to* LIGHT !

Arch Lighting Group Inc. • 30 Sherwood Drive • Taunton, MA 02780 • (508) 823-8277 /Ph • (508) 822-6787 /Fx • www.alslights.com

(C) 2003 Arch Lighting Group, Inc.



**ALS Disc 0015**