UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GENLYTE THOMAS GROUP LLC,
a Delaware Limited Liability Company
        Plaintiff,

v.

ARCHITECTURAL LIGHTING SYSTEMS,
a division of ARCH LIGHTING GROUP, a
Rhode Island Corporation

        Defendant.

Civil Action No. 05-CV-10945 WGY

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S SECOND
MOTION IN LIMINE TO EXCLUDE DEFENDANT'S EXPERT WITNESS,
IAN LEWIN, BASED ON HIS DEPOSITION TESTIMONY

Plaintiff, Genlyte Thomas Group LLC ("Genlyte"), by counsel, submits this Memorandum of Law in Support of its Second Motion in Limine to Exclude Defendant's Expert Witness, Ian Lewin ("Lewin"), and states:

INTRODUCTION

Genlyte's Second Motion in Limine seeks to further exclude the testimony of Arch Lighting Group's ("ALS") expert witness, Dr. Ian Lewin ("Lewin"), and Lewin's expert report dated December 22, 2006 relating to ALS' defense of non-infringement ("Lewin Non-infringement Report") on grounds that Lewin's opinions are not based on "sufficient facts or data" specifically required of expert testimony pursuant to Federal Rule of Civil Procedure 702(1), 703 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Specifically, Lewin's desposition testimony, taken on December 27, 2006, reveals that **Lewin formed his non-infringement opinion without ever having in his possession or looking at the accused ALS products in question**.

As this Court is well aware, a determination of infringement or non-infringement is a two-step process requiring, first an *interpretation* (*i.e.*, construction) of the claims of the patent-in-suit (here, U.S. Patent No. 5,238,254 ["the '254 Patent"]) followed by *application* of those properly construed claim terms to the accused product. Simply put, it is impossible for Lewin to have formed a proper opinion regarding whether ALS' products infringed Genlyte's patent because **he never had the accused products in his possession or viewed them** so as to be able to apply the construed '254 Patent claim terms to the accused ALS MULTMED and LATITUDE products. As such, Lewin's opinions cannot and will not assist the trier of fact in this action because they are not based on sufficient factual evidence and must be excluded pursuant to FED.R.EVID. 702, 703 and *Daubert*.

On December 26, 2006, Genlyte filed its First Motion in Limine to Exclude Defendant's Expert Evidence [D.E. 44] and an accompanying Memorandum of Law [D.E. 45] in Support of its Motion. Genlyte's Motion sought to exclude ALS' proffered experts Davis and Lewin on grounds that, despite an impending "rolling" trial date which could begin as early as January 2, 2007, ALS served, for the first time, on December 22, 2006 (after 5:00 p.m. the Friday before the holiday weekend), Lewin's Non-infringement Report and a "Notice of Experts" stating for the first time that it also intended to provide expert testimony through ALS' President and owner, Scott Davis ("Davis"). ALS' Notice of Experts, attached hereto as Exhibit "1." ALS did provide Lewin's Non-infringement Report, but did not provide an expert report of Davis. Genlyte's First Motion in Limine sought to exclude testimony from both proffered experts on grounds that ALS' late identification was prejudicial to Genlyte.

On December 27, 2006, this Court granted Genlyte's motion to exclude Davis, but reserved ruling on excluding Ian Lewin's expert report and testimony. Subsequently, on January 8, 2007, this Court denied Genlyte's motion to exclude Lewin. However, the instant motion asserts *additional* grounds to exclude Ian Lewin's report and proposed testimony <u>based on Lewin's deposition testimony</u>, which has not yet been before this Court.

## ARGUMENT

This Court is obligated to serve as "gatekeeper" where expert opinion evidence is proffered to determine whether expert opinion is grounded in objective underlying scientific methodology as opposed to mere speculation or conjecture. *Daubert,* 509 U.S. at 589-590, 595 ("focus, of course, must be solely on principles and methodology, not on the conclusions they generate"). *See also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141-42, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The court's obligation is codified in the Federal Rules of Evidence 702 and 703. The applicable rule governing admissibility of testimony by experts is Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, **if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.**

FED.R.EVID. 702 (emphasis added). In *Kumho Tire,* the Court clarified that *Daubert* 's general principles, as reflected in FED.R.EVID. 702 , apply to expert testimony of all types. 526 U.S. 137 at 149.

3

The applicable rule governing the legitimacy of underlying bases of opinion testimony by experts is Federal Rule of Evidence 703, which provides in relevant part:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.  If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.

FED.R.EVID. 703.

In other words, only expert testimony that can "assist the trier of fact" is to be admitted at trial where a preliminary assessment finds "the reasoning or methodology underlying the [proffered] testimony is scientifically valid and . . . that reasoning or methodology properly can be applied to the fact at issue." *Tunnell v. Ford Motor Co.*, 330 F.Supp.2d 731, 737-38 (W.D.Va. 2004)(citing *Daubert,* 509 U.S. at 592-93 (internal footnote omitted)). *See also* FED.R.EVID. 703.

The Federal Rules of Evidence, combined with *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), provide a framework for Court to considering when evaluating expert testimony:  (1) Whether the witness is qualified to express an expert opinion, FED.R.EVID. 702; (2) whether the facts upon which the expert relies are the same type as are relied upon by other experts in the field, FED.R.EVID. 703; (3) whether in reaching his conclusion the expert used a well-founded methodology, *Frye;* and (4) assuming the expert's testimony has passed FED.R.EVID. 702 and 703, and the *Frye* test, whether under FED.R.EVID. 403 the testimony's potential for unfair prejudice substantially outweighs its probative value.  As shown herein, Lewin's opinion when considered in this time-tested

framework does not comply with Fed. R. Evid. 702, 703 or *Daubert* and its protégées and must be excluded.

In determining whether an accused product literally infringes a patent claim, the Court applies a two-step analysis. *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.,* 442 F.3d 1322, 1326 (Fed.Cir. 2006); *CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. KG,* 224 F.3d 1308, 1316 (Fed.Cir. 2000); *Amgen, Inc. v. Hoechst Marion Roussel, Inc.,* 126 F.Supp.2d 69, 117 (D.Mass. 2001). First, the claims must be construed to determine the scope of the claims. *CAE Screenplates,* 224 F.3d at 1316*; see also Kahn v. Gen. Motors Corp.,* 135 F.3d 1472, 1476 (Fed.Cir. 1998). Second, the **claims must be compared to the accused product**. *CAE Screenplates,* 224 F.3d at 1316; *Kahn,* 135 F.3d at 1476. If the accused product meets each of the limitations contained in a claim, then the product literally infringes that claim. *Amgen, Inc.*, 126 F.Supp.2d at 117.

The guts of this motion is that Lewin never viewed the accused product before he created his opinion.

> Q. In preparing this report [Lewin's Non-infringement Report], did you review or view, I should say, a MulTMed product in actual operation?
>
> A. No, sir.
>
> Q. In preparing your report, Exhibit 4, did you view an ALS Latitude product in actual operation?
>
> A. No, I did not.

(Deposition of Ian Lewin, December 27, 2006, ("Lewin Dep.") at 62:5-10).

Logic and accepted patent infringement practice dictate that if Lewin never viewed the accused product, it would be impossible for him to have appropriately applied the claims at issue to the accused product. In turn, if Lewin never actually applied the

5

claims to the accused product, it would be impossible for him to provide a properly based opinion that the accused ALS products do not infringe the '254 Patent.  Because he did not view an actual accused product, he could not and did not rely on sufficient evidence, nor did he form his opinion in accord with reasonably reliable principles and methodology of determining patent infringement, nor did he rely on facts typically relied on by experts in the field of lighting (or for that matter any field of endeavor regarding patent infringement) to form his infringement opinion.

In addition, the testimony reveals that Lewin only spent 4.8 hours before forming his opinion, during which time he testified he reviewed the parties summary judgment briefs (total, 445 pages, including Exhibits) and Thomas Lemons' expert report (approximately 400 pages).  (Lewin Dep., at 10:13-16).  Lewin must be an accomplished speed reader.

In addition, it is established Federal Circuit precedent under patent law that where, as here, a patents is specifically crafted to claim an innovative device after installation, the claims must be applied to the accused product <u>when and as installed</u> to determine infringement, since the installed product is what is detailed in the claim and the claim language is controlling.  *Rawlplug Co., Inc. v. Illinois Tool Works, Inc.*, 11 F.3d 1036, 1041 (Fed.Cir. 1993)(citing *E.I. DuPont De Nemours & Co. v. Phillips Petroleum Co.,* 849 F.2d 1430, 1433 (Fed.Cir.) and *Autogiro Co. v. United States,* 384 F.2d 391, 395-96 (1967)), *cert. denied,* 488 U.S. 986 (1988)).  Here, since Lewin never viewed an accused product, installed or otherwise, it is <u>impossible</u> for him to have applied the claim terms to the accused product in its installed condition.  As such, Lewin's opinion cannot

be, and is not, based on sufficient facts and is not derived using reliable Federal Circuit practices or methods applicable to patent infringement matters.

Ignoring Federal Circuit precedent requiring application of the claim terms to the actual installed product, Lewin concedes that his non-infringement opinion is based only on a two dimensional photometric report.

> Q. Is it fair to state that your analysis and conclusions that are contained in Exhibit 4 are based solely on the photometric reports related to the mulTMed product?
>
> A. My comments on the mulTMed product are based on the photometrics, but, as I say, I did also look at the information which Mr. Lemons provided on the Latitude.

(Lewin Dep., at 62:11-16). Lewin reiterated throughout his deposition that the photometric report was his sole source of information for forming his opinion.

> Q. As part of your engagement in this case, have you had any discussions with the light fixture designers of ALS?
>
> A. No, sir.
>
> Q. So all you are basing your opinion on is the finished product; is that correct?
>
> A. The photometric test of the finished product.
>
> Q. The photometric test of the finished product. I misspoke.
>
> A. Yes.

(Lewin Dep. at, 70:17-25).

A person skilled in the lighting arts knows that a photometric report depicts the light output of the fixture in a <u>testing environment</u>, not as installed or in use in a room. Lewin conceded that and testified to those testing conditions, as follows:

> Q. What is the distance of the light-sensitive device that measures the light intensity from source of the light in a typical photometric report?
>
> A. There is no one definitive answer to that. Laboratories vary. I have two such laboratories. One has a—about a 10-foot test distance; the other has about a 24-foot test distance. It could be shorter or longer.
>
> Q. Do I understand correctly that the reason for the distance between the light-sensitive [*sic*., light sensing] measuring device and the source of the light is so that that the source of the light is considered from a point source?
>
> A. That is almost correct. It is so … that the difference between point source and the actual source is a low percentage of error.

(Lewin Dep. at, 95:12-25 and 96: 1-3).

Earlier, Lewin had testified that he was aware that placing the ALS luminaire adjacent a vertical wall, as opposed to placing it in the center of the room, would have an effect on how the light from the luminaire would be distributed in the room:

> Q. Does it [the spacing between the end wall and the ambient fixture of the ALS MulTmed luminaire] have an impact on how light is distributed throughout that room?
>
> A. Yes.
>
> Q. And what would that difference be?
>
> A. If the light is close to a particular room surface, then the light that is falling on that surface and reflected

8

>   from that surface will be brighter; and conversely, if
>   its at a greater distance, it will be less.

(Lewin Dep. at, 63:13-21).

Thus, Lewin has not only failed to view the actual accused device, as installed or otherwise, before issuing his opinion, he relies on a "test" that admittedly was and is not reflective of actual operating conditions. Consequently, Lewin's reliance on the photometric report alone is contrary to the requirements of the Federal Circuit (*e.g.*, *Rawlplug Co., supra*), and thereby is an additional reason that his Report fails to comply with the requirements of FED.R.EVID. 702, 703 or *Daubert*.

When asked about the location of installation of the product in the room and its effect on the performance of the product, Lewin acknowledged that the performance would be affected by the location of installation.

>   Q.  Would you agree with me that if ALS places its
>       mulTMed fixture in the center of a patient room,
>       that there will be a certain lighting effect that is
>       provided from the ambient fixture of that lighting
>       fixture or luminaire, if you will, placed in the center
>       of the room?
>
>   MR. DORNY:  Objection. You may answer.
>
>   A.  There will be an effect.
>
>   BY MR. HIGGINS:
>
>   Q.  And if that ALS mulTMed luminaire is moved from
>       the center of the room toward the head wall of the
>       patient area, will there be a different effect?
>
>   A.  Yes.
>
>   Q.  So by moving or setting, if you will, the fixture
>       in a particular position within a room has an effect
>       on the light pattern that is produced in the room; is
>       that correct?

9

      A.    Yes.

(Lewin Dep., at 64:5-20).

While Lewin acknowledges that placement of the luminaire within the room, (*i.e.*, as installed), would cause a certain lighting effect and while it is settled law that the claims here must be applied to the accused product in an installed condition in use, Lewin testified that the installation of the light in a room did not and would not have affected his non-infringement opinion which was erroneously based on the photometric report.

Demonstrably, Lewin's report does not consider or accommodate the position that the ALS luminaire is installed with respect to the headwall.  Even though Lewin concedes that such placement would have an effect on the light distribution from the luminaire, his opinion is based solely on the photometric report, which in turn is conceded to be <u>not</u> reflective of actual installed conditions.  This is precisely the reason why an expert must base his opinion on a sufficient study of the evidence, including the actual installed product in use, and confirms that Lewin's testimony does not meet the requirements of FED.R.EVID. 702, 703 or *Daubert* or *Kumho Tire*.

Lewin further testified that his opinion did not consider the ALS brochure showing the light patterns characterized by ALS itself[1].  Instead, he testified that his opinion was based on Davis' testimony regarding the alleged recommended installation practice for ALS' products.  However, the ALS brochure shows a <u>different</u> installation consistent with Genlyte's patent.

      Q.    Now, turning to the second page of Exhibit 15, I believe earlier you said that the -- you read Mr. Davis' deposition and took from that deposition the

---

[1] This is the same brochure the Court reviewed at the hearing on ALS' motion for summary judgment of non-infringement (actually it's a PowerPoint presentation from ALS' web site).

        statement that he made in his deposition that ALS recommends that its mulTMed products be installed one to two feet from the end wall; do you recall that?

A.    Yes.

Q.    Could you look at the photographs that are in Exhibit 15, and can you give me an estimate as to how far from the head wall do you think the fixture is mounted in the pictures that are shown therein?

A.    They appear to be abutting the wall.

Q.    And the fact that ALS shows in its product brochure that the mulTMed product installed abutting the wall, did that form any part of your opinion in this case?

A.    I went by the sworn testimony of Scott Davis that the recommended installation is one to two feet from the wall.

Q.    Does the fact that the actual installation, at least as shown by this brochure, is abutting the wall, as you have just correctly concluded, does that change your opinion?

A.    No.

(Lewin Dep., at 120:2-24). This is yet another example of Lewin blindly stating his opinion, favorable to his client, while ignoring facts that a competent expert would at least consider in forming his or her opinion. Such actions further demonstrate and compel the conclusion that Lewin's opinion expressed in the Lewin Non-infringement Report is <u>not</u> based on accepted principles or methodology relied upon by other experts in the field. Consequently, both must be excluded pursuant to FED.R.EVID. 702 and 703.

CONCLUSION

For all the reasons stated above, the testimony of Lewin, as well as Lewin's Non-infringement Report, must be excluded from the trial of this matter.

Respectfully submitted,

/s/ Kevin Gannon
James E. Milliman (Pro hac vice)
James R. Higgins, Jr. (Pro hac vice)
Robert J. Theuerkauf (Pro hac vice)
MIDDLETON REUTLINGER
2500 Brown & Williamson Tower
Louisville KY  40202
Telephone:  (502) 584-1135
Facsimile:  (502) 561-0442

-and-

Thomas C. O'Konski  BBO#337475
Kevin Gannon  BBO#640931
CESARI AND MCKENNA, LLP
88 Black Falcon Avenue
Boston, MA  02210
Telephone:  (617) 951-2500
Facsimile:  (617) 951-3927

*Counsel for Plaintiff, Genlyte Thomas Group LLC*

Certificate of Service

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on this 19th day of January, 2007.

_____
*Counsel for Plaintiff, Genlyte Thomas Group LLC*