UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GENLYTE THOMAS GROUP LLC,
a Delaware Limited Liability Company
                              Plaintiff,
v.
ARCHITECTURAL LIGHTING SYSTEMS, a
division of ARCH LIGHTING GROUP, a
Rhode Island Corporation
                              Defendant.

Civil Action No. 05-CV-10945 WGY

## GENLYTE THOMAS GROUP LLC.'S
## REQUESTED JURY INSTRUCTIONS

These submitted instructions are based upon the charge given by The Honorable

William G. Young in *The Read Corporation , et al. v. Powerscreen of America, Inc. et*

*al.,* Civil Action No. 96-11025-WGY, February 23, 2001.  Pertinent changes or changes

with reference to the present case are represented in italics and a citation of authorities is

listed where applicable.  A transcript of the instructions in the *Read* case is attached

hereto as Exhibit A.  Genlyte Thomas reserves the right to request modification of these

instructions depending upon the presentation of evidence at trial.

## PRELIMINARY INSTRUCTIONS

Now the way the lawyers and I have worked this out, the way we think this makes

this most intelligible for you, is to have me go first and explain to you in detail the law

which you must follow in this case.

When I'm done explaining the law we'll take a break.  Then the lawyers will get a

chance to talk about the evidence and urge you to certain conclusions within the legal

framework as I describe it.  When that's done I'll just give you some explanation about

how you may deliberate together, how juries deliberate together, and then the case is

yours.

So we start this morning with my explanation as to the law which must govern in this particular case.  Understand that just as soon as he can, and he's very quick, Mr. Womack will prepare a transcript of my charge now.  But he can't get to that until after we send you out.  So you're going to have to start your deliberations before you have the written charge.  But we will send in, without any interruption, just as soon as we have the written charge, we'll send in one copy to you so you actually have the written charge before you.  (*Read Instructions p. 2-3*)

But you must listen carefully now because this is a form of law teaching.  This is like a law class here.  And it's a little stilted because you can't raise your hand now and say, well, you didn't explain that very well, explain that a little better.  But what you can do if you don't understand any aspect of the law, write out your question, write it out, there will be a court security officer outside the door here, come out the door, give the question to the court security officer, we'll set things all up in here, we'll have you back in the courtroom and I will explain it better.  Don't hesitate to do that.  If justice is to be done here you people must understand the law in the case, and I must be good enough to teach it to you.  So if you have any questions about the law be sure to ask them, don't just go ahead without understanding what the law is.

I start my charges by a brief explanation of what our separate roles are, and then from there we'll go into what the evidence has been, at least the tools you have to do the job, and then from there we'll go directly into what the law is that governs this case.

(*Read Instructions p. 3*)

## ROLE OF THE JURY

First your role.  You are the judges of the facts.  The only judges of the facts.  Though I will necessarily have to make mention of evidence and make mention of particular witnesses, that's only to remind you of testimony or evidence that may, it's entirely up to you, bear on certain aspects of the case.  You're the judges of the evidence.  I have nothing to say about the evidence.

Now, you're going to judge the evidence as I said at the beginning of the case fairly and impartially without any bias or prejudice, without any sympathy for anyone, without any desire that anyone be punished or have revenge.  Carefully and coolly sifting through this evidence – an appropriate term in this case – sifting through this evidence to see that justice may be done.

Your verdict must be unanimous.  We're going to ask you certain questions that can be answered like yes or no.  So you must be unanimous as to a yes, you must be unanimous as to a no.  And unanimous means that you all come genuinely to agree.  And you'll deliberate.  Not that ten of you think this and the other couple go along with it.  It must be a genuinely unanimous verdict.

And your verdict must be concentrated entirely on the evidence.  You can, and I know how carefully you will listen to the lawyers the better to understand the evidence.  You may look at the demonstrative aids the better to understand the evidence.  But the evidence is what governs and you, and you alone, decide what you believe about the evidence.

Now, I'm the judge of the law. I've said that a number of times. I simply mean to point out to you that in this courtroom I'm the one who has the responsibility of teaching you the law. We make a careful record of what I've said. And that's the fair way.

You cannot quarrel with the law as I explain it to you. I'm going to tell you who has to prove what in this case. I'm going to tell you the burden of proof that that side bears. And there's no dispute here who has to prove what. *Genlyte Thomas* has to prove, do the proving here.

But you can't add to the parties' burden. You can't say gee, I, I really want them to show us this or that. But likewise you can't subtract from their burden. When I say they've got to prove something, then they have to prove that. You can't say, well, forget about that because this or that, something else is proved. I'll tell you what has to be proved and what the burden, what the standard of proof is.

Listen to my whole charge start to finish. Don't seize on one part of it and say, "Aha, the case turns on this or that." Listen to the whole charge and consider all aspects of the charge together.

Likewise, don't think that because I charge you as to all aspects of the case that I think anything is proved or not proved. I have nothing to say about that. I simply am trying to build for you a complete mental framework so that you will understand the law which you have to follow. That's my role.

Now, I emphasize that you must confine your analysis to the evidence. So lets' take a moment and go over the evidence in this case, not witness by witness but rather type by type, so that you know what tools you have. (*Read Instructions p. 4-6*)

## EVIDENCE

The first thing I think of is the testimony of the witnesses.  You have the power to believe everything of the witnesses.  You have the power to believe everything that any witness said to you here from the witness stand.  To believe it all.  Equally, you have the power to disbelieve and disregard everything a witness said as though that witness never testified.  Between those two extremes you have the power to believe some things a witness says but to disbelieve other things the witness says.  You are not prevented from reaching a verdict because one witness has testified to one version of an event and another witness has testified to another version of the same event and both witnesses were under oath.  You can believe one or believe the other.  You can decide where the truth lies.

How do you do it?  You use your common sense as you are reasonable men and women.  You may use everything. You know about the witness.  How did the witness impress you testifying on the witness stand?  How did the witness respond to questions both on direct and on cross-examination?  What was the opportunity of the witness to observe, to comprehend, to understand, to recall those matters about which the witness testified?  Does the witness stand to gain or lose anything depending upon how the case comes out?  Is the witness allied with, employed by one side or the other in the case?  Do those things affect the witness' testimony?  Is the testimony of the witness backed up – lawyers say corroborated – by other evidence in the case?  The exhibits or depositions or any other evidence in the case.  Or, does the other evidence in the case undercut, take away from, make less believable the testimony of the witness who is before you?

In short, you can sum up a witness' testimony and as reasonable men and women you can decide what you believe.  (*Read Instructions p. 6-7*)

## <u>EXPERT WITNESSES</u>

Some witnesses have been allowed to give their opinion about certain things.  The law provides that when a witness has background, experience, training that the judges and juries don't have, we'll let that witness render his opinion to the jury to aid the jury in doing their function.

Like any other witness, your powers with respect to opinions given by *these* witnesses are no different.  That is, if I've allowed you to hear an opinion you may believe it; but equally you may disregard it.  You may decide that's just not believable, that's not credible.  Or you could believe part of what a witness says and disbelieve other parts of an opinion given by a witness.  It's left to your good judgment.

I suggest to you that in evaluating opinion given by *these* witnesses you want to look at what undergirds them or underlies them, what was the witness relying on?  How did the witness come to that opinion?  Both by their experience, generally having nothing to do with this case, but also what do they know about things having to do with this case upon which their opinion rests.

You're the judge of that.  So with respect to opinions you may believe them, but you may disbelieve them or believe them in part.  (*Read Instructions p. 7-8*)

### *[OMITTED – TESTIMONY BY DEPOSITION]*

*(Read Instructions p. 8-9)*

## EXHIBITS

Now, in this case also there are a large number of exhibits.  And shortly after we send you out, once the arguments are over, when we send you out to begin your deliberations, those exhibits will be brought into the jury room.

Well, they're evidence.  Now, I'm talking about the exhibits that are evidence, not the charts that are not evidence, though some charts are evidence.

Exhibits are like the testimony of witnesses and your powers are exactly the same. That is, you may read, look at, view an exhibit, and if it persuades you of some aspect of the case that's perfectly appropriate because it's evidence.

But equally, if you don't find an exhibit believable, either because you don't, because you think it's a fake, I'm not suggesting anything is a fake, but if you don't think it's genuine, or if you come to believe that even though this may be genuine, it's either inaccurate or it doesn't help you, disregard it.  That's your power.  You're the judges of the facts.  And as with any other evidence in the case you could take part of an exhibit and say, well, this is persuasive, but another part is not persuasive.  (*Read Instructions p. 9-10*)

## STIPULATIONS

Lastly, you have some stipulations in this case.  *I've* read *them*.  The lawyers read them.  And they're designed to shorten the time and make things clear to you. Stipulations are agreements among the lawyers, as they represent their clients.  That's evidence.  But that is special.  That evidence is not disputed.  So you don't have the right just to disregard it.  You take that as given.  Lawyers have agreed to that so we'll start out with that taken as given.  It's evidence.  (*Read Instructions p. 10*)

### DELIBERATIONS

Now, that's the body of evidence that you have in this case. A few words about what you do with it, how you analyze it.

You use your common sense. You don't check your common sense at the door to the jury room. Rather I charge you to apply your common sense to the evidence in this case to the end that justice may be done.

At the same time, you don't go in there and guess or speculate or maybe or perhaps or even probably. What we need is, as to most of the case, *Genlyte Thomas* is going to have to prove it by what I call, what the law calls a fair preponderance of the evidence. And as to one part of the case, if your verdict was to be for *Genlyte Thomas*, it would have to be by clear and convincing evidence. And I will tell you the two parts.

But my point is you don't guess. You don't speculate. But you can use your common sense as you are reasonable men and women and you can draw what are called reasonable inferences.

Now, a reasonable inference is a logical deduction. It's common sense. And I'm going to give you an example that has nothing to do with this case better to illustrate what a reasonable inference is and also to illustrate how far you can take it.

Let's say we have a witness and she testifies that she's walking along a road and she looks out and there's a field of tall grass . . . and she sees through the grass the grass is all knocked down in an irregular course through the field. And suppose you believe that testimony. From that alone you could infer something went through the field. I mean, it just doesn't happen that grass falls down along a path unless something knocks it down. It isn't all fallen down in a windstorm, it's fallen down in a course through the

field.  So it's a reasonable inference that something went through the field.  We don't have a witness who saw the something, but there's a reasonable inference something went through that field.

Now, that's a reasonable inference.  But unless you had other evidence from some other source in the case you wouldn't know what went through the field.  A child.  An adult.  A big animal.  A small animal.  You just wouldn't know.  That would be guessing.

Now, there might be other evidence and you can draw inferences from it.  But the reasonable inference, if you believe the witness I gave you as an example, is something went through the field.  But you can't guess about it unless there's other evidence.  That's reasonable inferences.

Okay.  We've talked about our roles.  We've talked about the tools that you have to resolve this case.  I want to say just a very few words about what's not evidence in the case, not to emphasize it but just point out to you what's not evidence in the case.  (*Read Instructions p. 10-13*)

        . . . .

You're not going to judge this case in any way, shape or form based upon how you react to the lawyers as human beings.  They've done their job, and they will later on this morning keep on doing it for their respective clients, and so far they've done a fine job.  I mean that.  But it plays no role in what you do.  You've got to focus on the evidence.  The lawyers are not sources of the evidence.  And your reaction to them plays no role.

Equally important.  If you somehow think that I think something about this case based upon the manner in which I have presided over it, I most earnestly instruct you to

disregard it.  I don't.  And I tell you candidly I have no idea how this case will come out, nor is it my business.  My business is to teach you the law.

This, however, I tell you and this I believe passionately.  I believe in the jury system.  I believe that you will do justice in this case.  But I, clear as I am about constantly saying, oh, yes, I'm the judge of the law, I have nothing to say about the facts in this case.  I believe that you will justly and impartially decide the facts in this case. Now let's get to it.  (*Read Instructions p. 13-14*)

. . . .

## **BURDEN OF PROOF**

*Genlyte Thomas* brings this case.  *Genlyte Thomas* is the plaintiff in this case.  So *Genlyte Thomas* has to prove the case.  *You have heard the name Lightolier in this case. Lightolier is a part of Genlyte Thomas – it is a division of Genlyte Thomas and you shall treat it as if it were Genlyte Thomas.*   And for most of the case the burden of proof on *Genlyte Thomas* is what we call proof by fair preponderance of the evidence.  There's one part where the burden's different, but I'll hold that off until I get there.

Proof – this is not a criminal case where proof is proof beyond a reasonable doubt. This is a civil case where the burden of proof is proof by a fair preponderance of the evidence.  And in such a case that simply means that on those things that I'm going to tell you that *Genlyte Thomas* has to prove, they've got to prove those things are more likely true than not true.  More likely to be the case than something else.  It's not a question of how much evidence there is on one side or the other, it's a question of what you believe about the evidence which you've seen and heard, and does that convince you unanimously that it's more likely, by a fair preponderance, those things that *Genlyte*

10

*Thomas* has to prove is the truth.  Now, if something else is more likely the truth *Genlyte Thomas* hasn't proved it.  If on all the evidence that you do believe that evidence tends equally to two equal but opposite conclusions, *Genlyte Thomas* hasn't proved it.  But so long as on the evidence you believe that's more likely to be true than something else, you may take it that that point is proved by a fair preponderance of the evidence.  (*Read Instructions p. 15-16)*

## PATENT EXPLAINED

This is a patent case.  Patents are mentioned in the Constitution of The United States.  A patent gives to the inventor or inventors, or to their successors in interest, a period of exclusivity for the use of their invention.  And that simply means that no one may use the patented invention without first getting permission from the people who hold the patent.  The period of exclusivity extends for 20 years from the date of the filing of the patent.  And the patent owner is entitled to refuse to give anyone else permission to practice the invention.

This case involves United States Patent *5,038,254*.  We're calling it the '*254* patent.  And I'm referring to it in the verdict slip as, the '*254* patent.  (*Read Instructions p. 16)*

. . . .

Some things are not really disputed in this case.  And let me just explain those.  Even though they're evidentiary, there's no real dispute.

There's no real dispute here but that *Genlyte Thomas* really does own the '254 patent.  It is *Genlyte Thomas'* patent.  Second, there's no real dispute . . . that *this is* a valid patent.  *It's* valid.  And *Genlyte Thomas* owns them. . . .  (*Read Instructions p. 17)*

. . . .

A few more words about patents.  Why do we give the inventor this right, this exclusivity right to practice the patent for a period of years?  It's a trade-off.

The federal government says to the inventor under the law we'll give you the exclusive right, the exclusive use of this invention for a period of years.  But, in return you have to teach the world how to make this invention, how to use this invention.

And why do we want that?  We want that as a matter of social policy because we want inventions.  We give the period of exclusivity as a reward.  The inventor is entitled to the reward whether or not the inventor uses, practices its own invention.

Now, a patent, and I've shown you *it* and the lawyers have shown you *it*, is a document.  And it's divided into parts.  It may have drawings.  It has *a specification*. And the *specification teaches* you a way, at least teaches you a way to practice the invention.  This is not necessarily the only way to practice the patent.  *Genlyte Thomas* may or may not manufacture a product as shown in the *specification.  [Genlyte Thomas believes the applicable terms  is "specification" singular.]*  It is not necessary to its claim that it do so.  And at the end of each patent there are claims.  And it is the claim of the patent that describes the area of exclusivity.    It's not how the patent holder –*in this case, Genlyte Thomas -* chooses to practice the patent.  *Genlyte Thomas has the right to exclude others, including ALS from using its invention as claimed in the patent.*

So be very clear.  the comparisons – because in your infringement analysis you're going to have to make comparisons.  The comparison is between the written claim of the patent and the devices alleged, the *ALS MulTmed and Latitude fixtures here*, alleged to violate, to infringe that claim.  That's the comparison.  *It is not a comparison of ALS'*

*fixtures to Genlyte Thomas' fixtures.  It is a comparison between the claims of the 254'*

*patent and the ALS products.*

Now, in making that comparison you're of course entitled to look at what the

patent holder itself manufactures.  *You may look at the Genlyte Thomas fixtures and*

*compare the fixtures with the MulTmed and Latitude fixtures*.  But that doesn't end your

analysis.  You've got to look at the claim.  Because under the law it's the claim compared

to the allegedly infringing device.  (*Read Instructions p. 18-19*)

<u>**CLAIMS AGAINST OTHER COMPANIES**</u>

And this is the time to make mention of something else here and something that

I'll explain to you how I drew the line where I drew it.

Mention has been made in testimony, about other devices manufactured by other

people*, not ALS*, and what happened to those devices.  M*aybe they were licensed; license*

*is permission*.   We've heard about other lawsuits, maybe they were settled.  Maybe some

other court decided some other lawsuit.  And we've heard some other devices were

withdrawn from the market.  Taken off the market.

Well, that's some evidence.  You may look at those other devices and compare

then with the *ALS devices*, compare them with the *Genlyte Thomas devices*.  But

ultimately compare them to the claims of the patent.  And why are you allowed to do

that?  Having looked over the *devices* themselves, to get a better idea as to whether the

*ALS* devices, whether they violate the claim of the patent.  That's the only reason we got

into other lawsuits and other machines by other people, to give you a fuller picture.

I didn't let you hear what other judges had to say.  Not because I'm better than those other judges. . . . But you can't try a case that way.  It's got to be one teacher of the law, in this case it's me.

But the fact of other litigation, if you believe that actually took place, that's a fact, that's for you, and you may consider it.  (*Read Instructions p. 20*)

## <u>CONSTRUCTION</u>

Okay.  Let me go, before I pass out the verdict slip, let me go back over some things that I mentioned at the very beginning of the case.  This patent claim, this patent given by the government, is similar to a, to a statute passed by congress.  It's a government grant of exclusivity.  It's a government grant by the patent holder to *Genlyte Thomas* saying you have the exclusive right to practice the invention set forth in your claim.  And so when there arises a dispute about what's claimed, because it's like a law, and because judges are skilled, are expected to be skilled in interpreting the law and explaining the law, I am given the responsibility to explain to you what the claim means.  And I've exercised that responsibility in this case, and I want to go back over it because I'm focusing on the claims that are really in dispute here.

And let me call to your attention the claims that are really in dispute here. . . .  In this case we have been specifically concerned with a portion of *Claim number 1. You find it in Column Number 3 of the 254' patent.  Down at the bottom of Column 3, Line 36 to Line 47.*  And the key language that we are concerned with here is language which reads like this:  (*Read Instructions p. 20-21*)

> <u>Claim 1</u>:  a medical lighting system comprising:
>
>  a body;

14

*means for ceiling mounting said body;*

*a first light fixture within said body oriented to direct light downwardly to a selected reading area under said body;*

*a second light fixture within said body oriented to direct light downwardly and outwardly to a vertical wall surface outwardly adjacent from said body whereby light is reflected back to a broad area under said body.*

Now, I said it before, but now of course you understand why that's an important aspect of this dispute. Here's what that means legally.

. . . .

*In this case Genlyte Thomas and ALS agree about the meaning of several parts of the claims. Genlyte Thomas and ALS do not agree about the meaning of other parts of the claims. It is my duty to interpret these contested words and groups of words for you.*

*I will now tell you the meanings of the following words and groups of words from the patent claims. You must use these meanings in your deliberations concerning infringement.*

1.    *"oriented to direct light downwardly" means to "set or arrange to direct more light in a downward direction than in an upward or outward direction." When I say downward, I mean that the light is not directed upwardly or outwardly. For example, if the degrees of a circle are arranged vertically with 0 degrees being straight down and 180 degrees being straight up, then downwardly is anything in a downward direction between 90 degrees and 270 degrees.*

2.    *"a vertical wall surface outwardly adjacent from said body" means "a vertical wall surface next to or near either end of said body".*

3.    *"oriented to direct light downwardly and outwardly" means " to set or arrange to direct more light in a downward and outward direction than in an upward direction."*

*Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 34 USPQ2d 1321 (Fed. Cir. 1995).

## **VERDICT FORM**

All right.  Now, those are the key definitions at issue and now I think it's time to pass out the verdict slip.  (*Read Instructions p. 23*)

(pass verdict slip to jury)

We've made this verdict slip just as simple as humanly we can make it and nevertheless get from you the answers we need for me to enter judgment in this case.

. . . .


## **BASIS OF LIABILITY**

Now, *Genlyte Thomas owns the '254 patent*, and I've said that the key definitions here, and I've given them to you.

. . . .

*As to the '254 patent, Genlyte Thomas* has three different *bases* of liability, three different ways to win.  Now, of course, *ALS* disputes all three.  But I need to explain each of the three. . . .   And I've *spelled* out the three *on Verdict Forms 1, 2 and 3 respectively.*

*Genlyte Thomas* claims now as to *claims 1*, that the *MulTmed and Latitude* devices literally infringe *by making and selling them*.  And they say, well, if the

*MulTMed and Lattitude* fixtures don't literally infringe, *they* infringe by the doctrine of equivalents. *And they say, and what's more, the way ALS was making the fixtures it was an inducement to other people to infringe by using them in an infringing manner.* And I need to explain each *one*.

I'm going to go through each of the three *bases of liability* that *Genlyte Thomas* has asserted. (*Read Instructions p. 24*)

. . . .

## LITERAL INFRINGEMENT

What does it mean to infringe the claim of a patent? It means that the infringing device, you look at the claim of the patent and you look to see whether the infringing device, the actual thing, not plans or something, though you can look at plans because they tell you what the actual thing looks like, but in order for there to be infringement the, the device has to be sold or offered for sale in the United States of America. *The ALS MulTmed and Latitude products are sold and have been sold in the United States.* (*Read Instructions p. 25*)

. . . .

In order for there to be literal infringement the alleged offending device must have present it its configuration each and every element or aspect of *claim 1* in the *'254 patent*. And you take *claim 1*, you take it separately. You can look at all the other claims, but each claim is a separate grant of exclusivity. So you focus on *claim 1* and then you say *does the MulTmed and Latitude devices have each and every element of claim 1 present in it?* If it does, it's infringement. It infringes. If only one element of the claim is missing there's no infringement, even if all the others are present. If there

are other things added, made more sophisticated, made better, it still infringes so long as it has every element of what's claimed. Miss an element and there's no infringement. But add to the elements, make the elements better, still infringement so long as it has every element of the claim.

For example, in this case *claim 1* of the patent is an independent claim, it is a separate claim and you look at it separately. If you find *that either the MulTmed 2x2 (MT1D and/or MT1E), MulTmed 2x4 (MT2) or Lattitude products* has each and every element of C*laim 1* in it, then they infringe.

It's possible that you could have a machine that isn't as good, it's inefficient, doesn't work as well, but it has every element of the claim. Inefficient infringement is still infringement. (*Read Instructions p. 25-27*)

*A person does not have to intend to infringe. A person can directly infringe a patent without knowing that what it is doing is an infringement of the patent. It may also infringe even though in good faith it believes that what it is doing is not an infringement of any patent.*

35 U.S.C. 271(a); *Filmways Pictures, Inc. v. Marks Polarized Corp.,* 552 F. Supp. 863, 868, 220 USPQ 870, 873 (S.D.N.Y. 1982).

So you ask yourself is every element of the claim, the claim now, you can look at everything, look at the fixtures, look at all the evidence, but your comparison is *Claim 1* versus *the MulTmed and Latitude* allegedly infringing devices. If every element of *Claim 1* is present in the infringing device then what you have is literal infringement.

. . . .

So that's the first *basis of liability.* (*Read Instructions p. 27*)

## DOCTRINE OF EQUIVALENTS

The second *basis of liability* is infringement by the doctrine of equivalents.  Now, what do we mean by that?

Remember that I've already said that if you build a device that's very similar to the patented device, but you omit an element, you leave an element out entirely, there's no infringement.

Likewise, it is perfectly legal to design around a patent.  You read the patent and you learn from the patent.  This is the idea, you learn from the patent.  You say, well, this is a good idea.  But I can build a better mousetrap, one that's different, better.  It doesn't even have to be better.  Different, different than the patented device *as defined by the claims*.  The law encourages that.  The only thing that *Genlyte Thomas* is protected on, the only thing that it has exclusivity on is the patented device specifically claimed in the claims.

Yet the law says this.  An unscrupulous copier who changes the device a *little* bit may still be guilty of infringement.  And that's known as infringement by doctrine of equivalents.  Build a different device, the law encourages that.  But if you build what's really the equivalent device, from the patent, the law will hold that infringement.  (*Read Instructions p. 27-28*)

And so we're following here, that's what *Genlyte Thomas* claims here. . . . *It claims that a fixture contained in each ceiling-mounted  body of each ALS accused products are set or arranged to aim[direct] the light downward to a selected reading area, another is set to aim [direct] light downward and outwardly to a vertical wall which reflects back under the body.*  (*Read Instructions p. 28*)

19

What does that require of you?  That requires of you to look at *Claim 1* again. We always start with the claim.  But look carefully at *Claim 1*.  And then ask yourselves this.  Again, now, if there's an item, an aspect, they call them limitations, that exists in the claim, and it's missing in *the MulTmed and Latitude* devices, there is no infringement, no infringement under the doctrine of equivalents.  And in, in answering that question you must take the definitions from me, you can look at the, the patent, that's where you should start, but you can also look at this prosecution history.  We have them in there with blue ribbons and gold seals on them.  I mean, look at what's going on between what *Genlyte Thomas* is saying to the Patent Office, what the Patent Office is saying to *Genlyte Thomas* and the like and what's going on.

So understand what the limitations are, what the aspects of the specific claim are, you can look at that.

Now, here's the key test for doctrine of equivalents.  Ask yourself whether the *MulTmed and Latitude* devices with respect to each aspect, each aspect considered separately, of the claim has substantially the same means, substantially the same equipment used, performing in substantially the same way, to achieve substantially the same result.  If *Genlyte Thomas* persuades you by a fair preponderance of the evidence that the *MulTmed and Latitude* devices do that, as to each element now of the claim, if it uses substantially the same means, which performs in substantially the same way, to achieve substantially the same result that's infringement by the doctrine of equivalents. Now, if any one limitation is missing, any one aspect of it is missing, there's no infringement at all, doctrine of equivalents or literal infringement. (*Read Instructions p. 28-30).*

*But if one aspect is merely changed, there is infringement under the doctrine of equivalents if the changed element perform substantially the same function in substantially the same way to achieve substantially the same result.*

*As with literal infringement, a person does not have to "intend to infringe" under the doctrine of equivalents.  A person can directly infringe a patent without knowing that what it is doing is an infringement of the patent. It may also infringe even though in good faith it believes that what it is doing is not an infringement of any patent.*

35 U.S.C. 271(a); *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 478, 181 USPQ 673, 677 (1974); *Filmways Pictures, Inc. v. Marks Polarized Corp.,* 552 F. Supp. 863, 868, 220 USPQ 870, 873 (S.D.N.Y. 1982).

. . . .

## INDUCEMENT TO INFRINGE

Now, *Genlyte Thomas* has a third *basis* of liability. . . .Here is its *basis* so you understand it.  (*Read Instructions p. 30*)

. . . .

*Genlyte Thomas is going to argue to you that in urging its customers to use the MulTmed or Latitude is inducing them to infringe the '254 patent by using it.  Also Genlyte will argue that the way ALS tells its customers to arrange their ceiling-mounted body in relationship to the headwall of the hospital bed is an inducement to infringe. That the way the body is mounted is such that the closer the body is mounted to the headwall, the more light is directed off the headwall and ALS tells its customers to mount to the ceiling close to the headwall.  And ALS may not have done it themselves.*  But on inducement to infringe . . .  *Genlyte Thomas* has to show that what they had in mind was, well, we won't do it but the people we sell it to are going to know to *just mount this*

*ceiling-mounted body with multiple fixtures* near or adjacent to the headwall, and make an infringing device.

And if that's what *ALS* was doing, it can't get around the patent laws that way. That's inducement to infringe.

But there's a limitation on that. So be very clear on this. And it's set up here in the, in my *Verdict Form*.

There has – you have to believe by, again by a fair preponderance of the evidence, that somebody did it. There can't be any inducement to infringe unless in the United States somebody was infringing. Whatever they had in mind, if the people to whom they sold them or leased them in the United States didn't do it, they may have, even if you think, well, they wanted infringement, or they wanted to induce people, if people didn't do it there cannot be inducement to infringe. (*Read Instructions p. 30-31*)

. . . .

## **DAMAGES**

Now, those are Genlyte Thomas' *basis* of liability. Liability means shall Genlyte Thomas recover from *ALS*.

Now I'm going to come to the part where I tell you if you do find infringement of *this* patent, on any of the *bases of liability* that I have explained to you, what are the damages? And you see I ask you that . . . in *Verdict Form 4*.

Let me pause here. Remember, now, *ALS* has denied infringement under, against any of these theories and *ALS* has put on evidence and the like. And if you don't think *Genlyte Thomas* has proved infringement under any *basis of liability* by a fair preponderance of the evidence your verdict will be for ALS*, and you shall express such*

*finding on Verdict Forms 1, 2 and 3.* And if that's so the case is over, you don't have to answer *Verdict Form 4,* the foreperson signs it and dates it and that's how you return your verdict.

So we only get to damages if I assume that you've answered for *Genlyte Thomas* on *any part, or all of, Verdict Forms 1, 2, or 3.* And here's a perfect example of what I'm talking about.

The fact that I'm now going to explain damages in detail to you doesn't mean that I think they're proved or not proved, I just have to explain everything to you.

Damages. Damages are designed to, if you find liability, that is, you find infringement or inducement to infringe, the damages are designed to compensate *Genlyte Thomas and put Genlyte Thomas* where it would have been had there been no infringement. That's the theory. Damages are designed fully and fairly to compensate *Genlyte Thom*as. But, the damages do not reward *Genlyte Thomas or punish ALS.* But what they are is full, fair compensation of *Genlyte Thomas. And Genlyte Thomas* has to prove the damages. And *Genlyte Thomas* has to prove the damages again by a fair preponderance of the evidence.

Now, in a case like this, any case like this, I'm not talking specifically about this case, but in any case like this the law recognizes that you can't prove the damages down to the last nickel. So the law allows you as members of the jury to make good faith, careful estimations if *Genlyte Thomas* proves, it's not guesswork, it's not speculation, but, but *Genlyte Thomas* is not to be held to prove to absolute mathematical certainty the specific damages. It is to be held to prove by a fair preponderance of the evidence on a recognized analytic theory what its damages more likely than not are.

So let's talk about the damages.  At a minimum, at a floor if there is infringement *Genlyte Thomas* is entitled to a reasonable royalty as though it licensed its invention to *ALS*.  Now, it didn't license its invention to *ALS*.  There's no evidence that *Genlyte Thomas* ever would have licensed its invention to ALS.  And you may take it that *Genlyte Thomas* didn't want to license its competitor, *ALS, Genlyte Thomas* wanted to make the profits for itself, even though they would have gotten a royalty.

But as a minimum the law requires that what's happened has happened and if nothing else is proved *Genlyte Thomas* is at least entitled to a reasonable royalty which it would have gotten if it had licensed the practice of the invention to *ALS*.

Now, you knew this was coming.  You've heard one of the witnesses who has performed a reasonable royalty calculation for you, *Mr. Tate*, and you're entitled to believe it, you're entitled to disbelieve it.  You're entitled to make alterations to it based upon what you believe.  But there are factors that the law says we must consider and I must teach you those factors, there's a bunch of them, and I'm going to go through them right now.

You must consider, first, the royalties, if any, that *Genlyte Thomas* received for licensing other people under either of its patents.

Second:  The rates paid for the use of other patents that are comparable to the *Genlyte Thomas* patents.

Third:  The nature and scope of the license that reasonable you would expect would be negotiated.  Would it be an exclusive license or a nonexclusive license?  Would it be restricted as to territory or non-restricted.

Now, remember it would have to be restricted to the United States because these patents aren't good worldwide, they're good in the United States.

Would it be restricted in any way with respect to whom the manufactured product would be sold.

Four:  Did *Genlyte Thomas* have an established policy and marketing program to maintain its patent exclusivity by not licensing to others to use the invention, or was its policy to grant license under special conditions designed to preserve its patent exclusivity.

Five:  What's the commercial relationship between *Genlyte Thomas and ALS*? Are they competitors in the same territory, here the United States, in the same line of business?  Or is one an investor or promoter of this technology?

Six:  What would be the effect of selling the . . .  the patented item in promoting the sales of other *Genlyte Thomas* products?  In other words, if you can sell the patented product is that going to raise your sales of other products which you manufacture?

That will give you a handle on the existing value of the invention to *Genlyte Thomas* as a generator of sales of its nonpatented *items*.  So you want to consider the extent of those derivative sales.

Seven:  The duration of the patent.  How much longer did it have to run at the time – and you start figuring when the hypothetical royalty would have existed.  You start figuring that at the time when the infringement started.  Because the theory here is that you are finding infringement.  So if you find infringement then how much longer *does* the patents have to run recognizing that *it expires* in *2011*.

Nine:  The utility and advantages of the patented items over older modes or devices, if there is any advantage.  You compare them to the other things that are used in the industry to achieve results similar to the patented item.

Ten:  The nature of the patented invention.  The character of its commercial embodiment.  That means the things that *Genlyte Thomas* was actually producing.  The benefits to those who have used the invention.

Eleven:  The extent to which *ALS* made use of the *Genlyte Thomas* invention in its own marketing and production, and any evidence probative of that use.

In other words, if you think *ALS* was infringing then how would that bear on the deal that would be cut relative to a reasonable royalty.  Because you would have to consider the costs of a lawsuit and the likely result of the lawsuit.

Twelve:  The portion of the profits or of the selling price that may be customary in a particular business or comparable business to allow for use of the invention or similar inventions.

Thirteen:  The portion of the realizable profit that should be credited to the invention as distinguished from nonpatented elements, the manufacturing process, business risks, significant features or improvements that *ALS* could bring to the license.

You may consider the testimony of those who I've permitted to give opinions on this issue.

And last, Fifteen, you may consider any other economic factor that normally a careful businessperson would under similar circumstances take into consideration in negotiating such a hypothetical royalty.  (*Read Instructions p. 32-37*)

26

*For example, there is no rule in the patent law that says that the amount of damages ALS must pay (if actually liable) is "capped" by the profit or amount of profit (or loss) that ALS claims is attributable to these products.*

> *Georgia-Pacific Corp. v. United States Plywood Corp.,* 318 F. Supp. 1116, 166 USPQ 235 (S.D.N.Y. 1970), *modified and aff'd sub. nom., Georgia-Pacific Corp. v. United States Plywood Champion Papers, Inc.,* 446 F.2d 295, 170 USPQ 369 (2d Cir.), *cert. denied,* 404 U.S. 870, 171 USPQ 322 (1971); *TWM Mfg. Co. v. Dura Corp.,* 789 .2d 895, 898-900, 229 USPQ 525, 526-28 (Fed. Cir. 1986).

. . . .

*Those are the damages Genlyte Thomas is seeking from ALS.  It wants a reasonable royalty to be awarded for the products sold in the past that Genlyte Thomas claims to have infringed the '254 patent.*

Remember that in proving damages *Genlyte Thomas'* burden of proof isn't an absolute one but rather a burden of reasonable probability, reasonable certainty. . . . (*Read Instructions p. 39*)

All right.  *Verdict Form 4.*  You don't get to *Verdict Form 4* unless you have answered *any part of* either *Verdict Forms 1, 2 or 3 "yes".* . . .

. . . . *Genlyte Thomas* argues, but of course *ALS* denies, that the *ALS* devices infringe by *literal infringement, the* doctrine of equivalents, *or inducing others to infringe.*  And *Genlyte Thomas can win on one or all of those.*  And since it's the same *ALS* fixtures theoretically *Genlyte Thomas* will win the same amount of money *irrespective of the Verdict Form you sign.  It can receive only one recovery.  (Read Instructions p. 42)*

. . . .

## WILLFUL INFRINGEMENT

But since I need your advice and I need it officially, I need to explain to you this issue, even though there's no damage calculation with respect to this issue *on Verdict Form 5*.

*Genlyte Thomas* finally says, in addition to the things we've claimed before, these *ALS* people are guilty of what's called under the law, willful infringement. Well, now as to this issue, and this issue only, they've got to do better than by a fair preponderance of the evidence.

Under the law, before you could find for *Genlyte Thomas* on willful infringement you would have to find the willful infringement by clear and convincing evidence. And that means exactly what the words provide. You must unanimously be satisfied by evidence that is clear and convincing that *ALS* not only infringed but that they willfully infringed.

Now, what does that mean? Willful infringement is proved if *Genlyte Thomas* proves by clear and convincing evidence that *ALS* was aware of *the '254 patent*, knew about *it*, . . . actually knew about *it*, and two, had no reasonable, good faith basis for its making or using or selling the item that you have found to be infringing, that *ALS* had no reasonable, good faith basis for thinking that its putting its own item on the market in America, in the United States, would be proper -- *in other words, if ALS acted in conscious disregard of Genlyte's patent rights.*

Now, in this regard, in figuring out whether *ALS* had a reasonable basis for reaching a good faith conclusion you may consider whether *Genlyte Thomas* now has proved by clear and convincing evidence that *ALS* did not exercise *its affirmative duty of*

due care to determine whether the *Genlyte Thomas* patent, what they applied to and were valid and existing once they learned of the *Genlyte Thomas* patent. (*Read Instructions p. 42-44*)

*And the law says that where a potential infringer has actual notice of the other's patent rights, he has an affirmative duty to determine whether he is infringing. This includes the duty to seek and obtain competent legal advice from counsel before the institution of any possible infringing activity.* See *Underwater Devices, Inc. v. Morrison-Knudsen Co.*, 717 F.2d 1380, 1390 (Fed.Cir.1983) ( *overruled in part on other grounds by* Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp., 383 F.3d 1337 (Fed.Cir.2004) ( en banc )). *Courts consider several factors when determining whether an infringer has acted in bad faith and whether damages should be increased. They include: "(1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; ··· (3) the infringer's behavior as a party to the litigation;" (4) "defendant's size and financial condition;" (5) "closeness of the case;" (6) "duration of defendant's misconduct;" (7) "remedial action by the defendant;" (8) "defendant's motivation for harm;" and (9) "whether defendant attempted to conceal its misconduct." Good faith may normally be shown by obtaining the advice of legal counsel as to infringement or patent validity.*

> *Liquid Dynamics Corp. v. Vaughan Co., Inc.* 449 F.3d 1209, 1225 C.A.Fed. (Ill.),2006, citing *Read Corp. v. Portec. Inc.*, 970 F.2d 816, 826-27 (Fed.Cir.1992) (superseded on other grounds as recognized in *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1578 (Fed.Cir.1996)).

Now, one common way to fulfill *the affirmative* duty *of determining whether or not one infringes* is to seek and receive legal advice from a lawyer before beginning or continuing activities that might be infringing. Such legal advice must be competent, authoritative, and timely, in order for *ALS* to rely upon it to fulfill a duty of reasonable care. (*Read Instructions p. 44*)

. . . .

## **VERDICT**

All right, ladies and gentlemen. Those are my instructions as to the law. I may have left something out, I may have misstated something, and before we give you the break now the lawyers get a chance to correct me, and we'll ask you to wait for a moment while they do that. (*Read Instructions p. 45*)

. . . .

The verdict must be unanimous. That means genuinely unanimous; all twelve of you agreeing, not somebody going along with what the others think. But you are entitled to change your views if the views of your fellow jurors who saw and heard the same evidence, who are under the same oath as you are, in fact convince you to revise your views. That's what deliberations are. (*Read Instructions p. 50-51*)

So let's go over the logic of the verdict slip. *I've asked you five questions. Your answer to the Verdict Forms 1, 2 or 3 can be "Yes" or "No". If the answer to any part of the Verdict Forms1, 2 or 3 is yes, then you consider and answer Verdict Form 4 and Verdict Form 5. If the answer to all parts of Verdict Forms 1, 2 and 3 are "No" then you need not answer Verdict Forms 4 and 5. The foreperson shall sign each form signifying*

30

*you have reached a unanimous verdict and shall notify the marshal.* (*Read Instructions p.52*)

. . . .

So when I look it over and I see that it is at least logical and it answers the questions that I've put to you, I give it to Ms. Smith and I say, the verdict is in order, it may be recorded. Then she'll ask you to stand up. It's the only time in the entire case where you stand up and the rest of us sit here. And then she will read out in open court your verdict. And it reads out logically. It reads the answers that I need to have to enter a verdict.

If, at that moment, while each of you stand there, you, individually, are satisfied with your own conscience that your duty is faithfully done, then you will have done what's required of you in this case.

The word "verdict" comes from two Latin words. They mean, "to speak the truth." That is what is asked of you in this case, to speak the truth.

Very well. The jury may retire and commence their deliberations. I'll remain on the bench. (*Read Instructions p. 54-55*)

Respectfully submitted,


/s/ Kevin Gannon
James E. Milliman (Pro hac vice)
James R. Higgins, Jr. (Pro hac vice)
Robert J. Theuerkauf (Pro hac vice)
MIDDLETON REUTLINGER
2500 Brown & Williamson Tower
Louisville KY  40202
Telephone:  (502) 584-1135
Facsimile:  (502) 561-0442

    -and-

Thomas C. O'Konski  BBO#337475
Kevin Gannon  BBO#640931
CESARI AND MCKENNA, LLP
88 Black Falcon Avenue
Boston, MA  02210
Telephone:  (617) 951-2500
Facsimile:  (617) 951-3927

*Counsel for Plaintiff,*
  *Genlyte Thomas Group LLC*


<u>Certificate of Service</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on this 20th day of January, 2007.


/s/ Kevin Gannon
*Counsel for Plaintiff, Genlyte Thomas Group LLC*

READCHGF.TXT

1

1               UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS
2
                                        Civil Action
3                                       No. 96-11025-WGY

4    * * * * * * * * * * * * * * * * * *
                                       *
5    THE READ CORPORATION,             *
     F.T. READ & SONS, INC., and       *
6    NORDBERG-READ, INC.,              *
                                       *
7              Plaintiffs,            *
                                       *
8    v.                                *    JURY INSTRUCTIONS
                                       *
9    POWERSCREEN OF AMERICA, INC.,     *
     POWERSCREEN INTERNATIONAL         *
10   DISTRIBUTION LTD. and POWERSCREEN *
     INTERNATIONAL, PLC,               *
11                                     *
               Defendants.            *
12   * * * * * * * * * * * * * * * * * *
13
                 BEFORE:   The Honorable William G. Young,
14                         District Judge, and a Jury

15   APPEARANCES:

16
             WILLCOX, PIROZZOLO & McCARTHY, PC (By Jack R.
17   Pirozzolo, Esq. and Richard L. Binder, Esq.) 50 Federal
     Street, Boston, Massachusetts 02110, on behalf of the
18   Plaintiffs

19           CHOATE, HALL & STEWART (By Eric J. Marandett,
     Esq.), Exchange Place, 53 State Street, Boston,
20   Massachusetts 02109
                  - and -
21           FROST BROWN TODD LLC (By Arthur S. Beeman, Esq.
     and W. Bruce Baird, Esq.), 400 West Market Street, 32nd
22   Floor, Louisville, Kentucky 40202, on behalf of the
     Defendants
23

24                                  1 Courthouse Way
                                    Boston, Massachusetts
25
                                    February 23, 2001

                                                        2


1            THE CLERK:   Court is in session, please be seated.

2            THE COURT:   Well, good morning, ladies and

READCHGF.TXT
3    gentlemen, ladies and gentlemen.

4             THE JURY:  Good morning.

5             THE COURT:  I truly want to thank you.  You people
6    have been prompt, you've been alert to everything that's
7    gone on, and we all are deeply, deeply appreciative.

8             Now, the way the lawyers and I have worked this
9    out, the way that we think will make this most intelligible
10   for you is to have me go first and explain to you in detail
11   the law which you must follow in this case.  We've agreed
12   as I sketched it out yesterday.

13            When I'm done explaining the law we'll take a
14   break.  Then the lawyers will get a chance to talk about
15   the evidence and urge you to certain conclusions within the
16   legal framework as I describe it.  When that's done I'll
17   have about five minutes left and I'll just give you some
18   explanation about how you may deliberate together, how
19   juries deliberate together, and then the case is yours.

20            So we start this morning with my explanation as to
21   the law which must govern in this particular case.
22   Understand that just as soon as he can, and he's very
23   quick, Mr. Womack will prepare a transcript of my charge
24   now.  But he can't get to that until after we send you out.
25   So you're going to have to start your deliberations before

&#9633;                                                                3

1    you have the written charge.  But we will send in, without
2    any interruption, just as soon as we have the written
3    charge, we'll send in one copy to you so you actually have
4    the written charge before you.

5             But you must listen carefully now because this is
6    a form of law teaching.  This is like a law class here.

READCHGF.TXT

7    And it's a little stilted because you can't raise your hand
8    now and say, well, you didn't explain that very well,
9    explain that a little better. But what you can do if you
10   don't understand any aspect of the law, write out your
11   question, write it out, there will be a court security
12   officer outside the door here, come out the door, give the
13   question to the court security officer, we'll set things
14   all up in here, we'll have you back in the courtroom and I
15   will explain it better. Don't hesitate to do that. If
16   justice is to be done here you people must understand the
17   law in the case, and I must be good enough to teach it to
18   you. So if you have any questions about the law be sure to
19   ask them, don't just go ahead without understanding what
20   the law is.

21          I start my charges by a brief explanation of what
22   our separate roles are, and then from there we'll go into
23   what the evidence has been, at least the tools you have to
24   do the job, and then from there we'll go directly into what
25   the law is that governs this case.

4

1          First your role. You are the judges of the facts.
2    The only judges of the facts. Though I will necessarily
3    have to make mention of evidence and make mention of
4    particular witnesses, that's only to remind you of
5    testimony or evidence that may, it's entirely up to you,
6    bear on certain aspects of the case. You're the judges of
7    the evidence. I have nothing to say about the evidence.

8          Now, you're going to judge the evidence as I said
9    at the beginning of the case fairly and impartially without
10   any bias or prejudice, without any sympathy for anyone,

READCHGF.TXT

11    without any desire that anyone be punished or have revenge.

12    Carefully and coolly sifting through this evidence -- an

13    appropriate term in this case -- sifting through this

14    evidence to see that justice may be done.

15         Your verdict must be unanimous. We're going to

16    ask you certain questions that can be answered like yes or

17    no. So you must be unanimous as to a yes, you must be

18    unanimous as to a no. And unanimous means that you all

19    come genuinely to agree. And you'll all deliberate. Not

20    that ten of you think this and the other couple go along

21    with it. It must be a genuinely unanimous verdict.

22         And your verdict must be concentrated entirely on

23    the evidence. You can, and I know how carefully you will

24    listen to the lawyers the better to understand the

25    evidence. You may look at the demonstrative aids the

                                                              5

1     better to understand the evidence. But the evidence is

2     what governs and you, and you alone, decide what you

3     believe about the evidence.

4          Now, I'm the judge of the law. I've said that a

5     number of times. I simply mean to point out to you that in

6     this courtroom I'm the one who has the responsibility of

7     teaching you the law. We make a careful record of what

8     I've said. And that's the fair way.

9          You cannot quarrel with the law as I explain it to

10    you. I'm going to tell you who has to prove what in this

11    case. I'm going to tell you the burden of proof that that

12    side bears. And there's no dispute here who has to prove

13    what. Read has to prove, do the proving here.

14         But you can't add to their burden. You can't say,

                              Page 4

READCHGF.TXT

15    gee, I, I really want them to show us this or that.  But

16    likewise you can't subtract from their burden.  When I say

17    they've got to prove something, then they have to prove

18    that.  You can't say, well, forget about that because this

19    or that, something else is proved.  I'll tell you what has

20    to be proved and what the burden, what the standard of

21    proof is.

22          Listen to my whole charge start to finish.  Don't

23    seize on one part of it and say, "Aha, the case turns on

24    this or that."  Listen to the whole charge and consider all

25    aspects of the charge together.

6

1          Likewise, don't think that because I charge you as

2     to all aspects of the case that I think anything is proved

3     or not proved.  I have nothing to say about that.  I simply

4     am trying to build for you a complete mental framework so

5     that you will understand the law which you have to follow.

6     That's my role.

7          Now, I've emphasized that you must confine your

8     analysis to the evidence.  So let's take a moment and go

9     over the evidence in this case, not witness by witness but

10    rather type by type, and so you know what tools you have.

11          The first thing I think of is the testimony of the

12    witnesses.  You have the power to believe everything that

13    any witness said to you here from the witness stand.  To

14    believe it all.  Equally, you have the power to disbelieve

15    and disregard everything a witness said as though that

16    witness never testified.  Between those two extremes you

17    have the power to believe some things a witness says but to

18    disbelieve other things the witness says.  You are not

READCHGF.TXT

19    prevented from reaching a verdict because one witness has

20    testified to one version of an event and another witness

21    has testified to another version of the same event and both

22    witnesses were under oath.  You can believe one or believe

23    the other.  You can decide where the truth lies.

24            How do you do it?  You use your common sense as

25    you are reasonable men and women.  You may use everything

☐

7

1    you know about the witness.  How did the witness impress

2    you testifying on the witness stand?  How did the witness

3    respond to questions both on direct and on

4    cross-examination?  What was the opportunity of the witness

5    to observe, to comprehend, to understand, to recall those

6    matters about which the witness testified?  Does the

7    witness stand to gain or lose anything depending upon how

8    the case comes out?  Is the witness allied with, employed

9    by one side or the other in the case?  Do those things

10   affect the witness's testimony?  Is the testimony of the

11   witness backed up -- lawyers say corroborated -- by other

12   evidence in the case?  The exhibits or depositions or any

13   other evidence in the case.  Or, does the other evidence in

14   the case undercut, take away from, make less believable the

15   testimony of the witness who is before you.

16            In short, you can sum up a witness's testimony and

17   as reasonable men and women you can decide what you

18   believe.

19            Some witnesses have been allowed to give their

20   opinion about certain things.  The law provides that when a

21   witness has background, experience, training that the mine

22   run of judges and juries don't have, we'll let that witness

READCHGF.TXT

23    render his opinion to the jury to aid the jury in doing

24    their function.

25            Like any other witness, your powers with respect

8

1     to opinions given by witnesses are no different.  That is,

2     if I've allowed you to hear an opinion you may believe it;

3     but equally you may disregard it.  You may decide that

4     that's just not believable, that's not credible.  Or you

5     could believe part of what a witness says and disbelieve

6     other parts of an opinion given by a witness.  It's left to

7     your good judgment.

8             I suggest to you that in evaluating opinions given

9     by witnesses you want to look at what undergirds them or

10    underlies them, what was the witness relying on.  How did

11    the witness come to that opinion?  Both by their

12    experience, generally having nothing to do with this case,

13    but also what do they know about things having to do with

14    this case upon which their opinion rests.

15            You're the judge of that.  So with respect to

16    opinions you may believe them, but you may disbelieve them

17    or believe them in part.

18            Now, not all the witnesses in this case testified

19    live, that is, were here in court.  Some witnesses, because

20    of the geographical distances here, or for whatever other

21    legal reasons, testified by way of deposition.  And we had

22    a lawyer read the answers or we had the lawyer read both

23    the questions and answers.  The technique used makes no

24    difference.  And the fact that a witness testifies by way

25    of deposition doesn't make that witness anymore believable

9

READCHGF.TXT

1    or less believable than a witness testifying in court.
2    That testimony as matter of law starts even.  And like any
3    other testimony in the case, you may believe it, disbelieve
4    it, believe parts of it.

5         Now, with respect to witnesses who testified by
6    way of deposition, you didn't see them.  But you listened
7    very carefully to their testimony, and you want to compare
8    that testimony with the testimony of other witnesses, with
9    other depositions.  It's evidence in the case.  You may
10   believe it, disbelieve it, believe parts of it.

11        Now, in this case also there are a large number of
12   exhibits.  Ms. Smith and the lawyers spent time yesterday
13   afternoon gathering all these exhibits by number.  And
14   shortly after we send you out, once the arguments are over,
15   when we send you out to begin your deliberations, she will
16   come into the jury room, it may take her more than one
17   trip, and she'll bring all those exhibits into the jury
18   room.  And she'll bring in, I think we've got those videos,
19   we've got them on a VCR, we've got a camera, and if you
20   know how to run a VCR you'll be okay, if you want to see
21   them, but they're exhibits and you'll have the facility to
22   review them in the jury room.

23        Well, they're evidence.  Now, I'm talking about
24   the exhibits that are evidence, not the charts that are not
25   evidence, though some charts are evidence.

☐                                                              10

1         Exhibits are like the testimony of witnesses and
2    your powers are exactly the same.  That is, you may read,
3    look at, view an exhibit, and if it persuades you of some
                              Page 8

READCHGF.TXT

4    aspect of the case that's perfectly appropriate because
5    it's evidence.

6         But equally, if you don't find an exhibit
7    believable, either because you don't, because you think
8    it's a fake, I'm not suggesting anything is a fake, but if
9    you don't think it's genuine, or if you come to believe
10   that even though this may be genuine, it's either
11   inaccurate or it doesn't help you, disregard it.  That's
12   your power.  You're the judges of the facts.  And as with
13   any other evidence in the case you could take part of an
14   exhibit and say, well, this is persuasive, but another part
15   is not persuasive.

16        Lastly, you have some stipulations in this case.
17   I read one.  The lawyers read them.  And they're designed
18   to shorten the time and make things clear to you.
19   Stipulations are agreements among the lawyers, as they
20   represent their clients.  That's evidence.  But that is
21   special.  That evidence is not disputed.  So you don't have
22   the right just to disregard it.  You take that as given.
23   Lawyers have agreed to that so we'll start out with that
24   taken as given.  It's evidence.

25        Now, that's the body of evidence that you have in

&#9633;

11

1    this case.  A few words about what you do with it, how you
2    analyze it.

3         You use your common sense.  You don't check your
4    common sense at the door to the jury room.  Rather I charge
5    you to apply your common sense to the evidence in this case
6    to the end that justice may be done.

7         At the same time, you don't go in there and guess

READCHGF.TXT

8    or speculate or maybe or perhaps or even probably.  What we
9    need is, as to most of the case, Read's going to have to
10   prove it by what I call, what the law calls a fair
11   preponderance of the evidence.  And as to one part of the
12   case, if your verdict was to be for Read, it would have to
13   be by clear and convincing evidence.  And I will tell you
14   the two parts.

15          But my point is you don't guess.  You don't
16   speculate.  But you can use your common sense as you are
17   reasonable men and women and you can draw what are called
18   reasonable inferences.

19          Now, a reasonable inference is a logical
20   deduction.  It's common sense.  And I'm going to give you
21   an example that has nothing to do with this case better to
22   illustrate what a reasonable inference is and also to
23   illustrate how far you can take it.

24          Let's say we have a witness and she testifies that
25   she's walking along a road and she looks out and there's a

1    field of tall grass -- notice I'm getting ready for spring
2    here -- and she sees through the grass the grass is all
3    knocked down in an irregular course through the field.  And
4    suppose you believe that testimony.  From that alone you
5    could infer something went through the field.  I mean, it
6    just doesn't happen that grass falls down along a path
7    unless something knocks it down.  It isn't all fallen down
8    in a windstorm, it's fallen down in a course through the
9    field.  So it's a reasonable inference that something went
10   through that field.  We don't have a witness who saw the
11   something, but there's a reasonable inference something's

READCHGF.TXT

12    went through that field.

13        Now, that's the reasonable inference. Bud unless

14    you had other evidence from some other source in the case

15    you wouldn't know what went through the field. A child.

16    An adult. A big animal. A small animal. You just

17    wouldn't know. That would be guessing.

18        Now, there might be other evidence and you can

19    draw inferences from it. But the reasonable inference, if

20    you believe the witness I gave you as an example, is

21    something went through the field. But you can't guess

22    about it unless there's other evidence. That's reasonable

23    inferences.

24        Okay. We've talked about our roles. We've talked

25    about the tools that you have to resolve this case. I want

⬜                                                           13

1     to say just a very few words about what's not evidence in

2     the case, not to emphasize it but just point out to you

3     what's not evidence in the case.

4         And first I want to say, and I say most genuinely,

5     I compliment the lawyers in this case. It's hard to try

6     one of these cases. The matters are technical and complex,

7     and this case has been very well-tried. And I appreciate

8     it and it's a privilege to preside over a case that is

9     well-tried.

10        Now, you disregard it. I mean that what I told

11    them. But you disregard it. You're not going to judge

12    this case in any way, shape or form based upon how you

13    react to the lawyers as human beings. They've done their

14    job, and they will later on this morning keep on doing it

15    for their respective clients, and so far they've done a

READCHGF.TXT

16    fine job.  I mean that.  But it plays no role in what you
17    do.  You've got to focus on the evidence.  The lawyers are
18    not sources of the evidence.  And your reaction to them
19    plays no role.
20          Equally important.  If you somehow think that I
21    think something about this case based upon the manner in
22    which I have presided over it, I most earnestly instruct
23    you to disregard it.  I don't.  And I tell you candidly I
24    have no idea how this case will come out, nor is it my
25    business.  My business is to teach you the law.  I do not

14

1    discuss the substance of the case with Ms. Smith,
2    Mr. Womack.  I've had students in here seeing how cases are
3    to be tried, because this is a good example.  I'm not
4    discussing the substance of the case, the pieces of
5    equipment with anybody.  And I have no idea.
6          This, however, I tell you and this I believe
7    passionately.  I believe in the jury system.  I believe
8    that you will do justice in this case.  But I, clear as I
9    am about constantly saying, oh, yes, I'm the judge of the
10   law, I have nothing to say about the facts in this case.  I
11   believe that you will justly and impartially decide the
12   facts in this case.  Now let's get to it.
13          For simplicity sake I'm grouping the various Read,
14   Read plaintiffs and Nordberg, and there are three of them,
15   the Read Corporation, F.T. Read & Sons, and Nordberg-Read
16   Incorporated, I'm grouping them all together, and so can
17   you.  In one aspect of the case they may have to be
18   separated out, but everyone agrees that I'll do that.  You
19   don't have to worry about it.  So I'm taking those three

READCHGF.TXT

20    plaintiff corporations and I'm just going to call them

21    Read.  And I'm doing the same thing with respect to the

22    three defendant corporations:  Powerscreen of America

23    Incorporated, Powerscreen International Distribution

24    Limited, and Powerscreen International PLC.  For our

25    purposes, Powerscreen.  Treat them all the same.  And if

15

1    there needs to be some sorting out at the end I'll handle

2    it.

3         Read brings this case.  Read is the plaintiff in

4    this case.  So Read has to prove the case.  And for most of

5    the case the burden of proof on Read is what we call proof

6    by a fair preponderance of the evidence.  There's one part

7    where the burden's different, but I'll hold that off until

8    I get there.

9         Proof -- this is not a criminal case where proof

10    is proof beyond a reasonable doubt.  This is a civil case

11    where the burden of proof is proof by a fair preponderance

12    of the evidence.  And in such a case that simply means that

13    on those things that I'm going to tell you that Read has to

14    prove they've got to prove those things are more likely

15    true than not true.  More likely to be the case than

16    something else.  It's not a question of how much evidence

17    there is on one side or the other, it's a question of what

18    you believe about the evidence which you've seen and heard,

19    and does that convince you unanimously that it's more

20    likely, by a fair preponderance, those things that Read has

21    to prove is the truth.  Now, if something else is more

22    likely the truth Read hasn't proved it.  If on all the

23    evidence that you do believe that evidence tends equally to

READCHGF.TXT

24    two equal but opposite conclusions, Read hasn't proved it.

25    But so long as on the evidence you believe that's more

16

1     likely to be true than something else, you may take it that

2     that point is proved by a fair preponderance of the

3     evidence.

4          This is a patent case.  Patents are mentioned in

5     the Constitution of the United States.  A patent gives to

6     the inventor or inventors, or to their successors in

7     interest, a period of exclusivity for the use of their

8     invention.  And that simply means that no one may use the

9     patented invention without first getting permission from

10    the people who hold the patent.  The period of exclusivity

11    extends for 20 years from the date of the filing of the

12    patent.  And the patent owner is entitled to refuse to give

13    anyone else permission to practice the invention.

14         This case involves two patents.  One is United

15    States Patent 4,256,572.  We're calling it the '572 patent.

16    And I'm referring to it in the verdict slip as, it involves

17    the wheels part of that patent.  That's just so we're clear

18    there.

19         The other patent is United States Patent

20    4,237,000.  237, the triple zero patent.  That patent I'm

21    referring to in the verdict slip as the longitudinal center

22    plate patent.

23         Now, there's other things in those patents.  But

24    here's why I'm using that nomenclature.  Let's narrow this

25    down now.

17

READCHGF.TXT

1        Some things are not really disputed in this case.
2    And let me just explain those.  Though they're evidentiary,
3    there's no real dispute.

4        There's no real dispute here but what Read really
5    does own these patents.  They're Read's patents.  Second,
6    there's no real dispute, whatever I may have thought going
7    in in the case, now that I've heard all the evidence,
8    there's no real dispute but what these are valid patents.
9    They're valid.  And Read owns them.  And now there's no
10   real dispute, I think it's stipulated, that the '000 patent
11   expired, it ended, its 20 years of exclusivity ended on
12   March 5th, 1999.  And the '572 patent, that expired on
13   December 11th, 1999.

14       Likewise, there is no real dispute here about any
15   aspect of this patent, and about whether the Powergrid
16   things are the same as what is claimed in the Read patent
17   as to claims other than, I'm just narrowing down our focus,
18   in the '572 the wheels claim, and in the '000 patent the
19   longitudinal center plate claim.  That's the dispute as to
20   these two patents.

21       In other respects, in other respects you may take
22   it that the Powergrid machines are the same as what is
23   claimed in those two patents.  But remember if there is a
24   difference even as to the claims that we're talking about
25   here, then there can be no infringement.  And so that's

18

1    what our focus is.

2        A few more words about patents.  Why do we give
3    the inventor this right, this exclusivity right so to practice

Page 15

READCHGF.TXT

4    the patent for a period of years?  It's a trade-off.

5           The federal government says to the inventor under

6    the law we'll give you the exclusive right, the exclusive

7    use of this invention for a period of years.  But, in

8    return you have to teach the world how to make this

9    invention, how to use this invention.

10          And why do we want that?  We want that as a matter

11   of social policy because we want inventions.  We give the

12   period of exclusivity as a reward.  The inventor is

13   entitled to the reward whether or not the inventor uses,

14   practices its own invention.

15          Now, a patent, and I've shown you them and the

16   lawyers have shown you them, is a document.  And it's

17   divided into parts.  It may have drawings.  It has

18   specifications.  And the specifications teach you a way, at

19   least teach you a way to practice the invention.  And at

20   the end of each patent there are claims.  And it is the

21   claim of the patent that describes the area of exclusivity.

22   It's not how the patent holder chooses to practice the

23   patent.

24          So be very clear.  The comparisons -- because in

25   your infringement analysis you're going to have to make

□                                                                          19

1    comparisons.  The comparison is between the written claim

2    of the patent and the devices alleged, the Powerscreen

3    devices here, alleged to violate, to infringe that claim.

4    That's the comparison.

5           Now, in making that comparison you're of course

6    entitled to look at what the patent holder itself

7    manufactures.  Look at the machinery and compare that

READCHGF.TXT

8   machinery with the Powerscreen machinery. But that doesn't

9   end your analysis. You've got to look at the claim.

10  Because under the law it's the claim compared to the

11  allegedly infringing device.

12         And this is the time to make mention of something

13  else here and something that, I'll explain to you how I

14  drew the line where I drew it.

15         Mention may be made, mention has been made in

16  testimony, about other devices manufactured by other

17  people, not Powerscreen, and what happened to those

18  devices. We've heard about other lawsuits. We've heard

19  about other lawsuits, maybe they were settled. Maybe some

20  other court decided some other lawsuit. And we've heard

21  that other machines were withdrawn from the market. Taken

22  off the market.

23         Well, that's some evidence. You may look at those

24  other machines and compare them to the Powerscreen machine,

25  compare them to the Read machines. But ultimately compare

0                                                            20

1   them to the claims of the patent. And why are you allowed

2   to do that? Having looked over the machines themselves, to

3   get a better idea as to whether the Powerscreen machine,

4   whether they violate the claim of the patent. That's the

5   only reason we got into other lawsuits and other machines

6   by other people, to give you a fuller picture.

7          I didn't let you hear what those other judges had

8   to say. Not because I'm any better than those other

9   judges. Some are courts that are higher than this court.

10  But you can't try a case that way. It's got to be one

11  teacher of the law, in this case it's me.

Page 17

READCHGF.TXT

12          But, the fact of that other litigation, if you

13   believe that actually took place, that's a fact, that's for

14   you, and you may consider it.

15          Okay.  Let me go, before I pass out the verdict

16   slip, let me go back over some things that I mentioned at

17   the very beginning of the case.  This patent claim, this

18   patent given by the government, is similar to a, to a

19   statute passed by congress.  It's a government grant of

20   exclusivity.  It's a government grant by the patent holder

21   to Read saying you have the exclusive right to practice the

22   invention set forth in your claim.  And so when there

23   arises a dispute about what's claimed, because it's like a

24   law, and because judges are skilled, are expected to be

25   skilled in interpreting the law and explaining the law, I

□                                                                      21


1    am given the responsibility to explain to you what the

2    claim means.  And I've exercised that responsibility in

3    this case, and I want to go back over it because I'm

4    focusing on the claims that are really in dispute here.

5          And let me call to your attention the claims that

6    are really in dispute here.  And I'm going to start with

7    the '572 patent.  In this case we have been specifically

8    concerned with a portion of claim number 1.  You find it in

9    Column Number 5 of that patent, the '572.  Down at the

10   bottom of Column 5, going over to Column 6.  And the key

11   language that we are concerned with here is language which

12   reads like this:  A set of wheels mounted to one of said

13   sides and movable relative to the frame from an operative

14   position for transporting said apparatus to an inoperative

15   position for lifting the frame flush on the ground.

Page 18

READCHGF.TXT

16          Now, I said it before, but now of course you

17    understand why that's an important aspect of this dispute.

18    Here's what that means legally.

19          The language means that the wheels retract so as

20    to allow for the machine to be in two positions, a position

21    for transporting the machine behind a trailer in which the

22    heavy weight of the machine is on the wheels, and a stable

23    position for screening in which the weight is taken off the

24    wheels and the frame is flush to the ground.

25          Now, I must add one thing to that deposition -- to

                                                                    22

1     that description.  This claim does not require that all the

2     weight be taken off the wheels.  It's enough that the bulk

3     of the weight be shifted from the wheels.

4          Now, while we're still doing definitions let's go

5     over to the '000 patent and we'll come to what's key there.

6     The specific claim that we're most concerned with there is

7     a claim that begins in Column 5 at Line 7 of that patent,

8     and I'll read it:  At least one rigid longitudinal center

9     plate generally parallel to and between the side plates

10    joining the upper and lower levels of structural cross

11    beams such that forces applied to the screen assembly are

12    transmitted through the center plate to the joined cross

13    beams.

14          Now, here's what that means.  This simply means

15    that the rigid center plate or center plates must run the

16    entire length of the machine from front to back with, as

17    the words clearly state, with the idea of giving it

18    structural integrity so that the weight, the things you're

19    sifting when put down on the screens to be sifted out, so

                              Page 19

READCHGF.TXT
20    that the screens will hold themselves and actually sift
21    through won't bend or won't break.
22        I must add a little bit to that definition, though
23    I think that's accurate and I stand on it.  As has been
24    explained, I add to that definition, one reason for this
25    longitudinal center plate is to have the screens vibrate in

23

1    unison, not vibrate apart.  I originally thought that it
2    was just to give it structural integrity so the screens
3    wouldn't bend and separate.  But I'm satisfied that it's
4    more than that.
5        All right.  Now, those are the key definitions at
6    issue and now I think it's time to pass out the verdict
7    slip.
8        (Whereupon copies of the verdict slip were passed
9    to the jurors.)
10        THE COURT:  We've made this verdict slip just as
11    simple as humanly we can make it and nevertheless get from
12    you the answers we need for me to enter judgment in this
13    case.
14        I'm going to ask you to look at Questions 1 and 2.
15    Question 2 goes over to the second page.  But look
16    together, if you would, at Questions 1 and 2.
17        Now, there's two separate patents that Read owns,
18    and I've said that the key definitions here, and I've given
19    them to you in the '572 have to do with the wheels claim,
20    and the key definitions with respect to the '000 have to do
21    with that longitudinal center plate claim.
22        Now, I think the intelligent way to explain this
23    is to deal with Questions 1 and 2 together, but I'm going

READCHGF.TXT

24   to have to go from one patent over to the other.  But I
25   think you can follow.

24

1          As to the '000 claim Read has three different
2    theories of liability, three different ways to win.  Now,
3    of course, Powerscreen disputes all three.  But I need to
4    explain each of the three.  And I've called out the three
5    there at the top of Page 2.

6          They claim, now as to this longitudinal center
7    plate, they claim that the Powerscreen device literally
8    infringes.  And they say, well, if it doesn't literally
9    infringe it infringes by the doctrine of equivalents.  And
10   they say, and what's more, the way Powerscreen was making
11   the thing it was an inducement to other people to infringe.
12   And I need to explain each one.

13         Jump back to Question 1.  As to Question 1 Read
14   has only one theory of liability.  And as to Question 1,
15   this wheels issue, it's not disputed that there isn't --
16   well, it may be disputed, but I've ruled as matter of law
17   that it doesn't literally infringe.  But it may, and this
18   is entirely up to you, infringe under the doctrine of
19   equivalents.  And so since there's only one theory I didn't
20   spell out the theory, but now I'm explaining it to you.

21         Under Question 1, Read's theory is that the
22   Powerscreen devices infringe under the doctrine of
23   equivalents.

24         Now, having told you that I'm going to skip back
25   to Question 2 and I'm going to go through each of the three

25

READCHGF.TXT

1   theories that Read has as to the longitudinal center plate,
2   but you'll understand that when I get to explaining the
3   doctrine of equivalents that applies to Question 1, too.
4   That applies to Question 1 also.

5        Okay. What does it mean to infringe the claim of
6   a patent? It means that the infringing device, you look at
7   the claim of the patent and you look to see whether the
8   infringing device, the actual thing, not plans or
9   something, though you can look at plans because they tell
10  you what the actual thing looks like, but in order for
11  there to be infringement the, the device has to be sold or
12  offered for sale in the United States of America.

13       I should pause and make that a point. These
14  patents are good in the United States of America.
15  Powerscreen's over there in Northern Ireland. Now, what
16  happens in Europe we are not concerned with. So
17  Powerscreen can make whatever it wants, it can make the
18  identical thing in Europe to the Read claim and we don't
19  have a problem. But, if they make the identical thing to
20  the Read claim and offer it for sale or sell it in the
21  United States that's infringement.

22       Now, of course it's disputed that it's identical.
23  So let's focus on infringement. Literal infringement now.
24       In order for there to be literal infringement the
25  alleged offending device must have present in its

                                                        26

1   configuration each and every element or aspect of the claim
2   in the Read patent. And you take the claim that we're
3   talking about, you take it separately. You can look at all
4   the other claims, but each claim is a separate grant of
                    Page 22

5    exclusivity. So you focus on the claim and then you say
6    does the Powerscreen device, if you find that it was sold
7    or offered for sale in the United States, does that have
8    each and every element of that claim present in it? If it
9    does it's infringement. It infringes. If only one element
10   of the claim is missing there's no infringement, even if
11   all the others are present. If there are other things
12   added, made more sophisticated, made better, it still
13   infringes so long as it has every element of what's
14   claimed. Miss an element and there's no infringement. But
15   add to the elements, make the elements better, still
16   infringement so long as it has every element of the claim.
17              It's possible that you could have a machine that
18   isn't as good, it's inefficient, doesn't work as well, but
19   it has every element of the claim. Inefficient
20   infringement is still infringement.
21              So you ask yourself is every element of the claim,
22   the claim now, you can look at everything, look at the
23   machines, look at the machines of other manufacturers, look
24   at all the evidence, but your comparison is the claim
25   versus the Powerscreen allegedly infringing device. If

□                                                           27

1    every element of that claim is present in the infringing
2    device then what you have is literal infringement.
3              Now, the only alleged -- well, the only literal
4    infringement that I'm allowing you to consider here is
5    literal infringement of the longitudinal center plate and
6    then the only evidence of that is found here in this
7    Exhibit 106.
8              Now, I have nothing to say about what these photos
                          Page 23

READCHGF.TXT

9    show.  But it's going to be argued to you that they show a

10   longitudinal center plate, and you listen to all the

11   evidence, you make up your own mind, and that this machine

12   in this configuration literally infringes.

13        You understand that -- well, you may draw your own

14   conclusions about that.  I have nothing to say about it.

15   But what I'm pointing out to you is that this is the only

16   evidence in this case of literal infringement if you

17   believe that the Powerscreen device literally infringes.

18        So that's the first theory.  The second theory is

19   infringement by the doctrine of equivalents.  Now, what do

20   we mean by that?

21        Remember that I've already said that if you build

22   a device that's very similar to the patented device, but

23   you omit an element, you leave an element out entirely,

24   there's no infringement.

25        Likewise, it is perfectly legal to design around a

28

1    patent.  You read the patent and you learn from the patent.

2    This is the idea, you learn from the patent.  You say,

3    well, this is a good idea.  But I can build a better

4    mousetrap, one that's different, better.  It doesn't even

5    have to be better.  Different, different than the patented

6    device.  The law encourages that.  The only thing that Read

7    is protected on, the only thing that it has exclusivity on

8    is the patented device specifically claimed in the claims.

9        Yet the law says this.  An unscrupulous copier who

10   changes the device a bit may still be guilty of

11   infringement.  And that's known as infringement by the

12   doctrine of equivalents.  Build a different device, the law

READCHGF.TXT

13  encourages that.  But if you build what's really the

14  equivalent device, from the patent, the law will hold that

15  infringement.

16       And so we're following here, that's what Read

17  claims here.  They claim that as to the wheels aspect of

18  their machine and the Powergrid operation and they claim

19  that with respect to the longitudinal center plate.

20       What does that require of you?  That requires of

21  you to look at the claim again.  We always start with the

22  claim.  Now, there are two separate claims and two separate

23  patents so look at them separately.  But look carefully at

24  the claim.  And then ask yourselves this.  Again, now, if,

25  if there's an item, an aspect, they call them limitations,

29

1  limitation in the claim that exists in the claim, and it's

2  missing in the Powerscreen devices, no infringement, no

3  infringement under the doctrine of equivalents.  And in, in

4  answering that question you can look not, and you can do

5  this with respect to literal infringement, too, but you

6  must take the definitions from me, you can look at the, the

7  patent, that's where you should start, look at the two

8  patents, but you can also look at this prosecution history.

9  We have them in there with blue ribbons and gold seals on

10  them.  I mean, look at what's going on between what Read is

11  saying to the Patent Office, what the Patent Office is

12  saying to Read and the like and what's going on.

13       So understand what the limitations are, what the

14  aspects of the specific claim are, you can look at that.

15       Now, here's the key test for doctrine of

16  equivalents.  Ask yourself whether the Powerscreen device

Page 25

READCHGF.TXT

17    with respect to each aspect, each aspect considered

18    separately, of the claim has substantially the same means,

19    substantially the same equipment used, performing in

20    substantially the same way, to achieve substantially the

21    same result.  If Read persuades you by a fair preponderance

22    of the evidence that the Powerscreen, the alleged

23    infringing Powerscreen device does that, as to each element

24    now of the claim, if it uses substantially the same means,

25    which performs in substantially the same way, to achieve

☐                                                                30

1    substantially the same result that's infringement by the

2    doctrine of equivalents.  Now, if any one limitation is

3    missing, any one aspect of it is missing, there's no

4    infringement at all, doctrine of equivalents or literal

5    infringement.

6         Okay.  Now, that theory applies to both patents.

7    That is Read's theory as to the '572 patent, and it's also

8    Read's theory as, I may have said that literal infringement

9    is limited to whatever is shown, or whatever is evidenced

10    as to a machine by these photographs, but that's not the

11    limitation of their doctrine of equivalents theory, they

12    say with respect to all the machines.

13         Now, they've got a third theory, Read does, and

14    their third theory only applies to the '000.  Now,

15    Mr. Pirozzolo, the lawyers will argue, but here's their

16    theory so you understand it.

17         They say, they're going to argue to you that the

18    way those, well, I hesitate to characterize it myself, I

19    call them partial plates, or the way those plates with the

20    bolt holes in them, we'll let Mr. Pirozzolo argue it,

                          Page 26

READCHGF.TXT

21    because I have nothing to say about it, but I just want you
22    to focus on this aspect of the case, the way those were set
23    up by Powerscreen, Mr. Pirozzolo for Read, Read argues to
24    you, Read submits to you, and I'm going to let you decide,
25    whether in fact that's an inducement to infringe.  And the

31

1    way that argument goes, I'll let Mr. Pirozzolo make it, but
2    the way that argument goes is, look, the reason they put
3    those bolt holes in there is so that anyone using this
4    would bolt something to attach those all together so that
5    there would be a single, at least rigid, it might be made
6    up of more than one piece, but rigid longitudinal center
7    plate, and that's what's claimed by the Read device.  And
8    they, they may not have done it themselves.  Though of
9    course he's going to argue to you at least with one machine
10   they did with, and he may argue that others they did and
11   you should infer that they did.  And I leave that all to
12   his argument and I leave that all to your good judgment.
13   But on inducement to infringe he doesn't have to show --
14   well, he has to show that what they had in mind was, well,
15   we won't do it but the people we sell it to are going to
16   know to just bolt those together, and make an infringing
17   device.
18           And if that's what Powerscreen was doing, he can't
19   get around the patent laws that way.  That's inducement to
20   infringe.
21           But there's a limitation on that.  So be very
22   clear on this.  And it's set up here in the, in my verdict
23   slip.
24           There has -- you have to believe by, again by a
                         Page 27

READCHGF.TXT

25    fair preponderance of the evidence, that somebody did it.

32

1    There can't be any inducement to infringe unless in the
2    United States somebody was infringing. Whatever they had
3    in mind, if the people to whom they sold them or leased
4    them in the United States didn't do it, they may have, even
5    if you think, well, they wanted infringement, or they
6    wanted to induce people, if people didn't do it there
7    cannot be inducement to infringe.

8          So you look at your questions i, double ii, triple
9    iii there on questions, on Page 2, and if your answer to i
10   and double ii is no, your answer to triple iii must be no.
11   If your answer to either i or double ii is yes, your answer
12   to triple iii may or may not be yes. It's up to you. Has
13   Read proved to you that inducement to infringe.

14         Now, those are Read's theories of liability.
15   Liability means shall Read recover anything from
16   Powerscreen.

17         Now I'm going to come to the part where I tell you
18   if you do find infringement of either of these patents, on
19   any of the theories that I have explained to you, what are
20   the damages? And you see I ask you that both in Question 1
21   and in Question 2.

22         Let me pause here. Remember, now, Powerscreen's
23   denied infringement under, against any of these theories
24   and Powerscreen has put on evidence and the like. And if
25   you don't think Read has proved infringement by a fair

33

READCHGF.TXT

1  preponderance of the evidence your verdict will be for

2  Powerscreen, Question 1a, and Powerscreen, Question 2a.

3  And if that's so the case is over, you don't have to answer

4  Question 3, the forelady signs it and dates it and that's

5  how you return your verdict.

6      So we only get to damages if I assume that you've

7  answered for Read on either Question 1 or 2. And here's a

8  perfect example of what I'm talking about.

9      The fact that I'm now going to explain damages in

10  detail to you doesn't mean that I think they're proved or

11  not proved, I just have to explain everything to you.

12      Damages. Damages are designed to, if you find

13  liability, that is, you find infringement or inducement to

14  infringe, the damages are designed to compensate Read and

15  put Read where it would have been had there been no

16  infringement. That's the theory. Damages are designed

17  fully and fairly to compensate Read. But, the damages do

18  not reward Read or punish Powerscreen. But what they are

19  is full, fair compensation of Read. And Read has to prove

20  the damages. And Read has to prove the damages again by a

21  fair preponderance of the evidence.

22      Now, in a case like this, any case like this, I'm

23  not talking specifically about this case, but in any case

24  like this the law recognizes that you can't prove the

25  damages down to the last nickel. So the law allows you as

34

1  members of the jury to make good faith, careful estimations

2  if Read proves, it's not guesswork, it's not speculation,

3  but, but Read is not to be held to prove to absolute

4  mathematical certainty the specific damages. It is to be

READCHGF.TXT

5    held to prove by a fair preponderance of the evidence on a
6    recognized analytic theory what its damages more likely
7    than not are.

8         So let's talk about the damages.  At a minimum, at
9    a floor if there is infringement Read is entitled to a
10   reasonable royalty as though it licensed its invention to
11   Powerscreen.  Now, it didn't license its invention to
12   Powerscreen.  There's no evidence that Read ever would have
13   licensed its invention to Powerscreen.  And you may take it
14   that Read didn't want to license its competitor,
15   Powerscreen, Read wanted to make the profits for itself,
16   even though they would have gotten a royalty.

17        But as a minimum the law requires that what's
18   happened has happened and if nothing else is proved Read is
19   at least entitled to a reasonable royalty which it would
20   have gotten if it had licensed the practice of the
21   invention to Powerscreen.

22        Now, you knew this was coming.  You've heard one
23   of the witnesses who has performed a reasonable royalty
24   calculation for you, Mr. Tanger, and you're entitled to
25   believe it, you're entitled to disbelieve it.  You're

□                                                            35

1    entitled to make alterations to it based upon what you
2    believe.  But there are factors that the law says we must
3    consider and I must teach you those factors, there's a
4    bunch of them, and I'm going to go through them right now.
5         You must consider, first, the royalties, if any,
6    that Read received for licensing other people under either
7    of its patents.  Not terribly helpful here because there's
8    no real evidence of the licensing of this patented

Page 30

READCHGF.TXT

9    technology.

10           Second:  The rates paid for the use of other

11   patents that are comparable to the Read patents.

12           Third:  The nature and scope of the license that

13   reasonably you would expect would be negotiated.  Would it

14   be an exclusive license or a nonexclusive license?  Would

15   it be restricted as to territory or nonrestricted.

16           Now, remember it would have to be restricted to

17   the United States because these patents aren't good

18   worldwide, they're good in the United States.

19           Would it be restricted in any way with respect to

20   whom the manufactured product would be sold.

21           Four:  Did Read have an established policy and

22   marketing program to maintain its patent exclusivity by not

23   licensing to others to use the invention, or was its policy

24   to grant license under special conditions designed to

25   preserve its patent exclusivity.

                                                            36

1            Five:  What's the commercial relationship between

2    Read and Powerscreen?  Are they competitors in the same

3    territory, here the United States, in the same line of

4    business?  Or is one an investor or promoter of this

5    technology?

6            Six:  What would be the effect of selling the

7    patented project -- the patented item in promoting the

8    sales of other Read products?  In other words, if you can

9    sell the patented product is that going to raise your sales

10   of other products which you manufacture?

11           That gives you a handle on the existing value of

12   the invention to Read as a generator of sales of its

                            Page 31

READCHGF.TXT

13    nonpatented item.  So you want to consider the extent of
14    those derivative sales.

15        Seven:  The duration of the patent.  How much
16    longer did it have to run at the time -- and you start
17    figuring when the hypothetical royalty would have existed.
18    You start figuring that at the time when the infringement
19    started.  Because the theory here is that you are finding
20    infringement.  So if you find infringement then how much
21    longer did the patents have to run recognizing that they
22    expired in 1999.

23        Nine:  The utility and advantages of the patented
24    items over older modes or devices, if there is any
25    advantage.  You compare them to the other things that are

37

1     used in the industry to achieve results similar to the
2     patented item.

3         Ten:  The nature of the patented invention.  The
4     character of its commercial embodiment.  That means the
5     things that Read was actually producing.  The benefits to
6     those who have used the invention.

7         Eleven:  The extent to which Powerscreen made use
8     of the Read invention in its own marketing and production,
9     and any evidence probative of that use.

10        In other words, if you think Read was -- if you
11    think Powerscreen was infringing then how would that bear
12    on the deal that would be cut relative to a reasonable
13    royalty.  Because you would have to consider the costs of a
14    lawsuit and the likely result of the lawsuit.

15        Twelve:  The portion of the profits or of the
16    selling price that may be customary in a particular

Page 32

READCHGF.TXT

17   business or comparable business to allow for use of the

18   invention or similar inventions.

19          Thirteen:  The portion of the realizable profit

20   that should be credited to the invention as distinguished

21   from nonpatented elements, the manufacturing process,

22   business risks, significant features or improvements that

23   Powerscreen could bring to the license.

24          You may consider the testimony of those who I've

25   permitted to give opinions on this issue.

38

1           And last, fifteen, you may consider any other

2    economic factor that normally a careful businessperson

3    would under similar circumstances take into consideration

4    in negotiating such a hypothetical royalty.

5           That's the floor.  And Read says we're entitled to

6    more than that.  Because here Read says we have proved our

7    lost profits.  Read's going to argue what they would have,

8    what they say they would have earned if only there had been

9    no infringement.

10          Now, again Read's burden is by a fair

11   preponderance of the evidence.  And you recall the witness

12   who testified as to a lost profits analysis.

13          All right.  Here's what Read has to prove.  Lost

14   profits may be in the form of diverted sales, eroded

15   prices, or increased expenses.  Read must establish a

16   factual basis for its claim of lost profits.  The factual

17   basis for this part of the claim is evidence that but for

18   infringement Read would have made the sales that

19   Powerscreen made, would have charged higher prices, or

20   would have incurred lower expenses.

Page 33

READCHGF.TXT

21          In order to show that Read would have made the
22     sales that Powerscreen made, Read must show:  One, there
23     was a demand for the Read project -- product; two, that
24     there were no acceptable noninfringing substitutes
25     available; three, that Read had the manufacturing and

                                                              39

1      marketing capability to meet the market demand; and four,
2      there was a reasonable probability that Read would have
3      made the sale and realized the profits were it not for the
4      infringement by Powerscreen.
5          Remember that in proving damages Read's burden of
6      proof isn't an absolute one but rather a burden of
7      reasonable probability, reasonable certainty.  If in all
8      reasonable probability Read would have made the sales which
9      Powerscreen made, when Powerscreen was infringing, and you
10     consider what the patent owner in reasonable probability
11     would have netted from those sales, sales denied to Read,
12     that's the measure of the loss.  And for that Powerscreen
13     would be liable under that analysis.
14         Remember, Read has to show that it has the
15     marketing capability to have made Powerscreen's infringing
16     sales and that it would have made Powerscreen's infringing
17     sales but for Powerscreen's infringement.
18         But it's not required to show, Read isn't, that it
19     actually bid on each of those jobs or was beat out by
20     Powerscreen in a particular infringing sale.  It is
21     required to show a reasonable probability that if
22     Powerscreen had not made the infringing sale Read would
23     have made it.
24         Read says but that's not all.  Read says, look, we

                            Page 34

READCHGF.TXT

25   sold the company to Nordberg based upon a multiple of our

40

1   sales.  And if our sales had been higher the multiple would
2   correspondingly be higher and the Read company would have
3   netted more from the sale to Nordberg.

4        Powerscreen says wait a minute.  As to that part
5   that's a wash.  Because if, if Read had made more sales and
6   therefore the purchase price had been larger, who paid that
7   purchase price?  Nordberg-Read.  So it's just one hand
8   feeding the other.

9        Well, I've looked at the, I've looked at the
10   contract between the parties.  And again a contract's like
11   a law and the judge interprets the contract.  And here's
12   how this works.

13        If you find infringement Read gets the benefit of
14   the lost sales analysis or reasonable royalty up to the
15   time of the contract.  And Nordberg gets the benefit of the
16   lost sales, or the reasonable royalty after the time of the
17   contract.  And I'm going to sort that out.  So you don't
18   have to worry about that.

19        But on this business of would Nordberg have paid
20   more for Read, looking at the contract Read gets all the
21   benefit of that.  So yes, you may consider whether but for
22   the infringement Read would have made more sales.  That's
23   the lost profits analysis.  But then you have to go on and
24   consider has Read proved by, again by a fair preponderance
25   of the evidence, that the same multiple of more sales would

41

1   have been paid by Nordberg.  If Read proves that by a fair
Page 35

READCHGF.TXT

2    preponderance of the evidence, and they would have gotten
3    that additional money out of Nordberg, but for the
4    infringing sales by Powerscreen, Read can recover that in
5    this lawsuit.  But if really Nordberg was up to its limit,
6    I mean, it happened to be whatever multiple of sales it
7    was, but they weren't going to pay anymore, then the fact
8    that Read didn't get anymore is not attributable to
9    Powerscreen here, it's attributable to the bargaining
10   positions as between Nordberg and Read.  And Read can't
11   recover twice.

12           All right.  Last question.  Question 3.  You don't
13   get to Question 3 unless you have answered either -- oh,
14   before I get to Question 3 let me stop.

15           Damages.  You see I have two different damage
16   lines there, because I have two different patents.  All
17   that Read is going to get in this case, if you award Read
18   damages, it's going to get the larger of those two lines.
19   I'm not going to add one on the other.  It's going to get
20   the larger of those two lines.

21           And the reason for that is, why do I even make
22   things more complex.  I think I have to for this reason.
23   Read argues, but of course Powerscreen denies, but Read
24   argues that the Powerscreen devices infringe by the
25   doctrine of equivalents, the wheels business, the wheels

42

1    claim, and also infringe on the '000 patent the
2    longitudinal center plate claim.  And Read can win on one
3    or both of those.  And since it's the same Powerscreen
4    machines theoretically Read will win the same amount of
5    money.  And you can award the same amount of money,
                                    Page 36

READCHGF.TXT

6    whatever it is, and then that's what Read will get.

7         But since Read has these different claims on the

8    '000 and since the claim of literal infringement rests only

9    on this, it is at least theoretically possible that you

10   would give a lesser amount of money in answer to Question 2

11   than you would in answer to Question 1.  And I need at

12   least to provide for that possibility.  You must understand

13   that Read will get the larger of the two amounts, but that

14   I will not add them together.  If Read wins here it will

15   get the larger of the two amounts, and it is also

16   theoretically possible that you would find the same amount

17   in answer to Question both 1 and 2.  But I leave that to

18   you.

19        Now I'm ready to do 3.  3 is a question that

20   really comes to me because I have to do certain things if

21   you find for Read with respect to the answer to Question 3.

22        But since I need your advice and I need it

23   officially, I need to explain to you this issue, even

24   though there's no damage calculation with respect to this

25   issue.

43

1         Read finally says, in addition to the things we've

2    claimed before, these Powerscreen people are guilty of

3    what's called under the law willful infringement.  Well,

4    now as to this issue, and this issue only, they've got to

5    do better than by a fair preponderance of the evidence.

6         Under the law, before you could find for Read on

7    willful infringement you would have to find the willful

8    infringement by clear and convincing evidence.  And that

9    means exactly what the words provide.  You must unanimously
                    Page 37

READCHGF.TXT

10  be satisfied by evidence that is clear and convincing that

11  Powerscreen not only infringed but that they willfully

12  infringed.

13      Now, what does that mean?  Willful infringement is

14  proved if Read proves by clear and convincing evidence that

15  Powerscreen was aware of its patents, knew about them, or

16  knew about at least one of them, actually knew about them,

17  and two, had no reasonable, good faith basis for its making

18  or using or selling the item that you have found to be

19  infringing, that Powerscreen had no reasonable, good faith

20  basis for thinking that its putting its own item on the

21  market in America, in the United States, would be proper.

22      Now, in this regard, in figuring out whether

23  Powerscreen had a reasonable basis for reaching a good

24  faith conclusion you may consider whether Read, now Read's

25  got to prove it by clear and convincing evidence, has

44

1   proved that Powerscreen did not exercise due care to

2   determine whether the Read patents, what they applied to

3   and were valid and existing once they learned of the Read

4   patent.

5       Now, one common way to fulfill that duty is to

6   seek and receive legal advice from a lawyer before

7   beginning or continuing activities that might be

8   infringing.  Such legal advice must be competent,

9   authoritative, timely, in order for Powerscreen to rely

10  upon it to fulfil a duty of reasonable care.

11      You consider whether Read has proved that

12  Powerscreen did not reasonably rely on any lawyer's

13  opinion, as to the scope or validity of the Read patents,

Page 38

READCHGF.TXT

14    in determining whether Powerscreen had a reasonable basis

15    for believing it had a right to make, use, or sell its

16    product in the United States because, of course, it had

17    every right to make, use, sell the products that are

18    accused here in places other than the United States.

19            All right, ladies and gentlemen. Those are my

20    instructions as to the law. I may have left something out,

21    I may have misstated something, and before we give you the

22    break now the lawyers get a chance to correct me, and we'll

23    ask you to wait for a moment while they do that.

24    SIDEBAR CONFERENCE, AS FOLLOWS:

25            THE COURT: Mr. Pirozzolo?

                                                                    45

1            MR. PIROZZOLO: Your Honor, I believe you stated

2    as to the weight transfer the bulk of the weight can be --

3            THE COURT: I did so state.

4            MR. PIROZZOLO: -- on the wheels. And I believe

5    the Portec case says some of the weight remains on the

6    wheels.

7            THE COURT: But that's --

8            MR. PIROZZOLO: Them it continues that it was more

9    than, it must be more than 50 percent.

10            THE COURT: I know, but that's, that's how I read

11    Portec, that some of the weight remains on the wheels.

12            MR. PIROZZOLO: That some may remain on the

13    wheels.

14            THE COURT: Yes, some may. But the bulk must be

15    on the wheels. Otherwise it wouldn't be a transference. I

16    read -- well, I'm reading the same language as you are.

17    That's the sense I have.

                        Page 39

READCHGF.TXT

18            I'm standing on my instruction.

19            MR. PIROZZOLO:  We ask for Request 25, to

20    specifically point out that there's no reason for treating

21    infringement by equivalents any differently from literal

22    infringement.

23            THE COURT:  You did ask and I think I covered the

24    concept.  I'm not changing.

25            MR. PIROZZOLO:  Request 28.

46

1            THE COURT:  I certainly gave you that.

2            MR. PIROZZOLO:  I guess you did, your Honor.

3            THE COURT:  I think I did.

4            MR. PIROZZOLO:  Okay.  On the center plate, as I

5    read the cases, and I believe we cited a number of them, if

6    a device is easily susceptible of being altered to

7    infringe, that is in and of itself infringement, not just

8    inducement to infringe.  So that by putting the center

9    plate out there with bolt holes --

10            THE COURT:  All right.  Your rights are saved.

11    I'm satisfied with the way I've construed it.

12            MR. PIROZZOLO:  I believe Mr. Beeman is going to

13    argue that Mr. Read didn't invent the wheel and didn't

14    invent the jack, that kind of argument.  That is why we

15    asked for the instruction:  Only God works from nothing.

16    Men must work with old elements.

17            THE COURT:  No, I --

18            MR. PIROZZOLO:  It can be given in many ways but

19    the point is --

20            THE COURT:  If I need to correct the argument I'll

21    correct it.

Page 40

READCHGF.TXT

22          Mr. Beeman.

23          MR. BEEMAN:  Yes.  Could we just switch spots,

24     Jack.

25          Your Honor, first, Mr. Davis was, Mr. Davis, the

47

1     former CFO, had testified in prior testimony he had

2     submitted an expert report regarding the matter of what

3     I'll call the diminution in value alleged by virtue of the

4     infringing period, we didn't get as much for our company.

5     They presented no expert opinion from Mr. Davis on that

6     matter.  It was simply dropped.  Okay?  It would be our

7     position, your Honor, that there's no evidence in this case

8     whatsoever on that issue.

9          THE COURT:  Yes.  I'm not taking it from the jury.

10          MR. BEEMAN:  Okay.  Your Honor, we would also

11     object -- well, we intend to present the record here as to

12     the duration or how long it took from the time that they

13     first inspected the machine to actually suing Powerscreen,

14     and that's going to be attributable as to whether they

15     literally infringed.  Related to that we believe that

16     almost invokes a laches, at the very least a laches defense

17     here for that period of time.

18          THE COURT:  You may argue it but I'm not further

19     charging.

20          MR. BEEMAN:  Okay.  And just for the record, your

21     Honor, just to make sure our rights are saved, we object

22     related to the fact of litigation as presented.

23          THE COURT:  You object to what I have already

24     said.

25          MR. BEEMAN:  Yes.  Yes, your Honor.
                          Page 41

READCHGF.TXT

48

```
 1              THE COURT:  Right.  And your rights are saved as
 2    to that.  I do understand it.  We've discussed it.
 3              MR. BEEMAN:  Okay, can I just also make sure that
 4    our rights are saved as to the addition regarding bulk of
 5    weight.
 6              THE COURT:  You don't like that either?
 7              MR. BEEMAN:  Well --
 8              THE COURT:  You didn't --
 9              MR. BEEMAN:  The fact that it's there at all.
10              THE COURT:  Right.  You do object.  Your rights
11    are saved.
12              MR. BEEMAN:  Thank you.  And also as to the
13    inefficient infringement is still infringement.  And
14    then --
15              THE COURT:  I'm satisfied, but your rights are
16    saved.
17              MR. BEEMAN:  Thank you, your Honor.  One final
18    thing.  As to the statement during the charge related to
19    unscrupulous copier.
20              THE COURT:  You don't like that language.
21              MR. BEEMAN:  Correct.
22              THE COURT:  All right.  I'm satisfied with the
23    charge.
24              MR. BEEMAN:  Thank you, your Honor.
25              MR. PIROZZOLO:  Your Honor?
```

49

```
 1              (Whereupon the sidebar conference concluded.)
```
Page 42

READCHGF.TXT

2          THE COURT:  I don't think that it's inappropriate
3  to tell you, this has nothing to do with the case, but we
4  have a class of students here led by a teacher who's a
5  former juror and who sat right where you're sitting now.
6          All right.  We're going to take the recess now for
7  15, maybe 20 minutes, let them get ready for final
8  arguments.  You've had my instruction as to the law.  But
9  please keep your minds suspended.  And as I see you're
10  doing leave your materials here.  I should also say that
11  when we finally send you out, which will be after the final
12  arguments, Ms. Smith will want to collect those verdict
13  slips.  We only have one verdict slip in the, in the jury
14  room.  But they can stay with your papers now.
15          So keep your minds suspended.  Do not discuss the
16  case either among yourselves nor with anyone else.  You may
17  stand in recess for 20 minutes.  We'll be back for the
18  important part of the case to include the closing arguments
19  of the attorneys.
20          The jury may retire.  I'll remain on the bench.
21          THE CLERK:  All rise for the jury.
22          (Whereupon the jury left the courtroom.)
23          (Closing Arguments.)
24          THE COURT:  Madam Forelady, as forelady of the
25  jury, it doesn't mean you do all the talking, nor do you

50

1  keep your mouth shut.  And really, I'm talking to all of
2  you.  Set things up in the jury room now so that each and
3  every one of you can fully and fairly discuss those matters
4  which you are discussing.  In other words, as you're
5  considering an aspect of the case, set things up so that

Page 43

READCHGF.TXT

6    the opinions or the views of one juror can be listened to

7    by all the others and people can talk together about those

8    views.

9        You may, of course, use your notes, that's why we

10    let you take notes.  Remember that your notes are not

11    evidence of anything either.  They just jog your own

12    memory.  And so use your notes to do just that, jog your

13    memory and then express your view to your fellow jurors.

14    Deliberate together.  Jury deliberations are all twelve of

15    you, not three or four off in the anteroom and some other

16    people over by the door.  Deliberate together.

17        It's probably not a good idea, even though the

18    verdict slip has the separate questions, it's probably not

19    a good idea at the outset of your deliberations to take a

20    straw vote.  And the reason for that is you may then think

21    that under your oath, you're required to adhere to that

22    first view.  Now, if you have any strong view of any aspect

23    of this case, by all means adhere to it.

24        The verdict must be unanimous.  That means

25    genuinely unanimous; all twelve of you agreeing, not

51

1    somebody going along with what the others think.  But you

2    are entitled to change your views if the views of your

3    fellow jurors who saw and heard the same evidence, who are

4    under the same oath as you are, in fact convince you to

5    revise your views.  That's what deliberations are.

6        Now, there's no pressure on you to return a

7    verdict.  I mean, there's the expression of the system that

8    we hope we can get a unanimous verdict, but because the

9    verdict must be unanimous, there's no pressure on you at

Page 44

READCHGF.TXT

10    all.

11          So I'll explain the schedule so we'll be very

12    clear.  Once I send you out now, you're in charge.  If we

13    don't hear from you at about ten minutes of 5:00, five

14    minutes of 5:00, I'll call you back in and I will excuse

15    you to come back in on Tuesday morning.  No one's going to

16    be kept after 5:00.

17          If you reach a time in your deliberations where

18    you want to stop, you have only to send out a note.  I have

19    to give you some instructions then, but I'd bring you in

20    here, give you those instructions and we'll send you home.

21          Now, I gave you fair warning so I imagine this

22    afternoon is clear on your calendars, but if you get to a

23    point where you'd rather sleep on it or think about it over

24    the weekend, you just tell us.  We'll stop, come back on

25    Tuesday morning and go on with your deliberations.

                                                              52

1          I should just, not to emphasize them, but so

2    you're comfortable with them, understand all the mechanical

3    things of how this works, lunch is at 1:00.  We've arranged

4    for lunch for you.

5          When we send you out now, Ms. Smith will be sure

6    to take back the verdict slips, but she will leave a

7    verdict slip with the forelady.  She will come in just as

8    soon as we have the written transcript of my charge, and

9    she will leave that.  She will come in on however many

10   trips it takes to bring the exhibits in, though you may

11   start your deliberations just as soon as I send you out

12   now.

13          Naturally, she will say nothing at all of

                          Page 45

READCHGF.TXT
14    substance of the case nor will you to her.  And when she's
15    coming in, stop your deliberations.

16         If you have a question of any sort, don't hesitate
17    to ask the question.  Give us a few minutes to set things
18    up because the lawyers are entitled to go off to the
19    cafeteria.  I tell them five minute-leash; I want them here
20    in the courtroom five minutes after I get the question so I
21    can answer the question.  Don't you hesitate to ask a
22    question in writing, if you have one.  We'll bring you back
23    and I'll answer your question.

24         Now, when you reach a verdict, let the court
25    security officer, who will have you in his care, and be

☐                                                                    53

1    right outside the door.  Let the court security officer
2    know.  Don't give him the verdict, just say, We've got a
3    verdict.  Then give us a few minutes, we'll set everything
4    up.  This will prove we work in the afternoons, we're here.
5    We'll set everything up, we'll all come in, and
6    Ms. Smith -- don't bring the exhibits back, just bring the
7    verdict slip back.

8         And Ms. Smith will say to you:  Ladies and
9    gentlemen, have you agreed upon a unanimous verdict?  We
10    imagine if you're back with a verdict slip, that you have.
11    And she will say, Will you pass the verdict slip?  You pass
12    to her and it's given to me.  I look at it for just one
13    reason, and that is to see that it is logical.

14         So let's go over the logic of the verdict slip.
15    I've asked you three questions.  If the answer to the first
16    two questions is for Powerscreen, don't answer the third
17    question.  If the answer to either of the first two

Page 46

READCHGF.TXT

18    questions is for Read, then consider the third question.

19    It doesn't mean Read wins on the third question, but you

20    consider it, so I need to know whether your verdict is for

21    Read or Powerscreen on the third question.

22          With respect to the first two questions, because

23    you're considering separate patents, remember that the

24    theory of liability on Question 1 is infringement by virtue

25    of the doctrine of equivalence.  With respect to

54

1     Question 2, there are three different theories.  Your

2     answer to the sub i there can be no or yes.  Your answer to

3     sub ii can be no or yes.  But if your answers to sub i and

4     sub ii are both no, your answer to sub ii must be no.

5          If your answer to either one of the preceding

6     subsections is yes, then your answer to sub iii may or may

7     not be yes, as you find the matter proved or not proved.

8          Remember damages, if you get to the stage of your

9     analysis where you consider damages, remember that I will

10    award the larger of the two amounts that are set forth on

11    the verdict slip, but I will not add the two together.

12    Remember that the amount of damages, if you reach that

13    point in your deliberations, may, with perfect logic, be

14    equal -- be the same, be the same, but it is at least

15    theoretically possible that the damages for one will be

16    less than the damages for the other.  And if that happens,

17    while I need to know that, I would enter judgment for the

18    larger of the two amounts.  Then I've got to look at it and

19    see that the forelady signed it and dated it.  That's the

20    only reason I look at it.

21          So when I look it over and I see that it is at

Page 47

READCHGF.TXT
22   least logical and it answers the questions that I've put to
23   you, I give it to Ms. Smith and I say, The verdict is in
24   order, it may be recorded.  Then she'll ask you to stand
25   up.  It's the only time in the entire case where you stand

                                                           55

1    up and the rest of us sit here.  And then she will read out
2    in open court your verdict.  And it reads out logically.
3    It reads the answers that I need to have to enter a
4    verdict.
5         If, at that moment, while each of you stand there,
6    you, individually, are satisfied with your own conscience
7    that your duty is faithfully done, then you will have done
8    what's required of you in this case.
9         The word "verdict" comes from two Latin words.
10   They mean, "to speak the truth."  That is what is asked of
11   you in this case, to speak the truth.
12        Very well.  The jury may retire and commence their
13   deliberations.  I'll remain on the bench.
14        THE CLERK:  All rise for the jury.
15        (Whereupon the jury commenced its deliberations at
16   12:05 p.m.)
17
18
19
20
21
22
23
24
25

                         Page 48

READCHGF.TXT

56

C E R T I F I C A T E

I, Donald E. Womack, do hereby certify that the
above portions of proceedings were reported by me
stenographically and this transcript represents a true and
accurate transcription of said proceedings.

ÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄÄ

DONALD E. WOMACK
Official Court Reporter
P.O. Box 51062
Boston, Massachusetts 02205-1062
(617) 439-8877