UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GENLYTE THOMAS GROUP LLC,

        Plaintiff/Counterclaim Defendant,

    v.

ARCHITECTURAL LIGHTING SYSTEMS, a
division of ARCH LIGHTING GROUP,

        Defendant/Counterclaimant.

Civil Action No. 05-CV-10945 WGY

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR JUDGMENT
AS A MATTER OF LAW, TO ALTER JUDGMENT AND/OR FOR A NEW TRIAL**

        Pursuant to Fed. R. Civ. P. 50(b), Defendant Arch Lighting Group, Inc. ("ALS") has

renewed its motion and moved for judgment as a matter of law ("JMOL") that the MulTMed

MT2A, MT2B, and MT1D products do not infringe claims 1 or 3 of U.S. Patent No. 5,038,254

("the '254 Patent") literally and/or under the doctrine of equivalents. For the reasons discussed

below, Plaintiff Genlyte Thomas Group Inc. ("Gentyle") failed to present evidence sufficient to

for a finding of infringement. Alternatively, ALS has further moved pursuant to Fed. R. Civ. P.

59(a) for a new trial since the jury verdict was against the weight of the evidence and the Court's

refusal to instruct the jury with respect to means-plus-function claim prevented the jury from

being able to properly render a verdict. Finally, ALS moves pursuant to Fed. R. Civ. P. 59(a) to

amend the judgment entered February 5, 2007 to strike paragraph 4 as being contrary to the jury

verdict in view of the instructions of the Court. Defendant's motions should be granted for the

reasons set forth below.

BACKGROUND

Genlyte brought this action accusing ALS's MulTMed products and Latitude products of infringing the '254 Patent. ALS denied infringement. A jury trial was held January 22 through January 31, 2007. At the close of discovery, ALS orally moved for judgment as a matter of law that Genlyte had failed to prove any of the accused products infringed the '254 Patent. Specifically, ALS asserted that Genlyte had failed to provide any evidence that any of the ALS products include a structure for ceiling mounting the fixtures which is identical or equivalent to any structures in the specification of the '254 Patent. ALS further asserted that Genlyte had failed to provide any evidence that the accused products included a first fixture which aimed more light in a downward direction to a reading area and a second fixture which aimed more light in a downward and outward direction to a wall. Instead, all of ALS's products have fixtures which direct light identically – downward. The Court denied ALS's motion. ALS renewed its motion for judgment as a matter of law at the close of all of the evidence, which was also denied.

Prior to trial and at a jury charge conference, ALS requested that the jury be instructed as to the law with respect to infringement under 35 U.S.C. §112, paragraph 6. All of the claims included a limitation recited as "means for ceiling-mounting said body." This limitation is in means plus function format and must be analyzed in accordance with the explicit statute. The Court refused to give the requested instructions and ALS properly objected the Court's omission.

The jury rendered a verdict finding that the MulTMed MT2A and MT2B products infringed claims 1 and 3 under the doctrine of equivalents and that the MulTMed MT1D product literally infringed claim 1. The jury awarded damages of $207,554. In light of the jury's verdict, on February 5, 2007, the Court held a hearing regarding entry of judgment. Genlyte had submitted a written motion for judgment having various terms. Paragraph 4 of the proposed

judgment required ALS to account for sales of the MulTMed products from September 2006 through the date of judgment and pay additional damages of $67.00 for each product sold during that time. Counsel for ALS objected to paragraph 4. The Court had instructed the jury to determine damages through the date of the verdict. The Court issued the judgment, including paragraph 4, over ALS's objection.

## ARGUMENT

A.    The MulTMed Products Do Not Infringe the '254 Patent.

Judgment as a matter of law is required where "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1); *Texas Instruments v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1563 (Fed. Cir. 1996). On a motion for judgment as a matter of law, the court must determine "whether there is substantial evidence to support a jury's verdict." *Dawn Equipment Co. v. Kentucky Farms*, 140 F.3d 1009, 1014 (Fed. Cir. 1998). Furthermore, the court's review must "tak[e] into consideration evidence that both justifies and detracts from the decision of the fact-finder." *SIBIA Neurosciences, Inc. v. Cadus Pharmaceutical Corp.*, 225 F.3d 1349, 1354-55 (Fed. Cir. 2000). In patent cases, "JMOL of non-infringement is properly granted if no reasonable jury could have concluded that a limitation recited in the properly construed claim is found in the accused device." *Medtronic, Inc. v. Advanced Cardiovascular Systems, Inc.,* 248 F.3d 1303, 1309 (Fed. Cir. 2001 (affirming JMOL of non-infringement); *Dawn Equipment*, 140 F.3d at 1017 (reversing denial of JMOL of non-infringement); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 989 (Fed. Cir. 1995) (in banc) (affirming JMOL of non-infringement), *aff'd* 517 U.S. 370 (1996).

The determination of whether an accused product infringes a claim of a patent is universally understood to involve two steps. First, the asserted claim is construed to determine its meaning and scope. *Markman,* 52 F.3d at 976. Second, the accused product is compared to the properly construed claim. *Id.* An accused device does not infringe if it does not contain each and every element of a claim. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17 (1997); *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1538-39 (Fed. Cir. 1991); *Mediacom v. Rates Tech., Inc.*, 4 F. Supp.2d 17, 34 (D.Mass. 1998). If every claim element is not present, the claim is not literally infringed. Although a claim may also infringe under the doctrine of equivalents, all claim elements must still be found. *Pennwalt Corp. v. Durand-Wayland, Inc.*, 833 F.2d 931, 935 (Fed.Cir.1987) (in banc), cert. denied, 485 U.S. 961 (1988) (the doctrine of equivalents "does not mean one can ignore claim limitations."). Infringement cannot be established unless every limitation of a claim is satisfied either exactly or by an equivalent in the accused device. *Carroll Touch, Inc. v. Electro Mechanical Systems, Inc.*, 15 F.3d 1573 (Fed. Cir. 1993); *LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n*, 867 F.2d 1572, 1577 (Fed.Cir.1989).

As set forth below, no reasonable jury could conclude that Genlyte proved at trial that ALS's MulTMed MT2A, MT2B and MT1D products infringe claims 1 or 3 of the '254 Patent, literally or under the doctrine of equivalents. Accordingly, this Court should enter judgment as a matter of law that ALS did not infringe the '254 Patent.

1.    Genlyte Failed to Prove That The ALS Products Have "Means for Ceiling-Mounting Said Body"

Both claims 1 and 3 of the '254 Patent include an element reciting "means for ceiling-mounting said body." These limitations are written in means-plus-function format and are to be interpreted pursuant to 35 U.S.C. § 112, paragraph 6. The patent statute provides that claim

elements may be written as means for performing specified functions without recitation of specific structures which perform those functions. In determining whether an accused product includes such a claim limitation, "the sole question is whether the single means in the accused device which performs the function stated in the claim is the same as or an equivalent of the corresponding structure described in the patentee's specification as performing that function." *Valmont Industries, Inc. v. Reinke Mfg. Co., Inc.*, 983 F.2d 1039, 1042 (Fed. Cir. 1993); *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1575 (Fed.Cir.1985).

Genlyte failed to provide any testimony showing that the ALS products include the same structure for mounting the body on the ceiling as disclosed in the patent. Thomas M. Lemons, Genlyte's expert, testified extensively regarding a T-bar grid mounting system for mounting the fixtures. *See* Transcript, page 233, line 11 to page 235, line 17 (Dorny Decl., Ex. D). However, he also admitted on cross examination that the T-bar grid system is not disclosed or mentioned in the '254 patent. Transcript, page 302, line 10 to page 303, line 3 (Dorny Decl., Ex. D). Furthermore, Scott Davis testified that the MulTMed products are not mounted in a T-bar grid. Such a grid cannot support the weight of a fixture. Instead, the fixtures are hung using wire, chains, or rods from the structure decking. Transcript, page 575, line 11 to page 576, line 16 (Dorny Decl., Ex. F).

Therefore, Genlyte failed to provide any evidence that the MulTMed products include a structure identical or equivalent to that shown in the '254 Patent for performing the function of mounting the body to the ceiling. Genlyte bears the burden of proof that all elements of a claim are present in the accused product. It has failed to meet its burden with respect to the "means for ceiling mounting said body. Therefore, judgment as a matter of law as to non-infringement should be granted to ALS.

2.      Genlyte Failed to Prove That The ALS Products Have First and Second Fixtures.

Claims 1 and 3 further both recite a first fixture and a second fixture. These fixtures are oriented to direct light to certain target areas. The Court interpreted the meaning of the terms "oriented to direct light" with respect to the fixtures in these claims. Under the Court's interpretation, the first fixture is "set or arranged to direct or aim more light in a downward direction than in an outward or upward direction to a reading area." The second fixture is "set or arranged to direct or aim more light in a downward and outward direction than in an upward direction to a wall." Under the Court's interpretation, Genlyte failed to present evidence that the MulTMed products include the first and second fixture. Specifically, Genlyte failed to present evidence that any of the MulTMed products have a first fixture which <u>aims more light</u> in a downward direction to a reading area and a second fixture which <u>aims more light</u> in a downward and outward direction to a wall.

Of course, Genlyte's expert, Mr. Lemons testified that the MulTMed products included each and every element of the claims of the '254 Patent either literally or under the doctrine of equivalents. However, he failed to provide any testimony regarding directions in which more light was aimed. In fact, Mr. Lemons testified on cross examination that he had not determined where the fixtures aimed more light. See Transcript, page 323, line 19 to page 324, line 7 (Dorny Decl. Ex. D) (indicating that Mr. Lemons only considered whether the reading light provided light to a reading area not the amount of light); Transcript, page 327, line 25 to page 328, line 2 (Dorny Decl. Ex. D) (indicating that Mr. Lemons didn't consider the amount of light directed to the wall). Therefore, Genlyte failed to provide any testimony that one fixture in the MulTMed directed more light to the reading area and one fixture directed more light to the wall.

On the other hand, multiple witnesses for Genlyte testified that the reading fixture and ambient fixtures in the MulTMed products have substantially identical light distributions and direct light in identical directions.  See Transcript, page 254, lines 6-20 (Dorny Decl. Ex. D) (Mr. Lemons testified that "the patterns of light from both [fixtures] are similar" and that the fixture which is directing light to the reading area or wall could be either one.); Transcript, page 361, line 19 to page 362, line 3 (Dorny Decl. Ex. E) (Mr. Lemons testified that despite slight differences in the distributions of the reading and ambient fixtures, "within the industry, it would be said that [the reading and ambient fixtures] are fairly, you know, equivalent sorts of lighting distributions.");  Transcript, page 159, line 19 to page 160, line 4 (Dorny Decl. Ex. C) (Roy Crane testified that "The light distribution of [the ambient] fixture is very similar to the light distribution of the reading light.").  Transcript, page 177, lines 3-7 and 15-24.  (Mr. Crane testified that the reading and ambient fixtures had "very similar distributions" and that in the fixtures "a lot of light is directed upwards off of a reflective surface that's painted white … and then redirected downward.")

Whether or not Genlyte provided testimony with respect to directions of more light from a fixture, the uncontradicted testimony of its witnesses was that both the reading fixture and ambient fixture direct light identically – and as Mr. Crane testified – downward.  Based upon Genlyte's own testimony, the MulTMed products do not include a first fixture which aims more light to a reading area and a second fixture which directs more light to a wall.  Either both fixtures direct or aim more light downward to the reading area or both fixtures direct or aim more light downward and outward to a wall.  Since the two fixtures have identical distributions, they cannot aim more light in different directions to different locations as required by the first and second fixtures of claims 1 and 3.  Therefore, the MulTMed products do not include all of

7

the limitations of claims 1 and 3 of the '254 Patent and judgment as a matter of law as to infringement should be granted in favor of ALS.

       3.    <u>Infringement under the Doctrine of Equivalents Would Eliminate an Element.</u>

Genlyte also asserted that the ALS MulTMed products infringed claims 1 and 3 of the '254 Patent under the doctrine of equivalents, if not literally. However, the nature of the distinctions between the ALS MulTMed products and the claims of the '254 Parent preclude infringement under the doctrine of equivalents. As discussed above, the claims of the '254 Patent recite fixtures which direct light in defined directions to defined locations. The Court properly interpreted the phrase "oriented to direct light" as "set or arranged to direct or aim more light." The ALS MulTMed products do not direct or aim more light in a downward and outward direction to a wall and, thus do not literally infringe the claims of the '254 Patent. Light from all fixtures of the ALS MulTMed products goes in many directions and some light does illuminate the wall. The testimony from Genlyte's expert was merely that light from the fixtures does illuminate the wall. He did not testify that more light was aimed at the wall nor did he seek to quantify the amount of light which was aimed at the wall.

Infringement by the ALS MulTMed products, under the doctrine of equivalents, could only be found if aiming less light at the wall were considered the same as aiming more light at the wall. This would eliminate a necessary element of the claim, namely that "directing light" means "directing or aiming more light". The Supreme Court has emphasized that the doctrine of equivalents cannot expand a claim such that an element is eliminated. *Warner-Jenkinson v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997) ("It is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety.") Claims cannot be expanded under the doctrine of

8

equivalents to the extent that they change more to less. *Asyst Technologies, Inc. v. Emtrak, Inc.*, 402 F.3d 1188, 1195 (Fed. Cir., 2005) (holding "unmounted" to be equivalent to "mounted" would effectively read a limitation out of the patent); *Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1106 (Fed.Cir.2000) ("it would defy logic to conclude that a minority — the very antithesis of a majority — could be insubstantially different from a claim limitation requiring a majority, and no reasonable juror could find otherwise").  In choosing to define the invention in terms of fixtures directing more light, Genlyte is now precluded from broadening its claims to include directing any light.  *Sage Products, Inc. v. Devon Industries, Inc.*, 126 F.3d 1420, 1425 (Fed. Cir. 1997) (""However, as between the patentee who had a clear opportunity to negotiate broader claims but did not do so, and the public at large, it is the patentee who must bear the cost of its failure to seek protection for this foreseeable alteration of its claimed structure.")

Therefore, the claims of the '254 Patent cannot be expanded under the doctrine of equivalents to over the ALS MulTMed products.  Judgment as a matter of law should be granted to ALS with respect to infringement of the '254 Patent.

B.    A New Trial Should Be Granted Because the Jury Verdict Is Contrary to the Evidence.

As an alternative to judgment as a matter of law, ALS has moved under Fed. R. Civ. P. 59(a) for a new trial.  As discussed above, the evidence produced by Genlyte at trial did not show that the ALS MulTMed products infringe claims 1 or 3 of the '254 Patent, either literally or under the doctrine of equivalents.  Therefore, the jury verdict finding that the MT1D product literally infringed claim 1 and that the MT2A and MT2B products infringed claims 1 and 3 under the doctrine of equivalents is contrary to the weight of the evidence.  A judge has a duty to set aside a jury verdict and grant new trial when the verdict is against the clear weight of the

evidence or will result in a clear miscarriage of justice. *Valentín-Almeyda v. Municipality of Aguadilla*, 447 F.3d 85, 103-04 (1st Cir. 2006); *Borras v. Sea-Land Service, Inc.*, 586 F.2d 881, 886-87 (1st Cir. 1978) (quoting *Aetna Casualty & Surety Co. v. Yeatts*, 122 F.2d 350, 352 (4th Cir. 1941). A decision to grant a new trial is left to the sound discretion of the trial judge. *Id.* Trial judges have more leeway to grant new trials than to set aside verdicts based on insufficiency of the evidence. They may consider their view of the credibility of the witnesses in doing so as long as they are careful not to invade the jury's province. *MacQuarrie v. Howard Johnson Co.*, 877 F.2d 126, 132 (1st Cir.1989). For the reasons discussed above, the jury verdict is against the substantial weight of the evidence. Accordingly, if the Court does not grant judgment as a matter of law, a new trial should be granted with respect to the MulTMed MT2A, MT2B and MT1D products.

C.    A New Trial Should Be Granted Because the Jury Was Incorrectly Charged.

Furthermore, a new trial should be granted in order to correct for errors relating to the jury's understanding of the law. As discussed above, infringement under the doctrine of equivalents – found by the jury with respect to the MT2A and MT2B products – could only occur if the claim element requiring a second fixture which aimed more light at the wall were entirely eliminated. Thus, the jury was likely confused regarding the standards for infringement under the doctrine of equivalents. Furthermore, the Court failed to instruct the jury properly with respect to means plus function elements of claims. The jury had no basis for concluding that the "means for ceiling-mounting said body" recited in the claims was present in ALS's products. Therefore, a new trial should be granted.

During the trial and in the Court's charge to the jury, the Court made several different statements regarding the standard for determining infringement under the doctrine of equivalents.

In some instances, the Court referred to the doctrine of equivalents as requiring substantially the same ends, substantially the same way and substantially the same means. See Transcript, page 29, lines 16-17 (Dorny Decl. Ex. B). At other times, the Court referred to it as requiring substantially the same function, substantially the same way and substantially the same means. See Transcript, page 671, lines 10-13 (Dorny Decl. Ex. G). Other times, the Court properly recited the requirement of substantially the same function, in substantially the same way, to obtain substantially the same result. See Transcript, page 682, lines 10-13 (Dorny Decl. Ex. G) and page 754, lines 1-6 (Dorny Decl. Ex. H). Furthermore, at one point the Court's instruction suggested that to find infringement only some, not all, of the non-literally present elements need be found under the doctrine of equivalents. See Transcript, page 729, lines 18-22 (Dorny Decl. Ex. G). All of these variations would be confusing to the jury and result in a verdict which is not supported by the evidence and which eliminates a necessary element of the claim.

Additionally, the jury was given no instructions on how to properly consider certain elements of the claims. Both claims 1 and 3 of the '254 Patent recite "means for ceiling-mounting said body." These elements are written in a means plus function format which has a specific statutory interpretation. Under 35 U.S.C. §112, paragraph 6, such elements are limited to the structures shown in the specification and equivalents. Despite a request from counsel for ALS for instructions with respect to infringement of such an claim element, the Court did not provide any such instructions. This left the jury without any understanding about how to determine infringement of such a claim element.

In order to infringe such an element, the accused device must use structures identical to or the equivalent of the structures described in the patent specification for performing the recited function. *Valmont Industries, Inc. v. Reinke Mfg Company, Inc.*, 983 F.2d 1039, 1042 (Fed. Cir.

1993); *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1575 (Fed. Cir. 1985). Furthermore, determining equivalents for a means plus function element is different than under the doctrine of equivalents. *Valmont*, 983 F.2d at 1043 ("A determination of section 112 equivalence does not involve the equitable tripartite test of the doctrine of equivalents.").

As discussed above, Genlyte failed to present evidence of the structures shown in the specification for ceiling mounting the body. Genlyte presented substantial evidence of T-bar grid ceilings for use with the ALS products, but such structures are not disclosed in the '254 Patent. See, e.g., Transcript, page 302, line 10 to page 303, line 3 (Dorny Decl., Ex. D) (Genlyte's expert testified that the T-bar grid ceiling is not disclosed in the '254 Patent). Without an instruction from the Court on how to determine infringement of this claim element, the jury could not properly consider nor find infringement. The jury never knew that use of such language has an "'attached string' [which] limits the applicant to the structure, material or acts in the specification and their equivalents." *Valmont*, 983 F.2d at 1042. Therefore, a new trial should be granted to allow a jury to properly consider the issues of infringement.

D.    Paragraph 4 of the Judgment Should Be Stricken.

Finally, ALS has moved amend the Judgment to strike paragraph 4 as resulting in double recovery. Paragraph 4 of the Judgment requires ALS to account for products sold between September 30, 2006 and the date of the judgment and to pay additional damages of $67.00 per product sold. However, in instructing the jury, the Court told them to determine damages through the date of the verdict, as follows:

> I'm saying if you've got checkmarks there in the grid, figure out a reasonable royalty and then apply that royalty to the products that you think infringed over the time that you think they were infringing up to today. And in fairness, you will recall that Mr. Tate said he stopped his analysis back in September of last year.

Transcript, page 678, lines 7-13 (Dorny Decl. Ex G) (emphasis added).  Therefore, the jury was

to determine damages through the date of the verdict.  There is no reason to believe that the jury

did not determine damages as directed.  Thus, the jury's damages verdict includes sales after

September 2006 and paragraph 4 of the Judgment is repeating the damages for those sales.

Accordingly, paragraph 4 of the Judgment should be stricken.

CONCLUSION

For the reasons set forth above, ALS's motions should be granted.  Genlyte failed to meet

its burden of proof with respect to infringement, either literal or under the doctrine of

equivalents.  There was no evidence that any MulTMed fixture aimed or directed more light to a

wall at the head of the bed.  Judgment as a matter of law in favor of ALS should be granted.

Alternatively, a new trial should be granted because the jury verdict was against the clear weight

of the evidence and/or the Court's instructions to the jury on the law were deficient.  Even if the

Court lets the Judgment stand, paragraph 4 should be stricken as resulting in a double recovery

of damages.

Respectfully submitted,

Dated:  February 20, 2007

_s/ Brett N. Dorny_____
Brett N. Dorny,  BBO# 628,977
Law Office of Brett N. Dorny
386 West Main Street, Suite 12A
Northborough, Massachusetts  01532
508-709-0501
bndorny@dornylaw.com
Attorney for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent by mail to those indicated as non-registered participants on February 20, 2007.

 _s/ Brett N. Dorny_____
Brett N. Dorny

# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GENLYTE THOMAS GROUP LLC,

        Plaintiff/Counterclaim Defendant,

    v.

ARCHITECTURAL LIGHTING SYSTEMS, a
division of ARCH LIGHTING GROUP,

        Defendant/Counterclaimant.

Civil Action No. 05-CV-10945 WGY

## DECLARATION OF BRETT N. DORNY

I, Brett N. Dorny, hereby declare as follows:

1.       I represent Defendant Arch Lighting Group, Inc. ("ALS") with respect to this matter. I submit this declaration in support of Defendant's Motion For Judgment As A Matter Of Law, To Alter Judgment And/Or For A New Trial.

2.       Attached hereto as Exhibit A is a true and correct copy of Trial Exhibit 1 (U.S. Patent No. 5,038,254).

3.       Attached hereto as Exhibit B is a true and correct copy of excerpts from the trial transcript of January 22, 2007 (Day 1), including pages 1 and 29.

4.       Attached hereto as Exhibit C is a true and correct copy of excerpts from the trial transcript of January 23, 2007 (Day 2), including pages 90, 159, 160, and 177.

5.       Attached hereto as Exhibit D is a true and correct copy of excerpts from the trial transcript of January 24, 2007 (Day 3), including pages 228, 233-37, 254, 302, 303, 323-25, 327, and 328.

6.       Attached hereto as Exhibit E is a true and correct copy of excerpts from the trial transcript of January 29, 2007 (Day 4), including pages 338 and 361-62.

1

7.    Attached hereto as Exhibit F is a true and correct copy of excerpts from the trial transcript of January 30, 2007 (Day 5), including pages 484, 575 and 576.

8.    Attached hereto as Exhibit G is a true and correct copy of excerpts from the trial transcript of January 31, 2007 (Day 6), including pages 631, 670-72, 677, 678, 682, and 729-732.

9.    Attached hereto as Exhibit H is a true and correct copy of excerpts from the trial transcript of February 1, 2007 (Day 7), including pages 737, 753, and 754.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 20th day of February, 2007.

                                         _s/  Brett N. Dorny_____
                                         Brett N. Dorny

# EXHIBIT 1-A

# United States Patent [19]

## Fabbri et al.

| | |
|---|---|
| [11] | **Patent Number:** 5,038,254 |
| [45] | **Date of Patent:** Aug. 6, 1991 |

[54] **INTEGRATED MEDICAL LIGHT SYSTEM**

[75] Inventors: **Wiliam C. Fabbri**, Billerica; **Roy Crane**, Wilmington, both of Mass.

[73] Assignee: **Keene Corporation**, Union, N.J.

[21] Appl. No.: **629,436**

[22] Filed: **Dec. 18, 1990**

[51] Int. Cl.$^5$ .............................................. **F21V 13/00**
[52] U.S. Cl. ...................................... **362/33; 362/225; 362/147; 362/804**
[58] Field of Search ................. 362/33, 225, 240, 364, 362/147, 804

[56] **References Cited**

U.S. PATENT DOCUMENTS

3,928,757 12/1975 Nelson ............................ 362/804 X

4,204,274 5/1980 Lüderitz ......................... 362/225 X

*Primary Examiner*—Stephen F. Husar
*Attorney, Agent, or Firm*—Kane, Dalsimer, Sullivan, Kurucz, Levy, Eisele and Richard

[57] **ABSTRACT**

The apparatus is a medical lighting system which includes a ceiling-mount reading light, examination light and ambient light. The reading light is directed toward a selected reading area on a hospital bed directly below the medical lighting system. The examination light illuminates the entire top surface of the hospital bed. The ambient light directs light to a wall abutting the head of the hospital bed thereby providing reflected light to the vicinity of the hospital bed.

**14 Claims, 2 Drawing Sheets**





FIG. 1



FIG. 2

5,038,254

1

# INTEGRATED MEDICAL LIGHT SYSTEM

## BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention pertains to a light system for use in hospitals and health facilities. The light system includes an examination light, an ambient light, and a reading light and is preferably mounted in the ceiling.

2. Description of the Prior Art

In hospitals and similar health or medical facilities, it is desirable to provide the bedridden patient with three types of lights—the first is an ambient light which provides background, preferably reflected, light to a large area surrounding the bed; the second is a reading light which provides direct light to a portion of the patient's bed; and the third is an examination light which directs a high intensity light to substantially the entire area of the patient's bed. The ambient light typically has an illumination value of approximately 50 foot-candles while the reading light typically has an illumination value of approximately 70 foot-candles and the examination light typically has an illumination value of approximately 100 foot-candles.

In the prior art, these lights were typically provided individually in a haphazard way. Different types of lamps and light fixtures were placed around the bed with numerous plugs competing with medical equipment for available outlet space. Moreover, such an arrangement was unsightly and could impede the mobility of the patient, the patient's bed, or the surrounding medical equipment.

Wall-mounted fixtures alleviated some of the above-identified deficiencies but still left much to be desired aesthetically and, more importantly, could impede access to the patient, and were easily damaged by motor driven bed headboards.

## OBJECTS AND SUMMARY OF THE INVENTION

It is therefore an object of this invention to provide an integrated medical lighting system which provides an ambient light with an illumination value of about 50 foot-candles over a wide area; a reading light with an illumination value of about 70 foot-candles over an area appropriate for a patient reading in bed; and an examination light with an illumination value of about 100 foot-candles over the entire area of the patient's bed.

It is therefore a further object of this invention to provide an integrated medical lighting system which requires no more than one or two electrical connections.

It is therefore a still further object of this invention to provide an integrated medical lighting system which does not impede access to the patient, the patient's bed, or surrounding medical equipment.

It is therefore a final object of this invention to provide an integrated medical lighting system which is aesthetically pleasing.

These and other objects are effectively attained by providing a ceiling-mounted medical lighting system which includes three individual dedicated light fixtures. The lighting system is rectangular and is designed to be placed so that one of the shorter ends of the rectangle is placed substantially on the ceiling-wall interface directly over the head of the patient's bed. The bed is

2

placed so that the longer sides of the bed are parallel to the longer sides of the rectangular light fixture.

A first light fixture includes a fluorescent bulb and a reflector designed to direct light toward the forward portion of the patient's bed so as to allow a patient to read comfortably. A second light fixture includes a fluorescent bulb and a reflector designed to direct light toward a vertical wall abutting the head of the patient's bed so as to provide a reflected light over a large area around the patient's bed. A third light fixture includes two to four fluorescent (preferably biax ® or other U-shaped) bulbs which are oriented perpendicularly to the bed. The fluorescent bulbs have a light distribution pattern which is substantially oriented in the direction perpendicular to the bulb. Therefore, the entire area of the bed is efficiently illuminated providing an examination light.

## BRIEF DESCRIPTION OF THE DRAWINGS

Further objects and advantages of the invention will become apparent from the following description and claims, and from the accompanying drawings, wherein:

FIG. 1 is a side plan view of the integrated medical light system of the present invention.

FIG. 2 is a bottom plan view of the integrated medical light system of the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring now to the drawings in detail wherein like numerals indicate like elements throughout the several views, FIG. 1 is a side plan view of lighting fixture 10 shown installed in ceiling 100 directly over bed 200. FIG. 2 shows the rectangular shape of lighting fixture 10 formed by long sides 12, 14 and short sides 16, 18. Long sides 12, 14 are typically four feet in length while short sides 16, 18 are typically two feet in length. As shown in FIG. 1, short side 16 abuts the wall-ceiling (300, 100, respectively) interface directly over the head of bed 200. Long sides 12, 14 are parallel to the longer side of bed 200.

Reading light reflector 20 is along short side 16 of lighting fixture 10 proximate to wall 300 and includes a fluorescent bulb 22 positioned therewithin parallel to short sides 16, 18 of lighting fixture 10 so as to provide a direct light to reading area 400 of bed 200 as shown on FIG. 1. Reflector 20 and bulb 22 are chosen to provide an illumination of approximately 70 foot-candles to reading are 400.

Ambient light reflector 24 is inwardly adjacent to reading light reflector 20 and includes a fluorescent bulb 26 positioned therewithin parallel to short sides 16, 18 of lighting fixture 10 so as to reflect or bounce light from wall 300 thereby providing ambient light to bed 200. Reflector 24 and bulb 26 are chosen to provide approximately 50 foot-candles of illumination to the ambient area.

Reflectors 20, 24 and bulbs 22, 26 are configured so as not to direct glare toward the head of bed 200 where the patient's head is likely to be, whether in a supine or sitting position. Similarly, reflectors 20, 24 and bulbs 22, 26 are configured so as not to direct glare to areas adjacent to bed 200 so as to allow other beds (not shown) to be placed proximate thereto without undue disturbance of neighboring patients.

Examination light reflector 28 is outwardly adjacent to ambient light reflector 24, includes short side 18 and is opposite from reading light reflector 20. Examination

5,038,254

3

light reflector 28 includes two to four fluorescent bulbs 30, 32. Fluorescent bulbs 30, 32 (preferably biax ® or other U-shaped) are parallel to short sides 16, 18 of lighting fixture 10. As fluorescent bulbs 30, 32 have a characteristic directional light distribution pattern oriented in the direction perpendicular to the bulbs, the entire area of the bed 200 is efficiently illuminated. The bulbs 30, 32 and reflector 28 are chosen to provide 100 foot-candles of illumination to the bed 200. An important feature of the present invention resides in the orientation of the lamps within the lighting 1 fixture which permits the lighting fixture 10 to be packaged in a two foot by four foot configuration and thereby replace a conventional troffer.

Bulbs 22, 26, 30 and 32 are powered by a single electrical source, preferably supplied from wiring within ceiling 100 although the use of a single electric cord (not shown) engaging an electrical socket (not shown) may be used. A single switch module (not shown), either hand-held or built into wall 300, is used to control bulbs 22 and 26 and a wall switch to control bulbs 30 and 32.

To use this device, the patient operates the switch module (not shown) to operate selectively bulbs 22 and 26. Medical personnel control bulbs 30 and 32 of the examination lighting from a switch on the headwall, not easily accessible to the patient.

Thus the several aforementioned objects and advantages are most effectively attained. Although a single preferred embodiment of the invention has been disclosed and described in detail herein, it should be understood that this invention is in no sense limited thereby and its scope is to be determined by that of the appended claims.

What is claimed is:

1. A medical lighting system comprising:

a body;

means for ceiling-mounting said body;

a first light fixture within said body oriented to direct light downwardly to a selected reading area under said body;

a second light fixture within said body oriented to direct light downwardly and outwardly to a vertical wall surface outwardly adjacent from said body whereby light is reflected back to a broad area under said body.

2. The medical lighting system of claim 1 wherein said first light fixture includes a first reflector and a first fluorescent bulb therewithin; and said second light fixture includes a second reflector and a second fluorescent bulb therewithin.

3. A medical lighting system comprising:

a body;

means for ceiling-mounting said body;

a first light fixture within said body oriented to direct light downwardly to a selected reading area under said body;

a second light fixture within said body oriented to direct light downwardly and outwardly to a vertical wall surface outwardly adjacent from said body whereby light is reflected back to a broad area under said body;

4

a third light fixture within said body oriented to direct light downwardly under said body to a selected patient examination area.

4. The medical lighting system of claim 3 wherein said first light fixture includes a first reflector and a first fluorescent bulb therewithin; said second light fixture includes a second reflector and a second fluorescent bulb therewithin; and said third light fixture includes a third reflector and a fluorescent assembly therewithin.

5. The medical lighting system of claim 4 wherein said fluorescent assembly includes at least one fluorescent bulb with a light distribution pattern oriented in a direction perpendicular to said at least one fluorescent bulb.

6. The medical lighting system of claim 5 wherein said at least one fluorescent bulb is a "biax"-type bulb.

7. The medical lighting system of claim 5 wherein said fluorescent assembly includes at least two fluorescent bulbs with a light distribution pattern oriented in a direction perpendicular to said at least two fluorescent bulbs.

8. The medical lighting system of claim 7 wherein said at least two fluorescent bulbs are "biax"-type bulbs.

9. The medical lighting system of claim 5 wherein said body is rectangular and a first shorter and of said body is designed to abut the vertical wall surface; wherein said first fluorescent light fixture abuts said first snorter end and said first fluorescent light bulb is parallel to said first shorter end; wherein said second fluorescent light fixture is inwardly adjacent to said first fluorescent light fixture and said second fluorescent light fixture is parallel to first shorter end; and wherein said third fluorescent light fixture is outwardly adjacent from said second fluorescent light fixture and abuts a second shorter end of said body; and wherein said at least one fluorescent bulb is parallel to said first shorter end.

10. The medical lighting system of claim 9 wherein said first and second shorter ends are substantially two feet in length and said body includes first and second longer ends which are substantially four feet in length.

11. The medical lighting system of claim 9 wherein said first light fixture illuminates said selected reading area to substantially 70 foot-candles; wherein said second light fixture illuminates said broad area to substantially 50 foot-candles; and wherein said third light fixture illuminates said patient examination area to substantially 100 foot-candles.

12. The medical lighting system of claim 11 wherein said patient examination area is sufficient in size to include a standard hospital bed when said first light fixture is substantially directly over a head of the standard hospital bed, the head of the standard hospital bed substantially abutting the vertical wall surface.

13. The medical lighting system of claim 3 wherein a distribution of light from said first and second light fixtures excludes glare from being directed to a forward area of a standard hospital bed placed below the medical lighting system.

14. The medical lighting system of claim 3 wherein a distribution of light from said first and second light fixtures excludes glare from areas adjacent to a standard hospital bed placed below the medical lighting system.

* * * * *

# EXHIBIT 1-B

1

```
 1                  UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
 2
                                          Civil Action
 3                                        No. 05-10945-WGY

 4

 5    * * * * * * * * * * * * * * * * * *
      GENLYTE THOMAS GROUP LLC,           *
 6    a Delaware Limited Liability Company, *
                                          *   DAILY TRANSCRIPT
 7                    Plaintiff,          *   OF PRETRIAL MATTERS,
         v.                               *   PRELIMINARY JURY
 8                                        *   INSTRUCTIONS,
      ARCHITECTURAL LIGHTING SYSTEMS,     *   OPENING STATEMENTS
 9    a division of ARCH LIGHTING GROUP,  *   and THE EVIDENCE
      a Rhode Island Corporation,         *
10                                        *
                      Defendant.          *
11    * * * * * * * * * * * * * * * * * *

12
                  BEFORE:  The Honorable William G. Young,
13                         District Judge, and a Jury

14


15


16
      APPEARANCES:
17
                  MIDDLETON REUTLINGER (By James E. Milliman,
18        Esq., James R. Higgins, Jr., Esq. and Robert J.
          Theuerkauf, Esq.), 2500 Brown & Williamson Tower,
19        Louisville, Kentucky 40202-3410, on behalf of the
          Plaintiff
20
                  LAW OFFICE OF BRETT N. DORNY (By Brett N.
21        Dorny, Esq.), 386 West Main Street, Suite 12A,
          Northborough, Massachusetts 01532, on behalf of
22        Defendant

23

24                                    1 Courthouse Way
                                      Boston, Massachusetts
25
                                      January 22, 2007
```

1    call the doctrine of equivalents.  And Architectural

2    Lighting, they deny that.  They say no, we don't.  Remember,

3    says Architectural Lighting, we're entitled to design

4    around.  We're entitled to do it differently but in the

5    similar area.  We're entitled to build a better mousetrap.

6         Well, Genlyte does have some rights that go

7    slightly beyond literal infringement.  And that's what

8    Genlyte claims here.  They claim infringement by the

9    doctrine of equivalents.  You want to be very careful with

10   this doctrine of equivalents because, remember, the law

11   encourages a design around.  However, if there is an element

12   of the claim in Genlyte's patent that's not in Architectural

13   Lighting's operation, there is no literal infringement.  But

14   then you have to ask yourself, does the Architectural

15   Lighting system have a different element that does three

16   things.  It accomplishes the same end, in the same way,

17   using the same means.  All of those three things have to be

18   proved by Genlyte in order for there to be infringement

19   under the doctrine of equivalents.

20        Then there's a third thing.  Genlyte says, well, if

21   we prove literal infringement, or we prove infringement by

22   the doctrine of equivalents, but it isn't Architectural

23   Lighting that is actually selling the product that

24   infringes, we say that Architectural Lighting is inducing

25   other people, other companies to violate the patent, to

# EXHIBIT 1-C

90

```
 1              UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS
 2
                                    Civil Action
 3                                  No. 05-10945-WGY

 4

 5   * * * * * * * * * * * * * * * * * *
     GENLYTE THOMAS GROUP LLC,            *
 6   a Delaware Limited Liability Company, *
                                          *
 7              Plaintiff,        *  TRANSCRIPT OF
        v.                        *  THE EVIDENCE
 8                                *   (Volume 2)
     ARCHITECTURAL LIGHTING SYSTEMS,      *
 9   a division of ARCH LIGHTING GROUP,   *
     a Rhode Island Corporation,          *
10                                        *
                Defendant.       *
11   * * * * * * * * * * * * * * * * * *

12

13

14         BEFORE:  The Honorable William G. Young,
                     District Judge, and a Jury
15

16
     APPEARANCES:
17
              MIDDLETON REUTLINGER (By James E. Milliman,
18      Esq., James R. Higgins, Jr., Esq. and Robert J.
        Theuerkauf, Esq.), 2500 Brown & Williamson Tower,
19      Louisville, Kentucky 40202-3410, on behalf of the

        Plaintiff
20
              LAW OFFICE OF BRETT N. DORNY (By Brett N.
21      Dorny, Esq.), 386 West Main Street, Suite 12A,
        Northborough, Massachusetts 01532, on behalf of
22      Defendant

23

24                                  1 Courthouse Way
                                    Boston, Massachusetts
25
                                    January 23, 2007
```

159

1    a painted white reflector body.  You can see that these

2    curves are very, very similar and very close to each other

3    no matter which way I turn the fixture.  If it's looking at

4    the light going parallel to the fixture or perpendicular to

5    the fixture or 45 degrees, we have basically a blob of light

6    going all the way around the fixture.  That's all it does.

7    Q    I'm going to show you what has been marked as

8    Exhibit 14.  Can you identify this document for us, please?

9    A    Yes, this is our photometry report on the ambient light

10   function of the MulTmed.

11   Q    And is this the -- is the report for this fixture and

12   the last fixture we just discussed, are the reports the

13   same?  I mean, as far as the method for testing?

14   A    Yes, they're both tested in accordance with IES.  IES is

15   the Illuminating Engineering Society by the way.  And they

16   put out the rules under which you test lighting fixtures.

17   And both of these are tested in accordance with IES

18   practice.

19   Q    Again, if you could, please, what does this report tell

20   you about the direction of the light emanating from that

21   fixture?

22   A    The light distribution of this fixture is very similar

23   to the light distribution of the reading light.  Again, very

24   little difference between all three planes.  The curves are

25   very similar in shape.  It's basically a blob of light type

160

1     of distribution, a wide distribution.  Both of these

2     products -- both of these lighting fixtures are using

3     painted white reflectors come with fluorescent sources, it's

4     kind of what you get.

5     Q   And you mentioned the IES standard.  Does your lab that

6     you conducted these tests in follow that standard?

7     A   Yes, it does.

8               THE COURT:  Counsel, it's time for the morning

9     recess.  Are you almost done?

10              MR. THEUERKAUF:  I've got probably another ten

11    minutes.

12              THE COURT:  Well, then why don't we take the

13    recess.

14              MR. THEUERKAUF:  That's all right, thank you.

15              THE COURT:  But before we take the recess we have a

16    very special -- it will only -- you may be seated.  You may

17    stay right there, sir.

18              We've got something, it has nothing to do with this

19    case, but I like to do it in the middle of a trial.  And it

20    won't hold you up but a moment, but it's very important to

21    the people involved and it's important to me.

22              In the middle of a trial, with the witness on the

23    stand, the lawyers doing their professional job in front of

24    you, we're going to swear in two new attorneys to the bar.

25    And I'll ask Ms. Lisa Hodes and Mr. Aaron Agulnek to come

1    thing?

2    A    Right.

3    Q    Now, when you testified before you compared the other

4    fixtures, examination fixture to, I believe the ambient

5    fixture, how did the ambient and reading fixtures compare?

6    Thirteen and fourteen?

7    A    Very similar distribution.

8    Q    Now, you referred, you testified that you could use

9    reflectors or baffles to prevent light from going in some

10   direction.  And that the product you tested, the MulTmed

11   product, did not have any baffles or reflectors; is that

12   correct?

13   A    I didn't say that.

14   Q    Okay.  Then maybe I misunderstood your testimony.

15          Does the MulTmed product have any baffles or

16   reflectors that prevent light from going in certain

17   directions?

18   A    The MulTmed uses a perforated material to shield the

19   lamp from being seen directly, but it still allows some

20   light to pass through in those areas.  Also, a lot of the

21   light is directed upwards off of a reflective surface that's

22   painted white.

23   Q    Okay.

24   A    And then redirected downward.

25          MR. DORNY:  I have no further questions.

# EXHIBIT 1-D

228

```
 1                  UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
 2
                                          Civil Action
 3                                        No. 05-10945-WGY

 4

 5    * * * * * * * * * * * * * * * * * *
      GENLYTE THOMAS GROUP LLC,           *
 6    a Delaware Limited Liability Company, *
                                          *
 7                    Plaintiff,          *  TRANSCRIPT OF
          v.                              *  THE EVIDENCE
 8                                        *   (Volume 3)
      ARCHITECTURAL LIGHTING SYSTEMS,     *
 9    a division of ARCH LIGHTING GROUP,  *
      a Rhode Island Corporation,         *
10                                        *
                      Defendant.          *
11    * * * * * * * * * * * * * * * * * *

12


13


14          BEFORE:  The Honorable William G. Young,
                        District Judge, and a Jury
15


16
      APPEARANCES:
17
               MIDDLETON REUTLINGER (By James E. Milliman,
18    Esq., James R. Higgins, Jr., Esq. and Robert J.
      Theuerkauf, Esq.), 2500 Brown & Williamson Tower,
19    Louisville, Kentucky 40202-3410, on behalf of the

      Plaintiff
20
               LAW OFFICE OF BRETT N. DORNY (By Brett N.
21    Dorny, Esq.), 386 West Main Street, Suite 12A,
      Northborough, Massachusetts 01532, on behalf of
22    Defendant

23

24                                        1 Courthouse Way
                                          Boston, Massachusetts
25
                                          January 24, 2007
```

```
 1    A   We constructed, or I constructed actually this cart.

 2    I'll pick up the front end so you see the inside bottom with

 3    tiles in it.  The tiles are removable so that we can put a

 4    light fixture in.  And the, generally the, what is the T bar

 5    across here and down the sides all clip together, and here's

 6    the two foot example of that T bar.

 7                MR. HIGGINS:  Your Honor, may I display this to the

 8    jury?

 9                THE COURT:  You may hold it up for them, yes.

10    Q   Please continue while I hold it up.

11    A   Now, in the T bars there are holes in it where you wire

12    this to the structure above.  And generally you have T bars

13    that are twelve feet long that you wire up four feet long

14    that you put in between those and when you go to a two by

15    two, you have two by two's that you clip in.

16                The whole purpose of this is to show the process by

17    which a two-by-four troffer -- and this as you can see is

18    approximately two feet wide and four feet long.  And an

19    electrician would take this, put it up into the ceiling, lay

20    it on its lip at one end, move it down so it lays at the

21    other end.

22                One other factor that I neglected earlier to

23    describe is, the IES handbook, when describing a patient

24    room lighting, says that the bed height is 30 inches above

25    the floor.  And ceiling heights do vary from facility to
```

234

1    facility, eight, eight-foot-six, nine foot.  Some of them,

2    especially older ones, even higher.  But if you look at an

3    eight-foot-six ceiling and a 30 inch bed, you have six feet

4    from the ceiling surface to the bed.  So we made this to

5    show the lighting from the light fixtures onto the floor

6    which is equivalent to the bed surface.

7              So, when we put a fixture in and light it you will

8    see the light on the floor as what is produced by the light

9    fixtures.

10   Q   And the light on the floor will be equivalent to what in

11   a hospital patient room?

12   A   The plane of the top surface of the bed, 30 inches above

13   the floor.

14   Q   Mr. Lemons, during the conduct of this case have you

15   prepared expert reports and given them to ALS?

16   A   Yes, I prepared four different reports.

17   Q   Could you read the exhibit numbers to the jury?

18   A   39, 41, 46, and 53.

19   Q   Did a report in this case include an explanation of the

20   crossbar and T grid system?

21   A   Yes.

22   Q   Particularly, would you proceed with your demonstration

23   for the jury.

24   A   This is a lay-in, standard lay-in troffer.  We replace

25   it with a hospital fixture.  And in the patent there is

235

1   shown a box by a face view that has four lamps mounted in
2   it.  There's the sockets and such here for such a thing.
3   And basically, this fits into the ceiling so that the, the
4   front lip is what fits on, on the T bar inside face.  So
5   that you have the opening here where the light would come
6   down onto the bed below.
7   Q    What mounting means are used in this example that you
8   just gave here?
9   A    The front lip of the fixture, a two foot by four foot
10  size, actually as it's stated in the patent, the width of
11  the fixture is approximately 23 and three-quarter inches
12  wide, because the spacing, the center of the T bars is two
13  feet.  So we have to be inside that.  And it's 47 and
14  three-quarter inches long.  Again, the spacing of the T bars
15  are on a four foot center.  We have to fit inside that.  And
16  then it also says in the patent that the fixture replaces a
17  standard troffer.
18  Q    What does the patent teach one skilled in the art about
19  means for ceiling-mounting the body of a luminaire?
20        MR. DORNY:  Objection.
21        THE COURT:  Well, the patent speaks for itself.
22  But consistent with my construction, if it's in his reports
23  he may answer.
24  A    The patent teaches what I just said, that the medical
25  fixture replaces a standard troffer.  It has dimensions to

236

```
 1    fit into a two foot by four foot size, or in a second

 2    example in the patent, a two foot by two foot size opening.

 3    Q   Now, Mr. Lemons, we're displaying on the screen a

 4    portion of the patent right now.  Can you explain to the

 5    jury how this relates to your demonstration here?

 6    A   Yes.  It says at Figure 2, which is a face view of this

 7    fixture we put in, shows a rectangular shape of the lighting

 8    fixture and formed with a long side and a short side, long

 9    side being typically four feet, short side being typically

10    two feet.

11    Q   You mentioned that the patent teaches about replacing a

12    conventional troffer.  Where is that found in the patent?

13    A   In the, on the next page in column 3, states an

14    important feature of the present invention resides in the

15    orientation of the lamps within the lighting fixture which

16    permits the lighting fixture to be packaged in a two foot by

17    four foot configuration and thereby replaces a conventional

18    troffer.

19    Q   Does this information that you've just described, that

20    is, Fig. 2, and the two textual parts of the patent convey

21    such information to you as a person skilled in the art to

22    describe and find the structure of the mounting means for

23    the body?

24    A   Yes, although the picture of Fig. 2 helps show that it a

25    lip that sets in it.  When we had the conventional troffer
```

1    they often have a bent-out or a bent-in flat face that sets

2    on the edge of the T bar.  But those three different ways of

3    having the face to the fixture are the conventional shapes

4    for a troffer.

5    Q   In your opinion, would a person skilled in the art

6    reading the patent realize what mounting means were

7    described in the claim?

8    A   Yes, it's been standard in the industry for over 50

9    years.  Every electrician would know, if you tell him you're

10   going to install troffers he instantly knows that it's going

11   to be a hung ceiling and you fit the fixture up into it and

12   set it down on the T bar.

13   Q   Are there other equivalent mounting means other than

14   just mounting it on its edge that persons skilled in the art

15   are aware of?

16   A   As I say, some troffers have a flat face where the

17   housing comes down and bends out or housing comes down and

18   bends in.  Generally on the ends it bends in, on the side it

19   bends out, but there are variations on that.

20   Q   What's the next product that you want to demonstrate to

21   the jury?

22   A   The product made by ALS.

23        In this unit there are prismatic elements that fit

24   in the two sides, the two sides of the fixtures.

25   Q   Mr. Lemons, has the ALS MulTmed product MT2A, actually

254

1   A   That it does infringe claim 1 of the patent.

2   Q   Does the MT1D product that is being displayed here

3   contain each and every element of claim 1 as construed by

4   the Court?

5   A   Yes.

6   Q   Does the fact that ALS calls one light fixture here or

7   the other ambient or reading have any impact on your

8   opinion?

9   A   No.

10  Q   Why not?

11  A   Because the patterns of light from both are very

12  similar.  So, I could say that this is the first light

13  fixture, and it provides light down to a reading area.  And

14  the other is the second light fixture and it provides light

15  onto the wall that is reflected out over a broad area.

16          The only real difference is when you look at the

17  photometric, this distribution comes from one lamp and

18  therefore more up here and less in the other areas, where

19  this comes from two lamps and therefore more light in all

20  areas.  But you could go either way with it.

21  Q   Directing your attention to the so-called first light

22  fixture or second light fixture in claim 1 of the patent,

23  does the patent in the claim call for a reading light

24  fixture or an ambient light fixture to be denominated as

25  such?

302

```
1    Q   Did you seek to measure the amount of illuminance you
2    had at the book?
3    A   No.
4    Q   Did you seek to measure the amount of illuminance you
5    had at the wall?
6    A   No.
7    Q   Did you seek to determine whether you had more
8    illuminance at the book than the wall?
9    A   No.
10   Q   Now, earlier this morning you talked a lot about
11   mounting of fixtures into a ceiling.  Does the patent refer
12   anywhere to a T bar grid?
13           THE COURT:  I didn't catch the phrase, refer
14   anywhere to a?
15           MR. DORNY:  To a T bar grid.
16           THE COURT:  T bar grid.  Thank you.
17   A   No.
18   Q   Does the patent refer anywhere to connecting a T bar
19   grid to a ceiling?
20   A   No.
21   Q   Does the patent talk anywhere about putting a fixture on
22   a T bar grid?
23   A   No.
24   Q   So your testimony this morning about T bar grid, that
25   comes from your knowledge; is that correct?
```

303

1    A    Yes.

2    Q    It doesn't come from the patent?

3    A    That is correct.

4         MR. DORNY:  If I may, your Honor.

5    Q    This is one of the fixtures that you put up into your

6    cart.  What is this fixture?

7    A    It is a body with four lamps, or position for four lamps

8    to be mounted in it, similar to Figure 2 of the patent.

9    Q    Do you know who built this fixture?

10   A    Yes.

11   Q    Who built the fixture?

12   A    Lightolier.  Lightolier/Genlyte.  Yes,

13   Lightolier/Genlyte in their Wilmington plant.

14   Q    Do you know who actually built it?

15   A    No.

16   Q    Okay.  Did you ask them to build this fixture?

17   A    Yes.

18   Q    Okay.  Did you tell them what dimensions you wanted the

19   fixture?

20   A    No.

21   Q    Okay.  Who did you ask to build the fixture?

22   A    Bill Fabbri.

23   Q    Okay.  And what did you ask him to do?

24   A    To make a body like Figure 2 in what is the standard

25   dimensions of a two by four troffer.

323

1    correct?

2    A    That is correct.

3    Q    Did anyone tell you not to do any additional tests?

4    A    I discussed this with Jim and Robert, and I gave them my

5    opinion that if ALS doesn't feel that their fixture needs to

6    be tested to know how it performs that there is really no

7    reason that we need to spend all the money to do all the

8    tests so that we can tell ALS how their product performs.

9         In fact, in one of the depositions that I wrote --

10   read, it was said by Mr. Davis that his opinion about how

11   the light is distributed is he looks and sees how it

12   functions.  And so, I agree with him.  You can look at it

13   and see how it performs and you don't need all those

14   numbers, which was his words.

15   Q    In looking at it, could you tell whether more light was

16   on the wall than was on the bed?

17        THE COURT:  I think I -- in looking at what?

18   Q    In looking at the -- let me ask.

19        In looking at the performance of the ALS two by

20   four MulTmed fixture, with the reading light, was there more

21   light on the wall than there was on the bed?

22   A    In looking at the reading light, I was only interested

23   in did it light a six square foot area in a normal area of a

24   bed.  All I was looking at as far as what was on the wall

25   was was there any reason that I would not, or that I might

324

1     think that there was some basis other than the fixture was

2     directing light out so that you would get light in that six

3     square foot area.  And there was no reason for me to think

4     otherwise.  So that was my only concern with the reading

5     light was that it would produce illumination on a six square

6     foot area where reading would normally be done by a patient

7     in a bed.

8     Q    And did you look at whether it produced illumination in

9     that six square foot area?

10    A    I visualized what it was.  We had an illustration of

11    someone laying on a bed with something to read and there was

12    plenty of light in that area.  So I accepted that I was

13    seeing that there was a six square foot area illuminating

14    and it was adequate for reading.

15    Q    Okay.  Did you -- when you were doing this, did you look

16    at whether there was illumination outside of that six square

17    foot area from the reading light?

18    A    I saw, yes, there was.  And I think I have shown that in

19    the photographs and in the demonstration.

20    Q    Let's go to the ambient light of the two by four MulTmed

21    fixture.

22           Did you determine whether more light was on the

23    wall or on the bed from the ambient fixture?

24    A    What I saw and what the pictures illustrate is that it

25    lights a broad area across the wall.  So broad that it would

325

1    light a 20 foot long wall, eight and-a-half feet tall.  And

2    a bed, eight times 20 is 160 square feet, and four times

3    seven is 28 square feet.  And so, I would have to have a

4    much, much brighter light lighting down on the bed to get

5    more light on the bed than I had on the wall.

6         So, I didn't need to do a lot of calculations.  I

7    saw it.  And it confirmed what I had calculated before, that

8    there are broad areas, it says to a broad area.  There is a

9    broad area.  A patient room today, in my experience, is

10   about 20 feet wide because they make one size and they

11   either put one or two patients in it.  And if there's two

12   patients it has to be about 20 feet wide, or you can't get

13   gurneys and wheel chairs in between the beds.  So, it has to

14   be about 20 feet wide.  Therefore, the head wall of the

15   patient room is 20 feet, approximately, wide, eight

16   and-a-half feet high, and the ALS fixture throws light all

17   the way across that.

18   Q    All right.  Let me ask you about broad area because the

19   patent refers to a broad area, does it not?

20   A    Yes.

21   Q    What is your understanding of a broad area from the '254

22   patent?

23   A    That it is an indeterminate area; that it isn't two feet

24   wide, it isn't ten feet wide, it is a broad area.

25   Q    And where is that broad area located within the room?

327

1    Q    It does?

2    A    By the fact that it's telling you that you reflect light

3    from it to a surface.

4    Q    Okay.  Let me ask it this way.  Does claim 1 refer to a

5    broad area on the wall?

6    A    It states specifically, and I guess what I should be

7    reading is how the Court has interpreted the statement.  But

8    it says in the patent itself, a second light fixture within

9    said body oriented to direct light downwardly and outwardly

10   to a vertical wall surface outwardly adjacent from said

11   body -- so that is the wall -- whereby light is reflected

12   back to a broad area under said body.

13         And as I say, if you don't light out eight or ten

14   feet to the side, you don't have light reflected out ten,

15   eight or ten feet to the side.  So, you don't get light on

16   the horizontal reflected off, what it says is to a vertical

17   wall surface outwardly adjacent.  It doesn't say to a small

18   vertical wall surface outwardly adjacent to said body.  It

19   says just to the surface.  And if it's to a broad area then

20   it is, the wall is as broad as the surface that receives the

21   light.

22   Q    So then it's your understanding that claim 1 simply

23   requires a light to be directed to a broad area on the wall?

24   A    Yes.

25   Q    Did you determine the amount of light that is directed

328

1      to make this broad area on the wall?

2      A   I told you earlier I didn't.

3      Q   Now, is there light reflected off of the side walls what

4      we looked at in the photograph?

5      A   If you have side walls, I think the photograph showed

6      that there was probably going to be some light on them.

7      Q   Do you determine the amount of light that was reflected

8      off the side walls?

9      A   I did not because that isn't an issue.

10     Q   Now, in a room, we don't see in the photograph, but

11     there would be a wall behind where the camera was; is that

12     correct?

13     A   Yes.

14     Q   Was there a wall behind the camera in the photographs

15     you took?

16     A   Not very close.  My estimate when you deposed me was

17     that it was approximately a room 25 feet wide.  And I think

18     in my answer to your question at my deposition as to what is

19     the size of a typical patient room that it's about 20 feet

20     wide and, or 20 feet long and 12 feet wide or however you

21     want to mix those, and it's eight and-a-half feet high.

22         So, a typical area would be 20 by 12 by eight

23     and-a-half feet high.

24     Q   When you took the photographs you didn't see whether

25     there was light reflecting off of the wall opposite the head

# EXHIBIT 1-E

338

```
 1                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
 2
                                            Civil Action
 3                                          No. 05-10945-WGY

 4

 5      * * * * * * * * * * * * * * * * * *
        GENLYTE THOMAS GROUP LLC,          *
 6      a Delaware Limited Liability Company, *
                                           *
 7                      Plaintiff,         *  TRANSCRIPT OF
            v.                             *  THE EVIDENCE
 8                                         *  and MOTION FOR
        ARCHITECTURAL LIGHTING SYSTEMS,    *  DIRECTED VERDICT
 9      a division of ARCH LIGHTING GROUP, *     (Volume 4)
        a Rhode Island Corporation,        *
10                                         *
                        Defendant.         *
11      * * * * * * * * * * * * * * * * * *

12

13

14             BEFORE:  The Honorable William G. Young,
                        District Judge, and a Jury
15

16
        APPEARANCES:
17
                MIDDLETON REUTLINGER (By James E. Milliman,
18      Esq., James R. Higgins, Jr., Esq. and Robert J.
        Theuerkauf, Esq.), 2500 Brown & Williamson Tower,
19      Louisville, Kentucky 40202-3410, on behalf of the
        Plaintiff
20
                LAW OFFICE OF BRETT N. DORNY (By Brett N.
21      Dorny, Esq.), 386 West Main Street, Suite 12A,
        Northborough, Massachusetts 01532, on behalf of
22      Defendant

23

24                                      1 Courthouse Way
                                        Boston, Massachusetts
25
                                        January 29, 2007
```

1    can simplify this.

2          In this exhibit we have the same type of graph at

3    the bottom right hand corner of the page.  Is the same true

4    for this, this, the ambient fixture, that the wall would be

5    in the part that's not illustrated on this page?

6    A   Again, all parts are illustrated on this page, it's just

7    how it is called out.  And how it is called out is an

8    industry standard.  There is a standard in the IES done by a

9    testing procedures committee for how do you do the test and

10   then how do you report the test.  And this is in concurrence

11   with that.  So you can't say this represents something that

12   it doesn't represent.

13   Q   Okay.

14   A   It is just an illustration, an example of the

15   performance.

16   Q   So, the illustration in Exhibit 14 is the same as the

17   illustration in Exhibit 13?

18   A   Because that is the standard.

19   Q   Oath.  Now, would you agree with Mr. Crane that the

20   distribution as shown in the testing for the ambient light

21   is essentially the same as for the reading light?

22   A   Well, you see, there's some minor variations because in

23   the, in the reading light, the zero, 45 and 90 degree are

24   fairly close together all the way from the bottom to the

25   top.  If you look at Exhibit 14 and you look at those three,

362

1    there's a little more space between them.  But within the

2    industry it would be said that these are fairly, you know,

3    equivalent sorts of lighting distributions.

4              MR. DORNY:  I have no further questions.

5              THE COURT:  Any redirect?

6                         REDIRECT EXAMINATION

7    BY  MR. HIGGINS

8    Q    Mr. Lemons, at the beginning of your cross-examination

9    Mr. Dorny asked you several questions about your luminaire

10   design used in the Panama canal.

11             Do you remember those questions?

12   A    Yes.

13   Q    What was the primary teaching point for the jury about

14   the Panama Canal luminaire?

15   A    That a fluorescent lamp can be controlled to eliminate

16   light in quite a bit of the quadrant of output.  So that if

17   someone wants to make a light fixture where there is no

18   light in some area that is possible.

19   Q    Based on your examination of the ALS MulTmed and

20   Latitude products, in your opinion, did ALS attempt to

21   design to keep light from going to a particular area?

22   A    No.  Because as we just saw the patterns of light in

23   Exhibits 13 and 14, as well as 15, are very uniform in all

24   planes.  So there was no attempt to eliminate them going in

25   any, eliminate light going in in any direction.

# EXHIBIT 1-F

484

```
 1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS
 2
                                          Civil Action
 3                                        No. 05-10945-WGY

 4

 5    * * * * * * * * * * * * * * * * * *
     GENLYTE THOMAS GROUP LLC,            *
 6   a Delaware Limited Liability Company, *
                                          *
 7                    Plaintiff,          *  TRANSCRIPT OF
          v.                              *  THE EVIDENCE
 8                                        *  and JURY CHARGE
     ARCHITECTURAL LIGHTING SYSTEMS,      *  CONFERENCE
 9   a division of ARCH LIGHTING GROUP,   *   (Volume 5)
     a Rhode Island Corporation,          *
10                                        *
                      Defendant.          *
11    * * * * * * * * * * * * * * * * * *

12

13

14            BEFORE:  The Honorable William G. Young,
                       District Judge, and a Jury
15

16
     APPEARANCES:
17
               MIDDLETON REUTLINGER (By James E. Milliman,
18        Esq., James R. Higgins, Jr., Esq. and Robert J.
          Theuerkauf, Esq.), 2500 Brown & Williamson Tower,
19        Louisville, Kentucky 40202-3410, on behalf of the
          Plaintiff
20
               LAW OFFICE OF BRETT N. DORNY (By Brett N.
21        Dorny, Esq.), 386 West Main Street, Suite 12A,
          Northborough, Massachusetts 01532, on behalf of
22        Defendant

23

24                                  1 Courthouse Way
                                    Boston, Massachusetts
25
                                    January 30, 2007
```

1    23?

2    A    Yes, it appears to be.

3    Q    What is Exhibit 23?

4    A    Exhibit 23 is what we refer to as the black and white or

5    spec sheet that accompanies our color literature.  This has,

6    where the color literature is more just a presentation tool,

7    this has more specific information about ordering codes,

8    details about the construction of the fixture, the kind of

9    materials that are used, the weight and so on and so forth.

10    And then additional photometric information.

11    Q    Looking at Exhibit 80, which is blown up in greater

12    detail --

13    A    Yes.

14    Q    -- can you explain how the MulTmed product is installed

15    or shown installed in that exhibit?

16    A    Yes.  Once it's -- the product weighing 60 pounds can't

17    sit on the grid ceiling.  If you had -- grid ceilings are

18    not made to support weight.  So, the fixture sets -- if you

19    notice, there are -- if you look on the left and right,

20    there are little wings that stick out and they set on top of

21    the, on top of the T bar so that the bottom edge of the

22    fixture just barely rests on the, on the T, and then the

23    entire weight of the fixture is borne by these cables that

24    you see at the top.  The top left and right is, it's a

25    little hard to see, but that's like a piece of hanger wire,

576

1    so to speak, where it could also, some contractors use a

2    thread and rods or chains.  But by some means the actual

3    weight of the fixture, the fixture is actually hanging off

4    these chains and supported to the decking where the

5    substructure or in some cases there might be a pipe or an

6    I-beam, whatever the contractor has convenient that's part

7    of the building superstructure.  So the fixture hangs off

8    the superstructure and these wings keep it kind of aligned

9    in the, within the grid ceiling so that it makes a nice

10   finished appearance without stressing the ceiling with

11   weight.

12   Q    Exhibit 80 is the two by four MulTmed product?

13   A    Yes.

14   Q    Is the two by two MulTmed products installed the same

15   way?

16   A    Yes, they are.

17   Q    I'm going to ask you about the Latitude product that

18   we've heard some testimony about.  Who designed the Latitude

19   product?

20   A    I designed it.

21   Q    And how many different models of the Latitude product

22   are there?

23   A    We have the Latitude Exam Ambient, and we have the

24   Latitude Exam.  And we have a number of other Latitude

25   products that are in development for general purpose

# EXHIBIT 1-G

```
 1                UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
 2
                                        Civil Action
 3                                      No. 05-10945-WGY

 4

 5    * * * * * * * * * * * * * * * * * *
      GENLYTE THOMAS GROUP LLC,            *
 6    a Delaware Limited Liability Company, *
                                           *
 7                    Plaintiff,           *  TRANSCRIPT OF THE
           v.                              *  EVIDENCE, JURY
 8                                         *  INSTRUCTIONS and
      ARCHITECTURAL LIGHTING SYSTEMS,      *  CLOSING ARGUMENTS
 9    a division of ARCH LIGHTING GROUP,   *     (Volume 6)
      a Rhode Island Corporation,          *
10                                         *
                      Defendant.           *
11    * * * * * * * * * * * * * * * * * *

12

13

14            BEFORE:  The Honorable William G. Young,
                       District Judge, and a Jury
15

16
      APPEARANCES:
17
                MIDDLETON REUTLINGER (By James E. Milliman,
18        Esq., James R. Higgins, Jr., Esq. and Robert J.
          Theuerkauf, Esq.), 2500 Brown & Williamson Tower,
19        Louisville, Kentucky 40202-3410, on behalf of the
          Plaintiff
20
                LAW OFFICE OF BRETT N. DORNY (By Brett N.
21        Dorny, Esq.), 386 West Main Street, Suite 12A,
          Northborough, Massachusetts 01532, on behalf of
22        Defendant

23

24                                 1 Courthouse Way
                                   Boston, Massachusetts
25
                                   January 31, 2007
```

1    that every element of claim 1 is found in the MT2A product.

2    Every single one.  If there's one element that's not there,

3    it's not literal infringement.  They have to prove that

4    every single element of the claim is there in that MT2A

5    product.

6         Now, be very clear.  The comparison you make is not

7    between what Genlyte may be selling and what its Lightolier

8    products actually look like.  The comparison is between the

9    claim and the MT2A product that ALS is selling.  That's the

10   comparison that you make.  And if you find every element of

11   claim 1 in the MT2A product, then it infringes.  You don't

12   get into an analysis of which is the better product or which

13   the consumer would most like to have in their hospital rooms

14   or the like.  That's not the analysis.  The analysis is you

15   take the claim, and you look to see if every single element

16   of that claim is found in the MT2A product.  If it is, the

17   product infringes, and so on for all the products down the

18   page.

19        Well, then Genlyte says, well, even if it doesn't

20   literally infringe, it certainly infringes under the

21   doctrine of equivalents.  That's the second column.  ALS

22   says no, it doesn't.  That's disputed.

23        So what does it mean to infringe under the doctrine

24   of equivalents.  Now, you don't even get to the doctrine of

25   equivalents if you find literal infringement.  Put a

1    checkmark there and move on to the next product.  It's all I

2    need to know.  If you put a checkmark there, I'll understand

3    your answer is yes, that it does infringe.  But if you, if

4    you don't think it infringes leave it blank.  I'll

5    understand that means you don't think it infringes.

6            Then you go over and you ask yourself under the

7    doctrine of equivalents does it infringe.  What does that

8    mean?  That means that even though not every single element

9    of claim 1 is present in the particular product that you're

10   considering, that as to the missing element, ALS has

11   something or has solved the problem, that performs

12   substantially the same function in substantially the same

13   way by substantially the same means.  All three of those

14   substantiallies have to be present.  So I'll say them again.

15           It's not just that the ALS product comes close.

16   It's got to perform substantially the same function in

17   substantially the same way using substantially the same

18   means.  Because even if the product is like the Genlyte

19   product, if it has been designed around the Genlyte -- I

20   said that wrong.  Because you're not comparing products.

21           Even if it's substantially like what you understand

22   is claimed in the '254 patent, you're entitled to design

23   around a patent.  That's fine.  That's encouraged.  That's

24   why those three substantiallies all have to be present.

25           So you ask yourself, if it doesn't literally

1    infringe, does it infringe by the doctrine of equivalents.

2    And if you think it does unanimously put a check.

3           But let's say that you come to believe that it

4    isn't ALS who's infringing.  Because ALS, while it appears

5    undisputed they make whatever these products are, they make

6    these products and they sell them and they sell them to

7    these specifiers or to contractors who are building

8    hospitals and somebody employs these specifiers, suppose you

9    come to think that the only, that there's infringement.

10   Now, if you don't think there's infringement, if you don't

11   think anybody's infringing, either literally or by the

12   doctrine of equivalents, your analysis as to that product is

13   over.  ALS wins as to that product.  Leave all three of the

14   boxes that relate to the specific product blank.

15          But suppose -- and I keep saying suppose.  That

16   doesn't mean I think anything's proved or not proved.  You

17   just need to know every possible analysis.

18          Suppose you come to think that in the hospital,

19   when the light is set up and the light, I'll say nothing

20   about where the light goes, that's a big dispute here, but

21   it lights.  And the way it lights in the specific hospital

22   room, suppose you come to think that infringes.  But you

23   don't think ALS did it.  It doesn't infringe until the

24   hospital room is constructed, and then given the setup it

25   infringes.  Well, Genlyte says, yes, but it's ALS who

1    business or comparable business for the use of an invention

2    or inventions like this.

3         You may consider the portion of the profit that

4    arises from the invention itself as opposed to profit

5    arising from features unrelated to the patented invention,

6    such as the manufacturing process, the business risks,

7    significant features or improvements added by ALS.

8         So on this last point, you can consider is the ALS

9    product a better product.  Is that what's driving its

10   commercial success.

11        You consider all those different points to arrive

12   at a fair and reasonable royalty.

13        Now, Mr. Tate testified and he gave you figures,

14   and Mr. Tate's figures assume that you've got a checkmark

15   here against every product.

16        Now, again, let's say you do have a checkmark

17   against every product.  That does not mean you just buy

18   Mr. Tate's figures.  You may.  I let him testify.  I just

19   want to emphasize you don't have to.

20        If you don't really believe that, you don't believe

21   that's accurate and how he weighted things, you can discount

22   from that.  So long as you've got a principled reason for

23   figuring out what it is you're figuring out.

24        My reason for pausing on this is, suppose there

25   isn't a checkmark against every single product.  Well, then

1    you have something to figure.  Because the way Mr. Tate

2    figured it, he assumed all of them were infringed.  But

3    let's say you assume only some of them are infringed.  It

4    follows then that even if he got the royalty rate right, the

5    total amount necessarily has to be less.  But no one

6    suggests, and certainly I do not suggest, that he got it

7    right or he got it wrong.  That's up to you.  I'm saying if

8    you've got checkmarks there in the grid, figure out a

9    reasonable royalty and then apply that royalty to the

10   products that you think infringed over the time that you

11   think they were infringing up to today.  And in fairness,

12   you will recall that Mr. Tate said he stopped his analysis

13   back in September of last year.  So you figure out what the

14   damages are and you write them out there in subparagraph c.

15           Now, if ALS has won the case, I've already told

16   you, you stop before figuring any damages.  If there's no

17   checkmarks in the grid, ALS wins, you stop.  If there's a

18   checkmark in the grid, you figure out the damages.

19           And then, lastly, you come to subparagraph d there

20   on the second page.  You will have told me then that ALS

21   does infringe as to at least one product or more than one

22   product.

23           So I ask you, was that patent infringement wilful.

24   Well, okay.  What does that mean?

25           First of all, the burden of proof -- Genlyte says,

1    you; you've preserved the record on that.

2              MR. DORNY:  Okay.

3              THE COURT:  Thank you.

4              MR. HIGGINS:  Very well, sir.

5              (Whereupon the sidebar conference concluded.)

6              THE COURT:  The parties want a little revision on

7    the three substantiallies.  So let me, let me -- and they're

8    right, so let me do it.  This is when you're considering the

9    doctrine of equivalents, the three substantiallies.

10             If you, if you don't find literal infringement then

11   you've got to look at the ALS product to see whether it

12   performs substantially the same function in substantially

13   the same way with substantially the same result.  That's the

14   only change I made.  But it's right to make it.

15             The three substantiallies for the doctrine of

16   equivalents are that the ALS product perform substantially

17   the same function in substantially the same way to achieve

18   substantially the same result.

19             Is the supplementary charge satisfactory,

20   Mr. Higgins?

21             MR. HIGGINS:  Yes, your Honor.

22             THE COURT:  Mr. Dorny?

23             MR. DORNY:  Reserving my right on the other issue.

24             THE COURT:  Of course, absolutely.  And the same is

25   true for Genlyte.

729

1          That's my answer to your questions.  And both of

2    these will be sent back as well as the red lined copy.

3          The jury may retire and continue their

4    deliberations.

5          THE CLERK:  All rise for the jury.

6          (Whereupon the jury left the courtroom at 2:03

7    p.m.)

8          THE COURT:  Please be seated.  But I'm not going to

9    take the recess.  As soon as Ms. Smith is back, we'll go

10   right to the motion session.  And counsel on the trial,

11   you're excused.

12         MR. HIGGINS:  Very well, sir.

13         (Recess.)

14         THE CLERK:  All rise for the jury.

15         (Whereupon the jury entered the courtroom at 4:45

16   p.m.)

17         THE CLERK:  Court is in session, please be seated.

18         THE COURT:  I have two additional questions.  I'll

19   read the first.

20         Must we find all elements of a claim to be

21   infringed in one way or another; for example, literal,

22   equivalency, inducement.

23         Is that the next question, Madam Forelady?

24         THE FORELADY:  Yes, it is.

25         THE COURT:  Is that the next question, ladies and

730

```
1     gentlemen of the jury?

2              THE JURY:  Yes.

3              THE COURT:  To that question I make this answer.

4     I'm doing a little interpretation here of what you mean.  I

5     don't believe you mean to say do you have to find

6     infringement.  I mean, obviously, that's one of the central

7     issues here and ALS has argued and put on evidence that

8     there's no infringement at all.  Genlyte has put on evidence

9     that there is infringement.

10             So I'm reading your question this way.  If you find

11    infringement must you find that every element of a specific

12    claim is infringed in one way or another.  That's how I'm

13    interpreting it.  And my answer to that question is yes.

14    Every single element of a claim must be infringed in one way

15    or another.

16             So, if every element of the claim is infringed

17    literally, by a particular product, check that box.  If all

18    the elements -- strike that.  If most of the elements are

19    infringed literally and some of the other elements are

20    infringed under the doctrine of equivalents, check the

21    doctrine of equivalents box, because then all the elements

22    are not infringed literally.  The only way Genlyte could win

23    is if all of them are infringed either literally or under

24    the doctrine of equivalents.

25             Now, inducement is a little different.  Because
```

1    inducement I said, inducement is putting the thing on the

2    market knowing that the hospital contractor is going to

3    assemble it and put it in a hospital room and once it's

4    assembled and put in the hospital room it infringes but not

5    until.  And if that's what you think happened, you check

6    that box, but then I told you, you have to go back and check

7    one of the other boxes as well, either literal or by the

8    doctrine of equivalents.  But I'm in no way suggesting that

9    you have to find infringement.  You don't.  And I think you

10   understand that.

11        In order for there to be literal infringement every

12   single element has to be literally infringed.  Doctrine of

13   equivalents, many of them can be literally infringed, but

14   the others have to be infringed by the doctrine of

15   equivalents in order for you to check that box.

16        If there is a single element of the claim that is

17   not literally infringed or infringed by the doctrine of

18   equivalents, by a specific product, you leave both boxes

19   blank, consider inducement, but if no inducement you leave

20   all three blank.  As to that product, ALS wins.

21        Now, you asked me to clarify in more detail the

22   doctrine of equivalents.  And your analysis seems to me to

23   make perfect sense.  You do want to focus on a specific

24   element of a specific claim.  If that is not literally

25   infringed by the product that you are considering, I have

1    instructed you to consider the doctrine of equivalents.

2          Now, the doctrine of equivalents is a judge created

3    doctrine to protect the patent owner from items that are so

4    similar to the claimed patent that the person who does that

5    should be held liable, and at the same time recognize that

6    it is perfectly legal, perfectly legal to design around a

7    patent and make a different item, a better item that is not

8    within the claims of the patent.

9          And so the doctrine of equivalents in the

10   circumstances of this case would only make ALS liable for

11   the specific product you're considering.  If the element of

12   a claim that you're considering is not literally infringed

13   but in the ALS product there is something or some function

14   that accomplishes substantially the same result in

15   substantially the same way using substantially the same

16   function.  And I didn't mean to be glib, but that's what I

17   meant by the three substantiallies.  And all three of them

18   have to be present.  That's what narrows down this doctrine

19   of equivalents to what's fair.

20         The ALS product as to the specific element has to

21   work by substantially the same means in substantially the

22   same way to accomplish substantially the same result.

23         Now, it's so close to five o'clock that I think

24   that it is fair that we stop and you come back tomorrow

25   morning promptly at nine o'clock.

# EXHIBIT 1-H

737

```
 1                  UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
 2
                                        Civil Action
 3                                      No. 05-10945-WGY

 4

 5      * * * * * * * * * * * * * * * * * *
       GENLYTE THOMAS GROUP LLC,           *
 6     a Delaware Limited Liability Company, *
                                           *
 7                      Plaintiff,         *
          v.                               *  TRIAL TRANSCRIPT
 8                                         *    (Volume 7)
       ARCHITECTURAL LIGHTING SYSTEMS,     *
 9     a division of ARCH LIGHTING GROUP,  *
       a Rhode Island Corporation,         *
10                                         *
                        Defendant.         *
11      * * * * * * * * * * * * * * * * * *

12

13

14            BEFORE:  The Honorable William G. Young,
                        District Judge, and a Jury
15

16
       APPEARANCES:
17
              MIDDLETON REUTLINGER (By James E. Milliman,
18     Esq., James R. Higgins, Jr., Esq. and Robert J.
       Theuerkauf, Esq.), 2500 Brown & Williamson Tower,
19     Louisville, Kentucky 40202-3410, on behalf of the
       Plaintiff
20
              LAW OFFICE OF BRETT N. DORNY (By Brett N.
21     Dorny, Esq.), 386 West Main Street, Suite 12A,
       Northborough, Massachusetts 01532, on behalf of
22     Defendant

23

24                                    1 Courthouse Way
                                      Boston, Massachusetts
25
                                      February 1, 2007
```

753

 1    which views make no impression upon the minds of others,

 2    equally honest, equally intelligent with themselves, and who

 3    have heard the same evidence, with the same attention, with

 4    an equal desire to arrive at the truth, and under the

 5    sanction of the same oath.  And, on the other hand, jurors

 6    for the other party ought seriously to ask themselves

 7    whether they may not reasonably doubt the correctness of a

 8    judgment, which is not concurred in by others with whom they

 9    are associated; and distrust the weight or sufficiency of

10    that evidence which fails to carry conviction in the minds

11    of the others.

12         With those instructions, I'm going to send you out.

13    Except now that -- we can never interrupt you.  But, you

14    know, I made a mistake and I can correct it now that you're

15    back here.

16         And I simply misspoke.  We have no right to ask you

17    anything about your deliberations, and I would never do so.

18    But in an earlier question you asked about the doctrine of

19    equivalents.  And I just, I had the, the three-prong test

20    right and I had the reasons for the three-prong test right,

21    but I messed up the words.  So let me just get the words

22    straight.

23         If you are -- if this helps you, I certainly hope

24    it does, but at least it gives me a chance to correct.  I

25    simply misspoke.

754

1                The three-prong test for doctrine of equivalents is

2       this.  If there isn't literal infringement then Genlyte has

3       to prove by a fair preponderance of the evidence that the

4       accused device that you're considering performs

5       substantially the same function in substantially the same

6       way with substantially the same result.  I messed up the

7       words.  It's substantially the same function in

8       substantially the same way with substantially the same

9       result.

10               I hope that helps you.  You may retire to continue

11      your deliberations.

12               THE CLERK:  All rise for the jury.

13               (Whereupon the jury left the courtroom at 3:20

14      p.m.)

15               THE COURT:  Please be seated.

16               Let me tell you what I'm going to do here so you

17      can make your plans accordingly.  If they come back and say

18      they're at an impasse again, I'm sending them out again with

19      no other instruction, just say remember my instructions, go

20      on and continue.  Naturally, I'm letting them go at 5:00 and

21      telling them to come back on Monday.

22               If I mistry this case, I'm holding it on the

23      running trial list, and as soon as I'm through the cases

24      I've set up for next week, we'll try it again.  You people

25      will be well-advised to settle.