**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSSETTS**

GENLYTE THOMAS GROUP LLC,

                Plaintiff,

v.

                              Civil Action No. 05-CV-10945-WGY

ARCH LIGHTING GROUP, INC. d/b/a
ARCHITECTURAL LIGHTING SYSTEMS,

                Defendant.

---

**PLAINTIFF GENLYTE THOMAS GROUP'S RESPONSE TO**
**ALS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR NEW TRIAL**

        Plaintiff, Genlyte Thomas Group LLC ("Genlyte"), by counsel, for its response in

opposition to the motion of Defendant Arch Lighting Group d/b/a Architectural Lighting

Systems ("ALS") for judgment as a matter of law ("JMOL") or for new trial, states:

**I.      ALS IGNORES THE LEGAL STANDARDS NECESSARY TO QUALIFY
        FOR A JMOL OR A NEW TRIAL.**

        **1.     The Standard for a JMOL.**

        The proper standard for determining a motion for JMOL, as explicated in *DMI,*

*Inc. v. Deere & Co.*, 802 F.2d 421 (Fed. Cir. 1986), is as follows:

> A trial judge presented with a motion for JNOV [now called
> JMOL] (1) must consider all the evidence in a light most
> favorable to the non-mover, (2) must not determine credibility
> of witnesses, and (3) must not substitute his or her choice for
> the jury's in finding facts, drawing inferences, or deciding
> between conflicting elements in the evidence.
>                       * * *
> To convince this court that the trial judge erred in denying the
> motion for [JMOL], [the movant] must show that there was
> not substantial evidence to support the jury's factual findings.
>  "Substantial" evidence is such relevant evidence from the
> record taken as a whole as might be accepted by a reasonable

> mind as adequate to support the finding under review.  If the
> jury's factual findings could on the evidence presented been
> made by a reasonable jury, [the movant] may prevail only by
> showing that those findings cannot support the jury's legal
> conclusion.

802 F.2d at 425 (selected citations omitted), *accord*, *Arachnid, Inc. v. Medalist Marketing Corp.*, 972 F2d 1300, 1301 (Fed. Cir. 1992); *see also DMI, supra*, at 427 ("Where, as here, there are conflicting elements in the evidence, neither the trial court on [JMOL] nor this court may substitute its choice for that of the jury.")  Further, the Court must view the evidence in the light most favorable to Genlyte, the non-movant, drawing all reasonable inferences in Genlyte's favor.  *See Amsted Indus., Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 181 (Fed. Cir. 1994).

### 2.    <u>The Standard for a New Trial.</u>

As for ALS' motion for new trial, a party is entitled to "a fair, not a perfect trial," *Fonar Corp. v. Johnson & Johnson*, 821 F.2d 627, 633 (Fed. Cir. 1987), *overruled on other grounds by, Cardinal Chem. Co. v. Morton Int'l, Inc.,* 508 U.S.83 (1993), and the Federal Circuit instructs that a new trial may only be granted if "the conduct of the trial was so grievous as to have rendered the trial unfair."  *Railroad Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506, 1512 (Fed. Cir. 1984), *cert. denied*, 469 U.S. 871 (1984).

As shown below, ALS did receive a fair trial, and falls woefully short of the standard required to entitle it to JMOL or new trial.  Accordingly, ALS' motion must be denied in its entirety.

II.    **SUBSTANTIAL EVIDENCE SHOWED, AS THE JURY FOUND, THAT THE ALS PRODUCTS INFRINGE THE '254 PATENT.**

1.    **ALS Ignores the Evidence at Trial Which Established That All ALS Products Contain a "Means for Ceiling-Mounting Said Body."**

ALS argues that Genlyte failed to prove that the ALS products include the "means for ceiling-mounting said body" claim limitation.  Such an argument ignores ALS' own expert, Dr. Ian Lewin's, concession:

> Q:    Now, sir, when you prepared your opinion that you discussed earlier, your opinion assumes and <u>concedes</u> the existence of all of the elements of claim 1 and claim 3, except the second light fixture of those claims.  Is that correct, sir?
>
> A:    Yes.

(Jury Trial Transcript ("TR"), 1/30/07, at 615:16 - 21, emphasis supplied, excerpts of transcripts are collectively attached hereto as Exhibit A).

ALS also ignores substantial evidence from the "entirety of the record." *Kearns v. Chrysler Corp.*, 32 F.3d 1541, 1547 (Fed. Cir. 1994); *accord, Perkin-Elmer Corp. v. Computervisions Corp.*, 732 F2d 888, 893 (Fed. Cir. 1984), *cert. denied,* 469 U.S. 851 (1984) ("the record as a whole").  Contrary to Federal Circuit precedent, ALS merely picks and chooses from the evidence those snippets that might support its view.  This is both improper and insufficient.  As the Federal Circuit instructs in *Kearns*, such an approach:

> pays mere lip service to the substantial evidence standard by ignoring the evidence upon which the jury reasonably relied in reaching its verdicts and by rearguing the merits of the

3

infringement issues.  An appeal [or a Rule 59 motion],
however, is not to be used as a means for retrying a case.

* * *

We conclude that Chrysler has failed to show that on the
entirety of the record reasonable persons could not have found
the facts necessary to support the jury's verdict of
infringement.

32 F.3d at 1548, 1549; *accord*, *Railroad Dynamics, supra,* 727 F.2d at 1514.

The testimony of Genlyte's expert, Thomas Lemons, established the presence of

each element required to prove infringement, including the "means for ceiling-mounting"

element.  Mr. Lemons explained that '254 Patent teaches that the inventive fixture

replaces a standard troffer, and like a standard troffer, the inventive fixture has a lip or

flange as the "means" by which the fixture is ceiling-mounted.  As Mr. Lemons

explained, the lip or flange of the inventive fixture rests on a T-bar ceiling grid.  (Exhibit

A, TR, 1/24/07, at 235:7 - 237:19).  Mr. Lemons further elaborated:

Q:    Does this information that you've just described, that is, Fig.
      2, and the two textual parts of the patent convey such
      information to you as a person skilled in the art to describe
      and find the structure of the mounting means for the body?

A:    Yes, although the picture of Fig. 2 helps show it a lip that sets
      in it.  When we had the conventional troffer they often have a
      bent-out or a bent-in flat face that sets on the edge of the T
      bar.  But those three different ways of having the face to the
      fixture are the conventional shapes for a troffer.

Q:    In your opinion, would a person skilled in the art reading the
      patent realize what mounting means were described in the
      claim?

A:    Yes, it's been standard in the industry for over 50 years.
      Every electrician would know, if you tell him you're going to
      install troffers he instantly knows that it's going to be a hung
      ceiling and you fit the fixture up into it and set it down on the
      T bar.

4

Q:      Are there other equivalent mounting means other than just mounting it on its edge that persons skilled in the art are aware of?

A:      As I say, some troffers have a flat face where the housing comes down and bends out or housing comes down and bends in.  Generally on the ends it bends in, on the side it bends out, but there are variations on that.

(Exhibit A, TR, 1/24/07, at 236:19 - 237:19).  After explaining the structure taught in the '254 Patent corresponding to the "means for ceiling-mounting," Mr. Lemons testified that the same structure, a lip or flange (*i.e.*, a bent-out lip or a bent-in lip), was found in each ALS product:

Q:      All right, Mr. Lemons, before you continue, can you show the jury the mounting means that are on the MT2 product?

A:      There are bend-out lips on the ends as well as on the side where it fits down in.  And though it's a little hard to see in the drawing, there's a double line all the way around the outside.  And in this drawing you might barely see that lip bent out.  And that's the data sheet for the product.

* * *

A:      Here it is enlarged showing that front lip.  And enlarged here showing the end bent out.

Q:      Does the fact that the MT2A or 2B product has a bent-out lip instead of an edge, is there, in your opinion, is there a difference between those two mounting means and the mounting means that are described in the '254 Patent?

A:      Standard is three different, a straight edge, a bent-out lip, or a bent-in lip.  And there's troffers with all three.  So, standard troffers have three different face constructions.

* * *

Q:      Does the MTA – excuse me, MT2B product from ALS contain means for ceiling-mounted said body?

A:      Yes.  Because it's two by four or just under two foot by four foot, and it has a pay slip [*sic,* lip] to set into a T bar ceiling.

5

* * *

Q:      Does the MT1D product contain means for ceiling-mounting
        that body?

A:      Yes.  There's a lip all the way around it.

(Exhibit A, TR, 1/24/07, at 238:7-25, 242:12-16 and 253:7-9).  Beyond Mr. Lemons'

testimony, the jury observed the ALS products (Trial Exhibits 18, 28, 31 and 33) actually

mounted by Mr. Lemons in a "ceiling" (Trial Exhibit 19) using the very structure on such

products that correspond to the "means for ceiling-mounting" claim limitation.  ALS'

argument that Genlyte did not prove the presence of "means for ceiling-mounting" is

without merit.

ALS' citation to Scott Davis' testimony relating to the MulTmed products being

mounted in a different manner than taught in the '254 Patent (Memorandum, p. 5) does

not satisfy ALS' burden for a JMOL.  In rendering its verdict, the jury obviously did not

accept Mr. Davis' testimony.  And, as shown above, substantial evidence was presented

which contradicted Mr. Davis' statement and a mere contradiction in evidence is

insufficient for a JMOL.  *See DMI, supra*, at 427.

2.  **ALS Ignores the Substantial Evidence Presented at Trial Which
    Established That All ALS MulTmed Products Contain "First" and
    "Second" Light Fixtures.**

In another attempt to avoid the jury's verdict, ALS erroneously contends that

Genlyte failed to prove that the ALS products have both a "first light fixture" and "second

light fixture" as required by the claims of the '254 Patent.  (Memorandum, p. 6).  ALS

argues that Genlyte failed to provide evidence that the ALS products "aim" light as

6

recited in the "first light fixture" and "second light fixture" elements of claim 1 and claim 3. *Id.* However, this argument is based on an incorrect application of the Court's claim construction and ignores the stipulations entered into by the parties.

The Court's construction recites "direct <u>or</u> aim." (Exhibit A, TR, 1/22/07, at 32:6-18). Further, ALS <u>stipulated</u> that its products contain a "reading" fixture which "direct light downwardly to a selected reading area under the fixture." (Docket Number ["DN"] 42, Exhibit 1, ¶24). This is exactly what the "first light fixture" of claims 1 and 3 of the '254 Patent requires. Thus, contrary to Federal Circuit precedent, ALS' argument that the "first light fixture" was not proved seeks to avoid the consequences of its stipulation. *See Kearns, supra,* 32 F.3d at 1546 ("We reject Chrysler's attempts to avoid the consequences of its stipulation by redefining its terms.").

Moreover, Genlyte's expert, Mr. Lemons, confirmed that the ALS products did contain the "first light fixture" claim element as construed by the Court:

> Q:    Does the ALS MulTmed MT2B product here contain a first light fixture within said body?
>
> A:    Yes.
>
> Q:    Which one is that?
>
> A:    That is the first one I turned on; that is called the reading light.
>
> Q:    Is the first light fixture set or arranged to direct or aim more light in a downward direction than in an upward or outward direction to a reading area?
>
> A:    Yes.

(Exhibit A, TR, 1/24/07, at 242:17 - 243:1). In addition, ALS also stipulated that "[e]very fixture denominated as a 'reading' fixture has the same light distribution pattern in every

ALS MulTmed product." (DN 68, ¶ 1). And, as already shown, Dr. Lewin's testimony

belies ALS' argument (*i.e.,* Dr. Lewin conceded the presence of the "first light fixture"

element in the ALS MulTmed products). Thus, contrary to ALS' argument, substantial

evidence supports the jury's finding that the ALS products contained the "first light

fixture" element of claims 1 and 3.

Regarding the "second light fixture" element, Mr. Lemons testified as follows:

Q:    Does the MT2B product contain a second light fixture within
      the body of the luminaire?

A:    Yes.

Q:    Which one is that?

A:    That is the ambient fixture, the one we turned on second.

* * *

Q:    Is the second light fixture of the MT2B product set or
      arranged to direct or aim more light in a downward and
      outward direction to a wall than in an upward direction?

* * *

A:    The ambient, the second light.

      Yes, it does. I believe that was shown when we turned the
      fixture on, that there is light on the wall, the same sort of
      intensity. It is a broad distribution and therefore there is
      plenty of light on the wall.

Q:    Is there any light upward in this product?

A:    No, because the housing prevents – prevents that and the way
      it's mounted prevents that. Light doesn't bend around
      corners.

(Exhibit A, TR, 1/24/07, at 243:22 - 244:19). Here also, ALS stipulated that "[e]very

fixture denominated as an "ambient" fixture has the same light distribution pattern in

every ALS MulTmed product." (DN 68, ¶ 2). As is seen, also contrary to ALS'

8

assertions, substantial evidence exists in the Record to support the jury's finding that the ALS products contained the "second light fixture" element of claims 1 and 3 as construed by the Court.

Further, not only did Mr. Lemons provide his opinion to the jury but he gave extensive detailed background into the process and formulation of that opinion. Fed.R.Evid. 705 provides:

> The expert may testify in terms of opinion or inference and give reasons therefore without first testifying to the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

Mr. Lemons fully complied with Fed.R.Evid. 705.

ALS also erroneously asserts that Mr. Lemons "failed to provide testimony regarding directions in which more light was aimed" and "had not determined where the fixtures aimed more light." (Memorandum, p. 6). This argument is also based upon the same incomplete application of the Court's construction (*e.g.*, "direct or aim"). In addition, ALS cites only portions of Mr. Lemons' testimony taken out of context, while ignoring the record as a whole. For example, ALS ignores Mr. Lemons' expert reports, which were admitted into evidence as Trial Exhibits 46 and 53. Such expert reports contain a quantification of the amount of light directed by the "first light fixture" and the "second light fixture" of the ALS products, which supplements Mr. Lemons' testimony that the ALS' products infringed the '254 Patent. This substantial evidence supporting the jury's finding cannot be ignored, as ALS wishes this Court to do.

At page 7 of its Memorandum, ALS attempts to support its position by arguing what ALS believes the evidence tends to prove, or not prove. However, ALS' view of the evidence was rejected in the findings made by the jury. In this regard, ALS erroneously argues that certain evidence regarding the similarity of the light distribution patterns of the "first light fixture" and the "second light fixture" somehow compels a conclusion of non-infringement. This is simply ALS' position of non-infringement, which, as evidenced by the verdict, the jury did not accept. As such, there was substantial evidence, as discussed above, to support the jury's findings.

>    **3.    ALS Ignores Substantial Evidence From Which the Jury Could, and Did, Properly Conclude that the ALS MT2 MulTmed Products Infringe the '254 Patent Under the Doctrine of Equivalents.**

ALS argues that the jury's verdict, that ALS MT2A and MT2B MulTmed luminaires infringe claim 1 and claim 3 of the '254 Patent under the doctrine of equivalents ("d/o/e"), improperly "eliminates an element" from those claims. (Memorandum, pp. 8-9). In making this argument, ALS focuses on a single limitation (not an element), and argues that the "only" way the jury could have reached its d/o/e conclusion is to eliminate the "requirement" that the "second light fixture" must "aim more light" "to a wall." (Memorandum, p. 8). ALS' argument is based on another incomplete application of the Court's construction. The actual, and proper, construction instructed by the Court for the term "oriented to direct light downwardly and outwardly to a vertical wall surface" is "set or arrange to direct or aim more light in a downward and

outward direction *than in an upward direction* to a wall." (Exhibit A, TR, 1/22/07, at 32:16-18, emphasis supplied).

As it has throughout this case, ALS' present argument <u>ignores</u> the "than in an upward direction" component of the Court's construction. In doing so, ALS again seeks to avoid the consequences of yet another stipulation. As part of the <u>Joint Pretrial Order</u>, ALS stipulated that its MulTmed products have "no upwardly directed light." (DN 42, Exhibit 1, ¶ 22). This is yet another example of ALS seeking to ignore the consequences of its prior stipulation, contrary to Federal Circuit precedent. *See Kearns, supra* 32 F.3d at 1546 ("public policy favors preventing Chrysler from reneging on an agreement which it freely entered and upon which Kearns and the district court relied.")

Moreover, ALS' d/o/e argument is based on pure speculation as to how the jury reached its d/o/e conclusion. It is equally possible that the jury focused its d/o/e conclusion on the "means for ceiling-mounting" element, or the "first light fixture" element of claims 1 and 3. The jury could also have considered ALS' literal non-infringement argument based on the "highest intensity" notion expressed by Dr. Lewin (*see e.g.,* Exhibit A, TR, 1/30/07, at 595:11 – 596:11), but found infringement under d/o/e because ALS' literal infringement defense was demonstrably based on less than one percent (1 %) of the total lumen output of the "second light fixture." (Exhibit A, TR, 1/31/07, pp. 637:22 – 638:9).

"[T]he law <u>presumes</u> the existence of findings to support the verdict that the jury reached." *Perkin-Elmer*, *supra*, 732 F.2d at 893 (emphasis supplied). Thus, an argument

based on such speculation as ALS proffers cannot be sustained.  *See DMI*, *supra*, 802 F.2d at 429 ("conjecture and speculation are not evidence").  In any event, ALS itself adduced no testimony challenging Genlyte's d/o/e proof, so ALS' argument based on no contrary evidence cannot be sustained.  *Id.*

Substantial evidence showed, as the jury found, that the ALS products infringed the '254 Patent.  Consequently, ALS' motion must be denied.

## III.    THE JURY WAS CORRECTLY CHARGED.

### 1.    ALS Waived its Right to Contend that a New Trial Should Be Granted Based Upon the Jury Instructions.

ALS' request for a new trial based upon what ALS calls "variations" in the Court's instruction for determining infringement under the doctrine of equivalents was waived by ALS and, therefore, cannot form the basis for a new trial.  It is black letter law that the "[f]ailure to object to the jury instructions at the time and in the manner specified by Fed.R.Civ.P. 51 constitutes a forfeiture."  *Sanchez v. Sosa*, 175 F.3d 35, 37 (1st Cir. 1999).  In fact, ALS did not object at all to what ALS now characterizes as "variations" in the Court's instruction.  (Exhibit A, TR, 1/30/07, at 623:24- 624:10; TR, 1/31/07, at 680:25 – 683:3; TR, 2/1/07, at 738:13 – 740:3 and 753:13 – 755:14).  Therefore, ALS waived any argument based upon this jury instruction and, consequently, its request for a new trial based on this argument must be rejected.

Regardless, ALS' argument that the jury was "likely confused" is inadequate to support its motion for a new trial.  As the First Circuit holds, a given instruction is only error "if it (1) was misleading, unduly complicating, or incorrect as a matter of law, and

(2) adversely affected the objecting party's substantial rights." *Sheek v. Asia Badger, Inc.*, 235 F.3d 687, 697 (1st Cir. 2000) (quoting *Beatty v. Michael Bus. Mach. Corp.*, 172 F.3d 117, 121 (1st Cir. 1999)). As discussed above, ALS never objected. Nonetheless, the Court properly instructed the jury on the doctrine of equivalents (Exhibit A, TR, 1/31/07, 682:6 – 18) and did so a second time only after having misspoke while answering a question from the jury. (Exhibit A, TR, 2/1/07, 753:13 - 754:9). In fact, the Court's instruction, contrary to ALS' argument, cleared up any confusion that may have existed. Therefore, ALS request for a new trial must be rejected.

> **2.      The Jury Was Fully and Properly Instructed on the Issue of Infringement.**

ALS also argues that a new trial should be granted because the Court did not instruct the jury on how to apply the "means for ceiling-mounting said body" claim element. ALS contends that "[t]his left the jury without any understanding about how to determine infringement of such a claim element." (Memorandum, p. 11). ALS' argument is without merit.

First, the Court instructed the jury at length as to how to determine whether there was infringement. (Exhibit A, TR, 1/31/07, at 668:5 – 674:12). Second, by stating that the jury was left "without an understanding," ALS is asserting that the jury should have been instructed how to locate corresponding structure on the ALS products by first locating in the '254 Patent specification the structure(s) corresponding to the "means for ceiling-mounting said body." This is an argument that the Court should have instructed the jury how to construe the claim term. Such an "instruction" to the jury would be

highly inappropriate, for claim construction is strictly a question of law.  *Markman v.*

*Westview Instrs., Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *affirmed* 517 U.S. 370 (1996).

And, as the Federal Circuit has stated, "a determination of corresponding structure is a

determination of the meaning of the 'means' term in the claim and is thus also a matter of

claim construction."  *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145

F.3d 1303, 1308 (Fed. Cir. 1998).  Therefore, the Court's decision not to give ALS'

proffered jury instruction was within its discretion.  *Sheek*, 235 F.3d at 697 (a trial court's

decision not to give a particular instruction is not error if the requested instruction was

incorrect as a matter of law).

Further, ALS did <u>not</u> request that the Court construe the term "means for ceiling-

mounting" (*see* immediately below), so a request to instruct the jury on a construction of

such term was waived.  And, under the circumstances, the Court was not required to

construe the "means for ceiling-mounting" claim term.  The Federal Circuit has held that

only those claim terms that are in dispute require construction.  *See e.g., Vivid Techs., Inc.*

*v. Am. Sci. & Eng'g, Inc.,* 200 F.3d 795, 803 (Fed.Cir. 1999).

ALS <u>dropped</u> any dispute it may have had regarding the meaning of the claim

term.  During the Markman hearing held on June 30, 2006, the Court stated with respect

to the "means for ceiling-mounting" claim term that "it was not disposed to construe

anything" at that time, but invited ALS to file a motion for summary judgment.

(Markman Hearing Transcript, p. 22, excerpt attached hereto as Exhibit B).  The Court

asked counsel for ALS whether he was "content with that." Counsel for ALS responded,

"Yes, your honor." *Id.* When ALS did file its motion for summary judgment, ALS did <u>not</u> raise an issue with respect to the "means for ceiling-mounting" claim term.

Further, in the parties Joint Pretrial Memorandum, the parties agreed, and stated "that the Court set forth the meaning of the claim terms in dispute" at the Markman hearing. (DN 42, p. 5). Therefore, the "means for ceiling-mounting" claim term was not in dispute at trial, and ALS waived any argument that the Court must provide a construction of the claim term to the jury. Consequently, the jury was fully and properly charged and ALS' motion for a new trial must be denied.

## IV.    PARAGRAPH 4 OF THE JUDGMENT IS PROPER.

ALS requests the Court to strike Paragraph 4 of the Judgment, because it contends the jury's verdict covers all damages-based activity up to the date of the verdict, February 1, 2007. ALS knows better, and in fact is trying to take advantage of its own failure to provide complete information requested by Genlyte in discovery. As the Court is aware (and ALS acknowledges in the quote at page 12 of its Memorandum), in its discovery responses ALS provided sales information to Genlyte only through September 30, 2006. Thus, Genlyte's damages expert, Michael Tate, could only compute and testify to damages through that date. However, ALS was under a duty to supplement its discovery responses (Fed.R.Civ. P. 26(e)), but did not prior to, or even during, trial despite express request from Genlyte (*see* e-mail request from Robert Theuerkauf attached as Exhibit C).

Having failed in its duty to provide complete and updated discovery information through supplementation, ALS cannot take advantage of its own failure. In *Thibeault v.*

*Square D Co.*, 960 F.2d 239, 244 (1st Cir. 1992), the First Circuit stated that courts enforce civil rules "to ensure that the spirit of open discovery embodied in Rule 26 is not undermined either by evasion or dilatory tactics." The *Thibeault* court affirmed this Court's sanction of a party for failure to supplement its discovery (expert) responses.

A district court has wide discretion to remedy a litigant's failure to supplement its discovery responses. *Sheek, supra,* 235 F.3d at 694. Here, this Court recognized that ALS did not supplement its discovery responses beyond September 30, 2006, even though it certainly possessed the information (its own sales records) to do so. The inclusion of Paragraph 4 in the Judgment was and is a fair and reasonable remedy to address ALS' discovery failures. ALS' request to delete Paragraph 4 from the Judgment should be denied.

<u>**CONCLUSION**</u>

"Having failed to carry its burden before one jury, [ALS] has shown no actual prejudice as would warrant a second chance before a second jury …". *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1583 (Fed. Cir. 1986). Here, ALS' Memorandum in support of its motion for JMOL or for new trial repeatedly states, wistfully, that "no reasonable juror" could conclude as the jury did in its verdict. In making its wishful argument, ALS ignores mountains of substantial evidence that supports the jury's verdict. In *Railroad Dynamics, supra*, the Federal Circuit, responding to a similar argument, stated:

> [Movant's] "no evidence" assertion [similar to ALS' "no reasonable juror could conclude" assertion] is short hand for disagreement with first the jury's and now the district court's

16

> view of the evidence, in particular the expert testimony. …
> Under the rules governing our jurisprudence, the jury had a
> right to credit that factual expert testimony, and, under those
> rules, the trial judge could not deprive the jury of that right by
> substituting his own credibility determination. … Because
> reasonable persons, crediting that testimony, could have found
> [as the jury found] the denial of [movant's] motion for
> [JMOL] was required.

727 F.2d at 1514.

Respectfully, for the foregoing reasons and under the cited authorities, Genlyte

requests this Court to deny ALS' motions in their entirety.

Dated:  March 6, 2007                        Respectfully submitted,

                                             GENLYTE THOMAS GROUP LLC

                                             By Its Attorneys,


                                             /s/ Kevin Gannon
                                             James E. Milliman (*Pro hac vice*)
                                             James R. Higgins, Jr. (*Pro hac vice*)
                                             Robert J. Theuerkauf (*Pro hac vice*)
                                             MIDDLETON REUTLINGER
                                             2500 Brown & Williamson Tower
                                             Louisville KY  40202
                                             Telephone:  (502) 584-1135
                                             Facsimile:  (502) 561-0442

                                             -and-

                                             Thomas C. O'Konski  BBO#337475
                                             Kevin Gannon BBO#640931
                                             Cesari and McKenna, LLP
                                             88 Black Falcon Avenue
                                             Boston, MA  02210
                                             Telephone:  (617) 951-2500
                                             Facsimile:  (617) 951-3927

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as on registered participants, if any, on this <u>6th</u> day of March, 2007.

<u>/s/ Kevin Gannon</u>

18

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GENLYTE THOMAS GROUP LLC,
a Delaware Limited Liability Company
                        Plaintiff,

v.                                                                        Civil Action No. 05-CV-10945 WGY

ARCHITECTURAL LIGHTING SYSTEMS, a
division of ARCH LIGHTING GROUP, a
Rhode Island Corporation

                        Defendant.

**[Proposed] ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT AS
A MATTER OF LAW, TO ALTER JUDGMENT AND/OR FOR A NEW TRIAL**

This matter is before the Court on the motion by Defendant, Arch Lighting

Group, Inc. ("ALS") for Judgment as a Matter of Law, to Alter Judgment and/or for a

New Trial ("ALS' Motion").  The Court, having reviewed and considered the parties'

respective memoranda and supporting material, and any responses thereto, and otherwise

being duly and sufficiently advised,

IT IS HEREBY ORDERED AND ADJUDGED that ALS' Motion be, and it

hereby is, DENIED in its entirety.

SO ORDERED this _____ day of _____, 2007.

_____
William G. Young, U. S. D. J.

TENDERED BY:


/s/ Kevin Gannon
James E. Milliman (Pro hac vice)
James R. Higgins, Jr. (Pro hac vice)
Robert J. Theuerkauf (Pro hac vice)
MIDDLETON REUTLINGER
2500 Brown & Williamson Tower
Louisville KY  40202
Telephone:  (502) 584-1135
Facsimile:  (502) 561-0442

-and-

Thomas C. O'Konski  BBO#337475
Kevin Gannon  BBO#640931
CESARI AND MCKENNA, LLP
88 Black Falcon Avenue
Boston, MA  02210
Telephone:  (617) 951-2500
Facsimile:  (617) 951-3927

*Counsel for Plaintiff,*
*Genlyte Thomas Group LLC*

# EXHIBIT A

```
 1              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS
 2
                                         Civil Action
 3                                       No. 05-10945-WGY

 4

 5   * * * * * * * * * * * * * * * * * * *
     GENLYTE THOMAS GROUP LLC,            *
 6   a Delaware Limited Liability Company, *
                                          *   DAILY TRANSCRIPT
 7             Plaintiff,                  *   OF PRETRIAL MATTERS,
        v.                                *   PRELIMINARY JURY
 8                                        *   INSTRUCTIONS,
     ARCHITECTURAL LIGHTING SYSTEMS,      *   OPENING STATEMENTS
 9   a division of ARCH LIGHTING GROUP,   *   and THE EVIDENCE
     a Rhode Island Corporation,          *
10                                        *
                  Defendant.              *
11   * * * * * * * * * * * * * * * * * * *

12

13            BEFORE:  The Honorable William G. Young,
                        District Judge, and a Jury
14

15

16

17   APPEARANCES:

18            MIDDLETON REUTLINGER (By James E. Milliman,
        Esq., James R. Higgins, Jr., Esq. and Robert J.
19      Theuerkauf, Esq.), 2500 Brown & Williamson Tower,
        Louisville, Kentucky 40202-3410, on behalf of the
20      Plaintiff

21            LAW OFFICE OF BRETT N. DORNY (By Brett N.
        Dorny, Esq.), 386 West Main Street, Suite 12A,
22      Northborough, Massachusetts 01532, on behalf of
        Defendant

23

24                                  1 Courthouse Way
                                    Boston, Massachusetts
25
                                    January 22, 2007
```

1    on the record, and we will Xerox a glossary of terms.  And

2    these are the terms that I have already, the word is

3    construed, it means already explained.  So here are my

4    explanations.  And these are explanations that make sense to

5    me and I'm trying to have them make sense to you.

6        In the patent you're going to hear the phrase

7    "oriented to direct light downwardly to a selected reading

8    area."  I tell you that means set or arrange to direct or

9    aim more light in a downward direction than in an upward or

10    outward direction to a reading area.

11        Second.  The patent says "oriented to direct light

12    downwardly and outwardly to a vertical wall surface

13    outwardly adjacent from said body."

14        You can see why they give judges the responsibility

15    of doing this work.

16        Here is what this means.  It means set or arrange

17    to direct or aim more light in a downward and outward

18    direction than in an upward direction to a wall.

19        Thank you very much.  This will become more

20    important and more understandable to you as you hear their

21    presentations, but I want to get that out right now.

22        So there's my preliminary instructions as to the

23    law.  The next thing we do is turn to the lawyers.  And the

24    lawyers each get no more than 15 minutes to give you what's

25    called an opening statement.

```
 1              UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS
 2
                                      Civil Action
 3                                    No. 05-10945-WGY

 4

 5   * * * * * * * * * * * * * * * * * *
     GENLYTE THOMAS GROUP LLC,          *
 6   a Delaware Limited Liability Company, *
                                        *
 7              Plaintiff,     *  TRANSCRIPT OF
        v.                     *  THE EVIDENCE
 8                             *    (Volume 3)
     ARCHITECTURAL LIGHTING SYSTEMS,    *
 9   a division of ARCH LIGHTING GROUP, *
     a Rhode Island Corporation,        *
10                             *
                Defendant.     *
11   * * * * * * * * * * * * * * * * * *

12

13

14        BEFORE:  The Honorable William G. Young,
                       District Judge, and a Jury
15

16
     APPEARANCES:
17
             MIDDLETON REUTLINGER (By James E. Milliman,
18      Esq., James R. Higgins, Jr., Esq. and Robert J.
        Theuerkauf, Esq.), 2500 Brown & Williamson Tower,
19      Louisville, Kentucky 40202-3410, on behalf of the
        Plaintiff
20
             LAW OFFICE OF BRETT N. DORNY (By Brett N.
21      Dorny, Esq.), 386 West Main Street, Suite 12A,
        Northborough, Massachusetts 01532, on behalf of
22      Defendant

23

24                                    1 Courthouse Way
                                      Boston, Massachusetts
25
                                      January 24, 2007
```

1  shown a box by a face view that has four lamps mounted in

2  it.  There's the sockets and such here for such a thing.

3  And basically, this fits into the ceiling so that the, the

4  front lip is what fits on, on the T bar inside face.  So

5  that you have the opening here where the light would come

6  down onto the bed below.

7  Q    What mounting means are used in this example that you

8  just gave here?

9  A    The front lip of the fixture, a two foot by four foot

10  size, actually as it's stated in the patent, the width of

11  the fixture is approximately 23 and three-quarter inches

12  wide, because the spacing, the center of the T bars is two

13  feet.  So we have to be inside that.  And it's 47 and

14  three-quarter inches long.  Again, the spacing of the T bars

15  are on a four foot center.  We have to fit inside that.  And

16  then it also says in the patent that the fixture replaces a

17  standard troffer.

18  Q    What does the patent teach one skilled in the art about

19  means for ceiling-mounting the body of a luminaire?

20          **MR. DORNY:**  Objection.

21          **THE COURT:**  Well, the patent speaks for itself.

22  But consistent with my construction, if it's in his reports

23  he may answer.

24  A    The patent teaches what I just said, that the medical

25  fixture replaces a standard troffer.  It has dimensions to

1    fit into a two foot by four foot size, or in a second

2    example in the patent, a two foot by two foot size opening.

3    Q    Now, Mr. Lemons, we're displaying on the screen a

4    portion of the patent right now.  Can you explain to the

5    jury how this relates to your demonstration here?

6    A    Yes.  It says at Figure 2, which is a face view of this

7    fixture we put in, shows a rectangular shape of the lighting

8    fixture and formed with a long side and a short side, long

9    side being typically four feet, short side being typically

10   two feet.

11   Q    You mentioned that the patent teaches about replacing a

12   conventional troffer.  Where is that found in the patent?

13   A    In the, on the next page in column 3, states an

14   important feature of the present invention resides in the

15   orientation of the lamps within the lighting fixture which

16   permits the lighting fixture to be packaged in a two foot by

17   four foot configuration and thereby replaces a conventional

18   troffer.

19   Q    Does this information that you've just described, that

20   is, Fig. 2, and the two textual parts of the patent convey

21   such information to you as a person skilled in the art to

22   describe and find the structure of the mounting means for

23   the body?

24   A    Yes, although the picture of Fig. 2 helps show that it a

25   lip that sets in it.  When we had the conventional troffer

1    they often have a bent-out or a bent-in flat face that sets

2    on the edge of the T bar.  But those three different ways of

3    having the face to the fixture are the conventional shapes

4    for a troffer.

5    Q   In your opinion, would a person skilled in the art

6    reading the patent realize what mounting means were

7    described in the claim?

8    A   Yes, it's been standard in the industry for over 50

9    years.  Every electrician would know, if you tell him you're

10   going to install troffers he instantly knows that it's going

11   to be a hung ceiling and you fit the fixture up into it and

12   set it down on the T bar.

13   Q   Are there other equivalent mounting means other than

14   just mounting it on its edge that persons skilled in the art

15   are aware of?

16   A   As I say, some troffers have a flat face where the

17   housing comes down and bends out or housing comes down and

18   bends in.  Generally on the ends it bends in, on the side it

19   bends out, but there are variations on that.

20   Q   What's the next product that you want to demonstrate to

21   the jury?

22   A   The product made by ALS.

23          In this unit there are prismatic elements that fit

24   in the two sides, the two sides of the fixtures.

25   Q   Mr. Lemons, has the ALS MulTmed product MT2A, actually

1    this is B because it has the nurse's light, does it now fit

2    in the space formerly occupied by the conventional troffer?

3    A    Yes.  I put it in so that it isn't facing -- to help you

4    observe the light pattern.

5            **MR. HIGGINS:**  They need somebody taller than me to

6    do this you see.

7    Q    All right, Mr. Lemons, before you continue, can you show

8    the jury the mounting means that are on the MT2 product.

9    A    There are bend-out lips on the ends as well as on the

10   side where it fits down in.  And though it's a little hard

11   to see in this drawing, there's a double line all the way

12   around the outside.  And in this drawing you might barely

13   see that lip bent out.  And that's the data sheet for the

14   product.

15   Q    Does the fact that the MT --

16   A    Here it is enlarged showing that front lip.  And

17   enlarged here showing the end bent out.

18   Q    Does the fact that the MT2A or 2B product has a bent-out

19   lip instead of an edge, is there, in your opinion, is there

20   a difference between those two mounting means and the

21   mounting means that are described in the '254 patent?

22   A    Standard is three different, a straight edge, a bent-out

23   lip, or a bent-in lip.  And there's troffers with all three.

24   So, standard troffers have three different face

25   constructions.

1    out and other words are replacing those words.  And those

2    are the words from your glossary.  Because that's the way

3    that the Court has construed the claim and that is the way

4    that Mr. Lemons is now going to examine and analyze the

5    claim.

6    Q    Mr. Lemons, does the MulTmed product here show and

7    present a medical lighting system?

8    A    Yes, it does.  And its literature says that.

9    Q    Does the ALS MulTmed MT2B product contain a body?

10   A    Yes, you can see the end, and if you're looking at the

11   side you can see the side of that body.  End.  Side.

12   Q    Does the MTA -- excuse me, MT2B product from ALS contain

13   means for ceiling-mounted said body?

14   A    Yes.  Because it's two by four or just under two foot by

15   four foot, and it has a pay slip to set into a T bar

16   ceiling.

17   Q    Does the ALS MulTmed MT2B product here contain a first

18   light fixture within said body?

19   A    Yes.

20   Q    Which one is that?

21   A    That is the first one I turned on; that is called the

22   reading light.

23   Q    Is the first light fixture set or arranged to direct or

24   aim more light in a downward direction than in an upward or

25   outward direction to a reading area?

1    A    Yes.

2             MR. HIGGINS:  Could you please display Exhibit 21.

3    And go to the next page, please.  The next page.  The next

4    page.

5    Q    Mr. Lemons, in reviewing the page from Exhibit 21 which

6    is the ALS reading fixture, does that confirm or negate your

7    opinion on infringement?

8             MR. DORNY:  Objection; leading.

9             MR. HIGGINS:  Your Honor, this is.

10            THE COURT:  Please, I don't need argument, or I'll

11   take it at the side bar.  But I overrule that.  You may --

12   he may give us his conclusions.

13   A    As is shown in the illustration, there is light that is

14   directed out from the fixture directly to the book as well

15   as some that is directed onto the wall to reflect out to the

16   book.  So it does light the book area.  The IES Handbook

17   says that it should a light a six foot square area which it

18   does.

19   Q    Is that reading area where the book is demonstrated

20   there below the body of the luminaire?

21   A    Yes.

22   Q    Does the MT2B product contain a second light fixture

23   within the body of the luminaire?

24   A    Yes.

25   Q    Which one is that?

1    A    That is the ambient fixture, the one we turned on

2    second.

3    Q    Is this second light fixture set or arranged --

4         **MR. HIGGINS:**  Excuse me, could you redisplay claim

5    1.

6    Q    Is the second light fixture of the MT2B product set or

7    arranged to direct or aim more light in a downward and

8    outward direction to a wall than in an upward direction?

9    A    In the reading light?

10   Q    Yes.  This is the ambient, the second light.

11   A    The ambient, the second light.

12        Yes, it does.  I believe that was shown when we

13   turned the fixture on, that there is light on the wall, the

14   same sort of intensity.  It is a broad distribution and

15   therefore there is plenty of light on the wall.

16   Q    Is there any light upward in this product?

17   A    No, because the housing presents -- prevents that and

18   the way it's mounted prevents that.  Light doesn't bend

19   around corners.

20        **MR. HIGGINS:**  Could you please display Exhibit 21.

21   Q    And while he's doing that, sir, is the light that is

22   hitting the wall there reflected back to a broader area

23   under the body of the MT2B product?

24   A    Yes.  That's laws of physics, that the angle of distance

25   equals the angle of reflection.  So it comes in, goes down.

1    Q    Is the MT1D product a medical lighting system?

2    A    Yes.  That's what its brochures say.

3    Q    Does the MT1D product contain a body?

4    A    Yes.  Again, I think you can see in from the front, you

5    might have to stand up to see it, but there is a housing in

6    there that is the body of the luminaire.

7    Q    Does the MT1D product contain means for ceiling-mounting

8    that body?

9    A    Yes.  There's a lip all the way around it.

10   Q    Does the MT1D product contain a second light fixture

11   within the body of the luminaire?

12   A    Yes.  An ambient, what is called an ambient fixture.

13   Q    Is this second light fixture that you've just

14   illuminated set or arranged to direct or aim more light in a

15   downward and outward direction to a wall than in an upward

16   direction?

17   A    Yes.

18   Q    Is there any upward light --

19   A    No.

20   Q    -- from this product?

21        Based on your analysis and examination, do you have

22   an opinion whether or not the ALS MulTmed MT1D product

23   infringes claim 1 of the '254 patent?

24   A    Yes, I do.

25   Q    And what is that opinion?

1              UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS
2
                                        Civil Action
3                                       No. 05-10945-WGY

4

5    * * * * * * * * * * * * * * * * * * *
     GENLYTE THOMAS GROUP LLC,           *
6    a Delaware Limited Liability Company, *
                                         *
7              Plaintiff,                * **TRANSCRIPT OF**
        v.                               * **THE EVIDENCE**
8                                        * and **JURY CHARGE**
     ARCHITECTURAL LIGHTING SYSTEMS,     * **CONFERENCE**
9    a division of ARCH LIGHTING GROUP,  *   (Volume 5)
     a Rhode Island Corporation,         *
10                                       *
               Defendant.                *
11   * * * * * * * * * * * * * * * * * * *

12

13

14        BEFORE:  The Honorable William G. Young,
                       District Judge, and a Jury
15

16
     APPEARANCES:
17
             MIDDLETON REUTLINGER (By James E. Milliman,
18      Esq., James R. Higgins, Jr., Esq. and Robert J.
        Theuerkauf, Esq.), 2500 Brown & Williamson Tower,
19      Louisville, Kentucky 40202-3410, on behalf of the
        Plaintiff
20
             LAW OFFICE OF BRETT N. DORNY (By Brett N.
21      Dorny, Esq.), 386 West Main Street, Suite 12A,
        Northborough, Massachusetts 01532, on behalf of
22      Defendant

23

24                                 1 Courthouse Way
                                   Boston, Massachusetts
25
                                   January 30, 2007

1              The second item which convinces me that the ALS

2      product does not infringe is that the second light feature

3      of the ALS product has to have -- I'm sorry, the second

4      light fixture of the '254 patent has to have more light

5      directed or aimed towards an end wall.  And when I look at

6      the photometric test reports of any of the features in the

7      ALS product, in fact, more light is aimed straight down to

8      the bed and not towards the wall.  And, therefore, the ALS

9      fixtures do not fulfill the required features of the '254

10     patent.

11     Q    In your discussion there you talked about the intensity

12     of the light.  Does claim 1 of the '254 patent refer to

13     intensity of light?

14     A    That term is not used, but that is how a person skilled

15     in the art would interpret the wording of the patent.  The

16     wording of the patent specifically says to direct light.

17     And this Court has interpreted that expression to mean

18     direct or aim more light to the particular area specified by

19     the target.

20          MR. HIGGINS:  Objection, your Honor; that's an

21     incomplete calling of the Court's construction.

22          THE COURT:  Well, please.  He may so testify.  I'm

23     sensitive to my own construction.

24          MR. HIGGINS:  Very well, sir.

25     Q    In reaching your conclusion you have interpreted more

```
 1    light to mean highest intensity; is that correct?

 2    A    Yes.

 3    Q    And on what basis do you determine that more light means

 4    highest intensity?

 5    A    Well, we have discussed the meaning of the term

 6    intensity in Court.  It is the concentration of light in a

 7    particular direction and the test reports that we've looked

 8    at show a table of numbers.  Each number in that table

 9    represents the intensity at a particular angle.  The highest

10    number in that table is where more light is going, more

11    light is going in that direction than any other direction.

12             MR. HIGGINS:  Objection, your Honor; that's

13    inconsistent with his report.

14             THE COURT:  Well, yes, pass up the report.  Come to

15    the side bar.

16    SIDEBAR CONFERENCE, AS FOLLOWS:

17             THE COURT:  Well, this is your witness.  Where's

18    the report?

19             MR. DORNY:  If he's objecting to it.  I don't have

20    it with me at the moment.

21             THE COURT:  Well, where is it?  Where is his

22    report?

23             MR. HIGGINS:  I have my copy, your Honor.

24             THE COURT:  Well, that, yes, I would -- I don't

25    mean to take theirs.  Is this the only copy in court?
```

1    characterize that as a blob?

2    A    I would never characterize something as a blob.  I would

3    use a more technical term.

4    Q    As a Ph.D. you prefer that it is a 360 degree range of

5    horizontal angles correct, sir?

6    A    I think that's an accurate technical response.

7    Q    And these ceiling-mounted luminaires, the up light from

8    them is blocked by the ceiling, correct, sir?

9    A    Correct.

10   Q    So the light that is being produced by the compact

11   fluorescent lamp or the fluorescent lamp as the case may be

12   is all, to use your term, a 360 degree range of horizontal

13   angles in a hemisphere below the luminaire.  Is that

14   accurate, sir?

15   A    That is accurate.

16   Q    Now, sir, when you prepared your opinion that you

17   discussed earlier, your opinion assumes and concedes the

18   existence of all of the elements of claim 1 and claim 3,

19   except the second light fixture of those claims.  Is that

20   correct, sir?

21   A    Yes.

22   Q    And your opinion that's in your report is that the ALS

23   model MulTmed two by four luminaire or two by two luminaire

24   does not infringe the '254 patent because the quote, highest

25   intensity, unquote, of the light emanating from the ALS

1    will either correct myself or say I'm content, give the jury

2    another break.

3        Then you'd argue.  Then I have, ladies and

4    gentlemen, you all deliberate together.  You can use your

5    notes.  Don't pass your notes around.  And then a little

6    peroration at the end about the verdict.

7        After that, I won't invite you.  It's so neutral

8    that I can't imagine you would want to be heard.  But if you

9    did, you've got to get on your feet and say, "May I be

10   heard" because I'll just send the jury out and then my right

11   to correct is gone.

12       But the question I put to you is first or last?

13       **MR. MILLIMAN:**  Your Honor, I would prefer to go

14   last.

15       **THE COURT:**  No, no, not -- you prefer my charge to

16   be last?

17       **MR. MILLIMAN:**  Oh, first.  Yes.  First.

18       **THE COURT:**  You prefer my charge to be first.

19       **MR. DORNY:**  I will agree, your Honor.

20       **THE COURT:**  Fine.  Then that's how we'll do it.  My

21   charge will come first.

22       Now the charge conference, and you'll be

23   sympathetic to me here, it's been a long day.

24       I will correct my charge in specific parts as

25   Genlyte has called to my attention, I found that very

```
 1      helpful.  As to the doctrine of equivalents, I'll put
 2      substantially in there, each place you want substantially,
 3      that's the law.  And I will emphasize that, going back to
 4      the first point that you made, that we're not talking about
 5      which is the best lighting system or the like, and that the
 6      infringement issue is between the claims and the accused
 7      device.  That's what they must balance.
 8            Other than that you've pretty well heard it.  I
 9      think I must go through the -- people will refer to them,
10      now I'm blanking.  What's the controlling case on damages?
11            MR. DORNY:  Georgia-Pacific.
12            THE COURT:  Georgia -- there you go.  Thank you.  I
13      go through Georgia-Pacific and its factors and I will list
14      them all.  I must give a stock charge on willfulness because
15      I do think that's in the case.
16            Anything else that should be raised now.
17      Plaintiffs?
18            MR. HIGGINS:  Yes, your Honor.
19            THE COURT:  Yes.
20            MR. HIGGINS:  With respect to the 112 6
21      means-plus-function issue that is in Mr. Dorny's proposed
22      instructions.
23            THE COURT:  I don't propose to go into it.
24            MR. HIGGINS:  Very well.  Because I think it's
25      submitted.
```

```
 1                  UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS
 2
                                          Civil Action
 3                                        No. 05-10945-WGY

 4

 5   * * * * * * * * * * * * * * * * * *
     GENLYTE THOMAS GROUP LLC,           *
 6   a Delaware Limited Liability Company, *
                                         *
 7             Plaintiff,                 *   TRANSCRIPT OF THE
        v.                                *   EVIDENCE, JURY
 8                                        *   INSTRUCTIONS and
     ARCHITECTURAL LIGHTING SYSTEMS,     *   CLOSING ARGUMENTS
 9   a division of ARCH LIGHTING GROUP,   *      (Volume 6)
     a Rhode Island Corporation,          *
10                                        *
               Defendant.                 *
11   * * * * * * * * * * * * * * * * * *                   —

12

13

14            BEFORE:   The Honorable William G. Young,
                           District Judge, and a Jury
15

16
     APPEARANCES:
17
               MIDDLETON REUTLINGER (By James E. Milliman,
18        Esq., James R. Higgins, Jr., Esq. and Robert J.
          Theuerkauf, Esq.), 2500 Brown & Williamson Tower,
19        Louisville, Kentucky 40202-3410, on behalf of the
          Plaintiff
20
               LAW OFFICE OF BRETT N. DORNY (By Brett N.
21        Dorny, Esq.), 386 West Main Street, Suite 12A,
          Northborough, Massachusetts 01532, on behalf of
22        Defendant

23

24                                   1 Courthouse Way
                                     Boston, Massachusetts
25
                                     January 31, 2007
```

1    presentation that is published by ALS, correct, sir?

2    A    Correct.

3    Q    All right.  Now, let's look at Exhibit 14 in detail.

4    You've already mentioned that the highest candela rating

5    that is shown on the first page, 915, is not straight down,

6    correct, sir?

7    A    Correct.

8    Q    And you said there were detailed reports, and that's on

9    the second page; is that correct, sir?

10   A    Correct.

11   Q    Now, you have -- is it correct, sir, that the highest

12   candela rating on this page is 917 candela?

13   A    Yes, it is.

14   Q    And that's not straight down either, is it, sir?

15   A    No, it's two and-a-half degrees from straight down.

16   Q    It's not straight down, is it?

17   A    That's correct.

18   Q    And the candela values that are used -- excuse me, that

19   are reported in this table, are the values that are used to

20   report the zonal lumens in other parts of the report,

21   correct, sir?

22   A    Zonal lumens are calculated from these values.

23   Q    If I could refer you to the third page in the zonal

24   lumens summary.  Is it connect, sir, that the amount of

25   lumens in the zero to five degree is 22?

1    A    Yes.

2    Q    Is it also correct, sir, that the amount of total lumen

3    output of the luminaire is 2,620?

4    A    Yes.

5    Q    So the amount of lumens, the zero to five category, 22,

6    is less than one percent of the total light output of that

7    fixture being measured; is that correct, sir?

8    A    Yes, but that is irrelevant with regard to the patent,

9    because the patent talks about direction.

10         **MR. HIGGINS:**  Your Honor, may I have an instruction

11    for the witness to just answer my question.

12         **THE COURT:**  Well, you're not supposed to be just

13    volunteering things.  I'll let that stand.  But he's right.

14    This is his chance to ask questions.

15         **THE WITNESS:**  Yes, sir.

16         **THE COURT:**  Mr. Dorny has a chance to ask you

17    questions.  And he's framing them so grammatically they can

18    be answered yes or no.

19         **THE WITNESS:**  Yes, sir.

20         **THE COURT:**  Now, if they can fully and honestly be

21    answered yes or no, answer them yes or no.  If you don't

22    know the answer, you don't remember, you can always say

23    that.  And if you can't answer it fully and honestly, yes or

24    no, you can always say cannot answer, need to explain.  But

25    he gets to ask the questions now and he gets to ask them his

1    as you are persuaded unanimously that on a point that

2    Genlyte has to prove that point is established, by a fair

3    preponderance of the evidence, you may say that Genlyte has

4    proved that point.

5         Now, what is it that they have to prove in this

6    patent case -- three things -- by a fair preponderance of

7    the evidence.  First, that Genlyte is the owner of a valid

8    patent.  Second, that ALS infringed one or more claims of

9    that patent by a specific product or products in one of

10   three different fashions.  And if you look at the grid there

11   on the first page, and on the second page, the three

12   different fashions are laid out there.  And the products

13   that Genlyte says infringed are laid out.  That's the second

14   point.  Infringement in one of three ways.

15        And the third point is then what damages, what

16   money damages should Genlyte recover.

17        Now, let me go over those points.  First point.  No

18   dispute as to that.  That's stipulated.  There is a patent.

19   It's the '254 patent.  It's a valid patent.  It's still in

20   full force and effect.  ALS doesn't dispute that.  That's

21   stipulated.  It's a given.  The first point's established.

22        Second point.  Did any of the specific ALS

23   products, and they're listed here, infringe any, well, not

24   any claim, one of two claims of the Genlyte patent.  Now, I

25   told you where to find the claims.  You will have a copy of

1    this.  We don't want to put stickers on the original.

2    There's only one original with its fancy ribbon.  Take

3    nothing of that.  A patent's a patent and they agree this is

4    the patent.  Well, I'm looking at the original.  And the

5    claims that -- they don't say that all their claims are

6    infringed.  They say that two different claims are

7    infringed, claim number 1 and claim number 3.  That's where

8    you look.

9           Now, you can, of course, read the whole patent to

10   better understand the claims, and you have my explanation of

11   what the words mean in claims 1 and 3.  But claims 1 and 3.

12   And Genlyte says that five different products -- and they're

13   listed here down the left hand margin -- infringe claim 1.

14   And Genlyte says that two different products infringe claim

15   3.  And ALS denies all that.  But that's what the case is

16   about.  So we've set up that grid there for you.

17          Now, I need to go over the three different ways a

18   product can infringe.  First of all, Genlyte says -- and I

19   don't need to go through each one of these products.  That's

20   evidence.  We'll leave that to you.  But we'll take the very

21   first one here.  And I'm just going to use that as an

22   example.  But it's true for each of the products that are

23   listed down that left hand margin.  Genlyte says that this

24   MT2A product literally infringes claim 1.

25          Here's what they have to prove.  They have to prove

1   that every element of claim 1 is found in the MT2A product.

2   Every single one.  If there's one element that's not there,

3   it's not literal infringement.  They have to prove that

4   every single element of the claim is there in that MT2A

5   product.

6           Now, be very clear.  The comparison you make is not

7   between what Genlyte may be selling and what its Lightolier

8   products actually look like.  The comparison is between the

9   claim and the MT2A product that ALS is selling.  That's the

10  comparison that you make.  And if you find every element of

11  claim 1 in the MT2A product, then it infringes.  You don't

12  get into an analysis of which is the better product or which

13  the consumer would most like to have in their hospital rooms

14  or the like.  That's not the analysis.  The analysis is you

15  take the claim, and you look to see if every single element

16  of that claim is found in the MT2A product.  If it is, the

17  product infringes, and so on for all the products down the

18  page.

19          Well, then Genlyte says, well, even if it doesn't

20  literally infringe, it certainly infringes under the

21  doctrine of equivalents.  That's the second column.  ALS

22  says no, it doesn't.  That's disputed.

23          So what does it mean to infringe under the doctrine

24  of equivalents.  Now, you don't even get to the doctrine of

25  equivalents if you find literal infringement.  Put a

1   checkmark there and move on to the next product.  It's all I

2   need to know.  If you put a checkmark there, I'll understand

3   your answer is yes, that it does infringe.  But if you, if

4   you don't think it infringes leave it blank.  I'll

5   understand that means you don't think it infringes.

6        Then you go over and you ask yourself under the

7   doctrine of equivalents does it infringe.  What does that

8   mean?  That means that even though not every single element

9   of claim 1 is present in the particular product that you're

10  considering, that as to the missing element, ALS has

11  something or has solved the problem, that performs

12  substantially the same function in substantially the same

13  way by substantially the same means.  All three of those

14  substantiallies have to be present.  So I'll say them again.

15       It's not just that the ALS product comes close.

16  It's got to perform substantially the same function in

17  substantially the same way using substantially the same

18  means.  Because even if the product is like the Genlyte

19  product, if it has been designed around the Genlyte -- I

20  said that wrong.  Because you're not comparing products.

21       Even if it's substantially like what you understand

22  is claimed in the '254 patent, you're entitled to design

23  around a patent.  That's fine.  That's encouraged.  That's

24  why those three substantiallies all have to be present.

25       So you ask yourself, if it doesn't literally

1    infringe, does it infringe by the doctrine of equivalents.

2    And if you think it does unanimously put a check.

3        But let's say that you come to believe that it

4    isn't ALS who's infringing.  Because ALS, while it appears

5    undisputed they make whatever these products are, they make

6    these products and they sell them and they sell them to

7    these specifiers or to contractors who are building

8    hospitals and somebody employs these specifiers, suppose you

9    come to think that the only, that there's infringement.

10   Now, if you don't think there's infringement, if you don't

11   think anybody's infringing, either literally or by the

12   doctrine of equivalents, your analysis as to that product is

13   over.  ALS wins as to that product.  Leave all three of the

14   boxes that relate to the specific product blank.

15       But suppose -- and I keep saying suppose.  That

16   doesn't mean I think anything's proved or not proved.  You

17   just need to know every possible analysis.

18       Suppose you come to think that in the hospital,

19   when the light is set up and the light, I'll say nothing

20   about where the light goes, that's a big dispute here, but

21   it lights.  And the way it lights in the specific hospital

22   room, suppose you come to think that infringes.  But you

23   don't think ALS did it.  It doesn't infringe until the

24   hospital room is constructed, and then given the setup it

25   infringes.  Well, Genlyte says, yes, but it's ALS who

1     induced that infringement.

2          Now, for inducement Genlyte has to prove that ALS

3     manufactured a product which, in its pieces, does not

4     infringe but which, when it is used by other people in the

5     manner in which ALS designed it, when it's, when it's

6     actually in place and being used, it infringes.  And if

7     Genlyte proves that, that ALS is in the business of putting

8     out this product which, when, when hospital contractors use

9     it in fact infringes the Genlyte claims, not Genlyte's

10    products, Genlyte's claim or claims, you may say that

11    Genlyte has proved that ALS has induced the infringement.

12         So your analysis should be, I think, start with the

13    MT2A product and say does it literally infringe.  If it does

14    put a check there and stop.  If it doesn't, pass on to ask

15    yourselves does it infringe by the doctrine of equivalents.

16    If it does, put a check there and stop.  If it doesn't, ask

17    yourself have they induced the hospital contractor to

18    infringe.

19         Now, if it doesn't infringe at all leave all three

20    boxes blank.  If you think, however, that Genlyte has proved

21    that ALS has induced the infringement put a check there in

22    the third box, and then I need to tell you to tell me why.

23    Was the inducement to literal infringement or was the

24    inducement to infringement by the doctrine of equivalents.

25         So you work your way across.  But if you put a

1   check in that third box, I want you to go back across the

2   line and tell me which way, by literal infringement or by

3   the doctrine of equivalents.

4       Now, suppose, and we're doing all the possible

5   supposes here, suppose as you have looked at each of these

6   products, five products, you check against claim 1, two

7   products you check against claim 2, and you haven't put any

8   checks in any boxes because you think that Genlyte has

9   failed in its proof.  Stop.  Don't go any further.  And then

10  go back to the first page and put a checkmark there in front

11  of, we find, number 1, for ALS.  If ALS wins the case, the

12  case is over.

13      Suppose, however, you do put a checkmark or

14  checkmarks somewhere within the grid.  If you do that you

15  pass on to the third question here, or really the third

16  major element, what are the damages, what damages has

17  Genlyte suffered by virtue of that infringement either

18  literally or by the doctrine of equivalents or by inducing

19  infringement, what are the damages.

20      Now, the way to figure the damages is to assume

21  that even though Genlyte never entered into a license with

22  ALS, they never permitted ALS to manufacture a product that

23  falls within claim 1 or claim 3, or both of those claims,

24  assume that they did.  That these two parties actually sat

25  down at arm's length, each one of them, which is perfectly

1          And I think you're entitled to know what happens

2     here.  If you answer no, the case is over.  Even if there's,

3     even if there's infringement, the answer is no, and as to

4     wilfulness, and the damages are the damages.

5          If the answer is yes, you put a question to me.  I

6     have to figure out various additional sanctions which I may,

7     but do not have to, impose on ALS.  And among the things I

8     can impose upon them is Genlyte's attorneys' fees; make ALS

9     pay Genlyte's attorneys' fees.

10         But, that's not asked of you.  What's asked of you

11    is was the patent infringement wilful.  Just tell me, no or

12    yes, by clear and convincing evidence, a unanimous verdict.

13         Now, I may have left something out, I may have

14    misstated something, and the lawyers get the chance to call

15    my attention to that at this time, and I'll ask them to come

16    to the side bar.

17    SIDEBAR CONFERENCE, AS FOLLOWS:

18              THE COURT:  Mr. Higgins?

19              MR. HIGGINS:  Yes, sir.  We had requested an

20    instruction on inefficient infringement like you gave in the

21    Read Corporation --

22              THE COURT:  Yes.

23              MR. HIGGINS:  -- v. Powerscreen case.

24              THE COURT:  I'm not giving it.

25              MR. HIGGINS:  All right.  We note that you

1    characterize the --

2            THE COURT:  Doctrine of equivalents.

3            MR. HIGGINS:  -- the function-way-means, and we

4    think that the proper way to say it is function-way-result.

5            THE COURT:  I'll make that change.

6            MR. HIGGINS:  Very well, sir.

7            And there are a number of stipulations of course

8    one of which is the ownership of the '254 patent.  Will the

9    jury actually receive the stipulations when they go in the

10   jury room?

11           THE COURT:  No, but I couldn't have said it more

12   forcefully.

13           MR. HIGGINS:  Yes, sir.

14           THE COURT:  It's just not an issue.  And you may

15   say emphatically in closing that that's just not an issue.

16           MR. HIGGINS:  Very well, sir.

17           THE COURT:  Mr. Dorny, anything?

18           MR. DORNY:  Yes, I object to your omitting an

19   instruction on 112, Paragraph 6.

20           THE COURT:  Yes, I have it in mind, but I will not

21   so charge.

22           MR. DORNY:  Okay.  Can I just make --

23           THE COURT:  I think it's adequate.

24           MR. DORNY:  Okay.

25           THE COURT:  And I will absolutely go to bat for

```
 1    you; you've preserved the record on that.
 2              MR. DORNY:  Okay.
 3              THE COURT:  Thank you.
 4              MR. HIGGINS:  Very well, sir.
 5         (Whereupon the sidebar conference concluded.)
 6              THE COURT:  The parties want a little revision on
 7    the three substantiallies.  So let me, let me -- and they're
 8    right, so let me do it.  This is when you're considering the
 9    doctrine of equivalents, the three substantiallies.
10              If you, if you don't find literal infringement then
11    you've got to look at the ALS product to see whether it
12    performs substantially the same function in substantially
13    the same way with substantially the same result.  That's the
14    only change I made.  But it's right to make it.
15              The three substantiallies for the doctrine of
16    equivalents are that the ALS product perform substantially
17    the same function in substantially the same way to achieve
18    substantially the same result.
19              Is the supplementary charge satisfactory,
20    Mr. Higgins?
21              MR. HIGGINS:  Yes, your Honor.
22              THE COURT:  Mr. Dorny?
23              MR. DORNY:  Reserving my right on the other issue.
24              THE COURT:  Of course, absolutely.  And the same is
25    true for Genlyte.
```

1          **MR. HIGGINS:**  Very well, your Honor.

2          **THE COURT:**  You've reserved your rights you have.

3     But the supplementary charge is satisfactory.

4          Now, even with all that, don't start.  And for a

5     very good reason.  I've just been talking the framework.  I

6     have nothing to say about the evidence.

7          Now the attorneys get a chance to sum up, to argue

8     to you within that legal framework what the evidence either

9     proves or fails to prove.  And I have no pride of place

10    here.  Among the attorneys and the judge, that's the

11    important thing.  What do these facts show or fail to show.

12         So continue to keep your minds suspended.  Do not

13    discuss the case either among yourselves nor with anyone

14    else.

15         You may stand in recess until ten minutes after

16    11:00.  The jury may recess.

17         **THE CLERK:**  All rise for the jury.

18         (Whereupon the jury left the courtroom.)

19         (Recess.)

20         **THE CLERK:**  All rise for the jury.

21         (Whereupon the jury entered the courtroom.)

22         **THE CLERK:**  Court is in session, please be seated.

23         **THE COURT:**  We come now, as I said, to one of the

24    most important parts of the case, the time where the lawyers

25    stand before you and argue the client's cause.

Page 737

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action
No. 05-10945-WGY

```
* * * * * * * * * * * * * * * * * *
GENLYTE THOMAS GROUP LLC,            *
a Delaware Limited Liability Company, *
                                     *
            Plaintiff,               *
                                     *
    v.                               *   TRIAL TRANSCRIPT
                                     *     (Volume 7)
ARCHITECTURAL LIGHTING SYSTEMS,      *
a division of ARCH LIGHTING GROUP,   *
a Rhode Island Corporation,          *
                                     *
            Defendant.               *
* * * * * * * * * * * * * * * * * *
```

BEFORE:  The Honorable William G. Young,
              District Judge, and a Jury

APPEARANCES:

        MIDDLETON REUTLINGER (By James E. Milliman,
    Esq., James R. Higgins, Jr., Esq. and Robert J.
    Theuerkauf, Esq.), 2500 Brown & Williamson Tower,
    Louisville, Kentucky 40202-3410, on behalf of the
    Plaintiff

        LAW OFFICE OF BRETT N. DORNY (By Brett N.
    Dorny, Esq.), 386 West Main Street, Suite 12A,
    Northborough, Massachusetts 01532, on behalf of
    Defendant

                        1 Courthouse Way
                        Boston, Massachusetts

                        February 1, 2007

Page 738

1        PROCEEDINGS - 10:30 A.M.

2

3

4        THE CLERK:  All rise.  Court is in session.

5        Oh, Mr. Dorny isn't here.

6        THE COURT:  Please be seated.

7        THE CLERK:  Please be seated.  Court is in session.

8        (Pause in proceedings.)

9        THE CLERK:  Was he out there, Mr. Milliman?

10        MR. MILLIMAN:  He's just outside.

11        THE CLERK:  Okay, thank you.

12        (Further pause in proceedings.)

13        THE COURT:  All right, everyone's present.

14        Plaintiffs had some issue about my answers to juror

15 questions and I'll hear you.

16        MR. HIGGINS:  Your Honor, yesterday when you were

17 answering the questions of the jury with respect to Question

18 No. 2, and the explanation that you gave with respect to the

19 three substantiallies, with respect, I believe you mixed up

20 the three substantiallies.

21        THE COURT:  And I said means and I should have said

22 function.

23        MR. HIGGINS:  Yes, sir.  And the first time you

24 mentioned the doctrine you repeated it as

25 function-result-function.  That's at the bottom of Page 3.

Page 739

1        THE COURT:  Yes.

2        MR. HIGGINS:  The quote, if the elements --

3        THE COURT:  I see it.  I see it.  The transcript is

4   clear.

5        MR. HIGGINS:  Yes, sir.

6        THE COURT:  Well, I agree with you.  But the law is

7   clear.  You made no objection and the jury went out and I

8   can't call them back.

9        Now, if they come back with some inquiry along

10  those lines, I can make the correction.  But other than

11  that, the jury is now deliberating.  The record is what it

12  is.

13       MR. HIGGINS:  Your Honor, may I inquire, if there's

14  another time when you're responding to a juror's question --

15       THE COURT:  I would be of a mind to correct that

16  because I'm quite clear that while the charge in chief is

17  accurate, I fumbled it there in that respect.

18       MR. HIGGINS:  I did not know the Court's rules.

19       THE COURT:  It's not a question of the Court's

20  rules.  This is matter of law.  You cannot interrupt a

21  deliberating jury unless they ask to be interrupted.

22       MR. HIGGINS:  That I understand, sir.

23       THE COURT:  Right.

24       MR. HIGGINS:  But if you are addressing them again

25  should I object right then and there, sir?

Page 740

1          THE COURT:  Absolutely.

2          MR. HIGGINS:  Very well, sir.  Thank you.

3          THE COURT:  Absolutely.

4          All right, now the issue of -- and this is only

5   hypothetical, though you might well be talking settlement,

6   but that's not for me to say.

7          Let's assume that the jury has rendered a verdict

8   for Genlyte, and we'll, we'll make two assumptions.  We'll

9   assume that they've rendered a verdict for Genlyte, and it

10  is pretty obvious that it goes the plaintiff's way both as

11  to extent of damages and scope of infringement, and let's

12  start with the presentation making that assumption.

13         Then at least in my mind -- well, things might be

14  different if they went plaintiff but from their damage

15  assessment they obviously discounted or disagreed with the

16  plaintiff's damages expert, or if they went plaintiff but

17  found that some but not all of the particular accused

18  devices in fact infringe.

19         It's the plaintiff's burden.  Plaintiff may

20  proceed.

21         MR. HIGGINS:  Very well, sir.

22         The controlling case as the Court is aware is the

23  eBay case, eBay v. Merc Exchange reported -- there's no U.S.

24  cite yet but the Supreme Court cite is 1 --

25         THE COURT:  Yes, I'm, I'm familiar with the case.

1   which views make no impression upon the minds of others,

2   equally honest, equally intelligent with themselves, and who

3   have heard the same evidence, with the same attention, with

4   an equal desire to arrive at the truth, and under the

5   sanction of the same oath.  And, on the other hand, jurors

6   for the other party ought seriously to ask themselves

7   whether they may not reasonably doubt the correctness of a

8   judgment, which is not concurred in by others with whom they

9   are associated; and distrust the weight or sufficiency of

10  that evidence which fails to carry conviction in the minds

11  of the others.

12          With those instructions, I'm going to send you out.

13  Except now that -- we can never interrupt you.  But, you

14  know, I made a mistake and I can correct it now that you're

15  back here.

16          And I simply misspoke.  We have no right to ask you

17  anything about your deliberations, and I would never do so.

18  But in an earlier question you asked about the doctrine of

19  equivalents.  And I just, I had the, the three-prong test

20  right and I had the reasons for the three-prong test right,

21  but I messed up the words.  So let me just get the words

22  straight.

23          If you are -- if this helps you, I certainly hope

24  it does, but at least it gives me a chance to correct.  I

25  simply misspoke.

1          The three-prong test for doctrine of equivalents is

2     this.  If there isn't literal infringement then Genlyte has

3     to prove by a fair preponderance of the evidence that the

4     accused device that you're considering performs

5     substantially the same function in substantially the same

6     way with substantially the same result.  I messed up the

7     words.  It's substantially the same function in

8     substantially the same way with substantially the same

9     result.

10          I hope that helps you.  You may retire to continue

11    your deliberations.

12          THE CLERK:  All rise for the jury.

13          (Whereupon the jury left the courtroom at 3:20

14    p.m.)

15          THE COURT:  Please be seated.

16          Let me tell you what I'm going to do here so you

17    can make your plans accordingly.  If they come back and say

18    they're at an impasse again, I'm sending them out again with

19    no other instruction, just say remember my instructions, go

20    on and continue.  Naturally, I'm letting them go at 5:00 and

21    telling them to come back on Monday.

22          If I mistry this case, I'm holding it on the

23    running trial list, and as soon as I'm through the cases

24    I've set up for next week, we'll try it again.  You people

25    will be well-advised to settle.

1          We'll recess.

2          THE CLERK:  All rise.

3          MR. DORNY:  Your Honor?

4          THE COURT:  Yes.

5          MR. DORNY:  Can we ask how many cases you have on

6    your trial list for next week?

7          THE COURT:  I have two.  I've doubled them up.  I

8    have, I have to finish a motion to suppress and that same

9    day I'm going to impanel someone who wandered in here

10   wanting preliminary injunction.  But maybe they'll fold.  I

11   don't know.  But they'll go ahead, unless we get notice

12   tomorrow that they've settled.  Then there's another case,

13   also wanted a preliminary injunction, I put them to an

14   immediate trial jury waived to start on Tuesday.  But I

15   understand they'll be settling.  So it's conceivable you'll

16   be back here.

17         We'll recess.

18         MR. DORNY:  Thank you, your Honor.

19         THE CLERK:  Court is in recess.

20         (Recess.)

21         THE CLERK:  All rise for the jury.

22         (Whereupon the jury entered the courtroom at 4:50

23   p.m.)

24         THE CLERK:  Court is in session, please be seated.

25         Madam Forelady, members of the jury, has the jury

# EXHIBIT B

Page 1

1                    UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS
2

                                            Civil Action
3                                           No. 05-10945-WGY

4

5    * * * * * * * * * * * * * * * * * *
                                        *
6    GENLYTE THOMAS GROUP LLC,          *
                                        *
7       Plaintiff/Counterclaim Defendant, *
                                        *
8       v.                              *    MARKMAN HEARING
                                        *
9    ARCHITECTURAL LIGHTING SYSTEMS,    *
     a division of ARCH LIGHTING GROUP, *
10                                      *
        Defendant/Counterclaimant.      *
11   * * * * * * * * * * * * * * * * * *

12
                    BEFORE:  The Honorable William G. Young,
13                              District Judge

14

15   APPEARANCES:

16             CESARI and MCKENNA, LLP (By Kevin Gannon,
        Esq.), 88 Black Falcon Avenue, Boston,
17      Massachusetts 02210
                 - and -
18             MIDDLETON REUTLINGER (By James R. Higgins,
        Jr., Esq.), 2500 Brown & Williamson Tower,
19      Louisville, Kentucky 40202-3410, on behalf of the
        Plaintiff/Counterclaim Defendant
20
               LAW OFFICE OF BRETT N. DORNY (By Brett N.
21      Dorny, Esq.), 386 West Main Street, Suite 12A,
        Northborough, Massachusetts 01532, on behalf of
22      Defendant/Counterclaimant

23
                                        1 Courthouse Way
24                                      Boston, Massachusetts

25                                      June 30, 2006

Page 22

1    upon both Figures 1 and 2, whatever they show.

2         MR. DORNY:  Yes, your Honor.

3         THE COURT:  Okay.  Then I think for our purposes

4    this morning that I should not go any further and I should

5    wrestle with this issue if you file a motion for summary

6    judgment on that ground.  I'm not disposed to construe

7    anything.  I don't see that I have to construe anything.

8    I'm rejecting their proposal because it adds in holes and

9    flanges and different things, which I don't see disclosed

10   here.  But don't think that the therefore automatically

11   follows.

12        Now, you understand that?

13        MR. DORNY:  I understand that, your Honor.

14        THE COURT:  And you're content with that?

15        MR. DORNY:  Yes, your Honor.

16        THE COURT:  For now.

17        Now back to Genlyte.  What's wrong with that in the

18   context of a Markman hearing?  I now see and appreciate many

19   of your slides here.  I continue to think Mr. Lemons is

20   extrinsic.  Though I like the way you phrased that.  But,

21   your job is to teach how to do this to one skilled in the

22   art in the patent.  And you say we've done it.  Well, maybe.

23   We'll see that on summary judgment, with a careful perusal

24   of the cases which both support and reject it.

25        But what's to be construed here?

# EXHIBIT C

**Sherrie J. Craft**

| | |
|---|---|
| **From:** | Robert J Theuerkauf |
| **Sent:** | Sunday, January 28, 2007 11:32 AM |
| **To:** | bndorny@dornylaw.com |
| **Cc:** | James E. Milliman; James R. Higgins, Jr. |
| **Subject:** | Genlyte v. ALS |

Dear Brett:
The most recent sales data we received from ALS only included sales of the accused
products through September 2006.  Please provide ALS' sales data from September to date.
Thanks:
Robert

1