UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GENLYTE THOMAS GROUP LLC,<br><br>    Plaintiff/Counterclaim Defendant,<br>v.<br><br>ARCHITECTURAL LIGHTING SYSTEMS, a division of ARCH LIGHTING GROUP,<br><br>    Defendant/Counterclaimant. | Civil Action No. 05-CV-10945 WGY |

**MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION TO ALTER OR AMEND THE AMENDED JUDGMENT, TO RECONSIDER SAME, FOR RELIEF FROM AMENDED JUDGMENT AND/OR FOR SANCTIONS**

Defendant Arch Lighting Group, Inc. ("ALS") hereby opposes Plaintiff's Motion to Alter or Amend the Amended Judgment, to Reconsider Same, For Relief From Amended Judgment and/or for Sanctions. In its haste to brand ALS a "misfeasor" for its "egregious misconduct," Plaintiff Genlyte Thomas Group LLC ("Genlyte") has misstated the facts, completely ignored contradictory facts, misrepresented the jury's and the Court's decisions, and misapplied the law clearly set forth in the cited cases. Genlyte's motion is filled with statements which Genlyte knows to be false and/or misleading. As set forth in greater detail below, Genlyte's motion is without factual or legal support and should be denied.

BACKGROUND

Genlyte brought this action accusing ALS's MulTMed products and Latitude products of infringing the '254 Patent. ALS denied infringement. ALS responded to Genlyte's first discovery requests on January 3, 2007. In connection with its responses, ALS provided information regarding sales of the MulTMed products through the time of the response.

1

Pursuant to Fed. R. Civ. P. 26(e), in October 2006, ALS supplemented its interrogatory answers and produced additional documents to cover sales through September 30, 2006.

In November 2006, in connection with various discovery requests, ALS granted Genlyte access to all of its customer files. A paralegal of Genlyte's counsel spent a week reviewing the files and selecting documents for copying. Declaration of Paul B. Northrup ("Northrup Decl.") ¶¶2, 4, attached as Exhibit 1 hereto. ALS's customer files included all sales information for the MulTMed products. Northrup Decl. ¶3. The customer files also included existing unfilled orders for the MulTMed products. The paralegal copied documents relating to at least 10 open orders along with many other documents relating to the MulTMed sales through December 1, 2006 when he left ALS's offices. Northrup Decl. ¶5.

A jury trial was held January 22 through January 31, 2007. During trial, Michael Tate, Genlyte's financial expert, testified as to a determination of damages. He indicated that his damages calculation only included ALS sales through September 2006. Nevertheless, the Court instructed the Jury to determine damages through the date of the verdict. The Court specifically noted that Mr. Tate's damages calculation ended in September 2006. Genlyte never objected to the Court's instruction regarding the determination of damages.

Following a partial verdict in its favor, Genlyte requested entry of judgment. One of the terms it requested was an accounting of sales of the MulTMed products from September 2006 through the date of judgment. Despite ALS's objections to such a term, the Court originally ordered ALS to report the number of such sales and to pay additional damages of $67 per product sold. ALS timely moved to strike that portion of the judgment as being contrary to the Court's instructions to the jury. The Court granted ALS's motion on April 11, 2007. In the interim, ALS complied with the order by providing an accounting of sales from September 2006

through February 5, 2007.  During that time period, ALS sold 412 of the MulTMed products held to infringe Genlyte's patent.  Of those sales, 223 products related to sales made before November 23, 2006 and included in the customer files produced to Genlyte.  Northrup Decl. ¶6.  A substantial portion of the remaining 189 products sold in December and January related to the open orders also provided to Genlyte.

## ARGUMENT

A.   <u>Genlyte Misstates The Law Of Misconduct.</u>

Genlyte asserts that the judgment should be altered and/or ALS should be sanctioned for "misconduct."  In attempting to support its case, Genlyte relies heavily on the holding in *Anderson v. Cryovac, Inc.*, 862 F.2d 910 (1st Cir. 1988), that "failure to disclose or produce materials requested in discovery can constitute 'misconduct'". *Id.* at 923.  However, it fails to consider or follow the limitations clearly set by that decision with respect to determining misconduct and an appropriate judicial response.

In *Anderson*, the Court went on to say that "verdicts ought not lightly to be disturbed" and that movants must "demonstrate convincingly that they have been victimized by an adversary's misconduct." *Id*. at 924.  In order to warrant relief, any defects in discovery must have been harmful, affected the substantial rights of the movant, and "substantially interfered with the aggrieved party's ability fully and fairly to prepare for and proceed at trial." *Id.* at 924-925.  *See also Aguiar-Carrasquillo v. Agusto-Alicea*, 445 F.3d 19, 27 (1st Cir. 2006) ("Rule 6(b) provides for extraordinary relief and a motion thereunder may be granted only under exceptional circumstances.") (quoting *Lepore v. Vidockler*, 792 F.2d 272, 274 (1st Cir. 1986)).  Genlyte has not met, and cannot meet, this standard.  Not only were any defects in ALS's discovery responses negligible, they did not affect Genlyte's rights or prevent preparation for trial.

3

B.   <u>ALS Properly Supplemented Its Discovery Responses</u>.

Genlyte alleges that ALS engaged in misconduct by failing to supplement certain discovery responses with respect to sales of the MulTMed products after September 30, 2006. Genlyte properly references Interrogatory No. 19 and Request No. 13 as relating to sales of the MulTMed products. Genlyte further acknowledges that ALS responded to those discovery requests on January 3, 2006 and supplemented its answers on October 28, 2006 for the period through September 30, 2006. Genlyte does not suggest that the original responses or the supplemental responses were deficient. However, Genlyte further asserts that "there is no dispute that ALS did not supplement its discovery responses beyond September 30, 2006." Plaintiff's Motion at 7. Not only does ALS dispute this statement, it is completely false, as Genlyte well knows.

In late November 2006, ALS provided Genlyte with access to all of its customer files, which included sales information for the MulTMed products. Northrup Decl. ¶¶2, 3. A paralegal employed by Genlyte's counsel reviewed these documents through December 1, 2006. Northrup Decl. ¶¶2, 4. He copied numerous documents, including at least ten outstanding orders for the MulTMed products. Northrup Decl. ¶5. Therefore, ALS provided Genlyte with information relating to sales through November 30, 2006 and with respect to then existing orders for future sales. Of the 412 products sold from September 30, 2006 to February 1, 2007, 223 were sold and included on invoices before November 30, 2006. Northrup Decl. ¶6. Substantially all of the remaining products were identified in the open orders produced by ALS.

ALS acknowledges that it did not supplement the sales numbers after the final pretrial conference and designation of exhibits in December 2006.[1]  Nevertheless, ALS complied with Fed. R. Civ. P. 26(e) regarding supplementation of discovery responses.  Rule 26(e)(2) provides:

> (2) A party is under a duty seasonably to amend a prior response to an interrogatory, request for production, or request for admission if the party learns that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

ALS did seasonably amend its responses and produce additional documents relating to sales of the accused products during the pendency of this case.  Any failure to provide an additional supplementation with respect to a few additional sales is hardly material.  Furthermore, the general amount of such sales had already been made known to Genlyte through provision of the open orders as of December 1, 2006.  Therefore, properly complied with its duty under Rule 26(e) to supplement it responses.

C.    Genlyte Has Failed to Show It Was Victimized.

As noted above, in order to prove misconduct, Genlyte show convincingly that it has been victimized by, had substantial rights affected by, or its ability to fully and fairly prepare for or proceed with trial has been substantially interfered with by the alleged failure to supplement discovery responses.  Genlyte has failed to do so.  Genlyte suggest that its ability to prepare for and proceed with trial was affected because it could not show with exactness the total sales of ALS through the date of the verdict.  Genlyte further suggest that it, the jury and court presumed that no sales had been made after September 30, 2006.  Such suggestions are false and contradict the actions of the parties and the court, as Genlyte well knows.

---

[1] Genlyte suggest that ALS was deficient in responding to a request for supplementation before presenting its damages case.  The alleged request was sent to ALS's counsel on Sunday, January 28, 2007, in the middle of trial.  Genlyte had already fully presented it damages case before ALS's counsel saw the email after trial on Monday and could even request ALS personnel to determine the sales.

ALS produced documents showing sales of 223 products between September 30 and November 30 and additional outstanding orders.  Genlyte <u>knew</u> that ALS had made sales after September 30.  If the jury thought that all sales had ended by September 30, then it was only as a result of Genlyte's misleading presentation of the evidence.  Mr. Tate, Genlyte's expert, testified that he only had sales information through September 30.  Since Genlyte had additional sales information, it, not ALS, is responsible for failing to provide that information to its own expert.

Additionally, neither the Court nor Genlyte expressed any belief that sales of the MulTMed product stopped as of September 30.  In instructing the Jury, the Court stated: "figure out a reasonable royalty and then apply that royalty to the products that you think infringed over the time that you think they were infringing up to today.  And in fairness, you will recall that Mr. Tate said he stopped his analysis back in September of last year."  Trial Transcript, page 678, lines 8-13 (Exhibit 2 hereto).  The Court clearly understood that additional sales had been made.  He instructed the jury to determine damages through the date of the verdict and particularly pointed out that Mr. Tate had not included that entire time period in his testimony.[2]  After the verdict, Genlyte requested a judgment which included an accounting for sales after September 30.  Initially, the Court included such a term in the judgment.  Clearly, if either Genlyte or the Court did not believe there were any sales after September 30, this term in the judgment would have been meaningless.

Finally, the jury had sufficient information regarding sales of the MulTMed products in order to follow the Court's instructions to determine damages through the date of the verdict. Any lack of information was the result of Genlyte's failure to provide evidence of sales through November 30, 2006.  As presented at trial, ALS sold 837 products during 2006 through

---

[2] Genlyte did not object to the Court's instruction and cannot now claim that the Court erred in having the jury determine damages through the date of verdict.  *Scarfo v. Cabletron Systems, Inc.*, 54 F.3d 931, 940 (1st Cir. 1995) (Failure to timely object to jury instruction precludes further review).

6

September 30, or an average of 93 per month. For the period through November 30, 2006, for which ALS had provided all sales information, ALS sold 1060 products, or an average of 96 per month. In the omitted months of December 2006 and January 2007, ALS sold 189 products, or an average of 94 per month. The jury had, or should have had, information sufficient to determine damages despite a couple month omission of data.

The *Anderson* court clarified that while any missing discovery could be prevent a party from fully preparing for or proceeding with trial, only actions which cause <u>substantial</u> interference constitute misconduct under Rule 60(b). *Anderson*, 862 F.2d at 924. Genlyte has not shown substantial interference. Therefore, it is not entitled to its requested relief and the motion should be denied.

D.      Sanctions Are Not Appropriate.

Finally, Genlyte asks the Court, if it does not reinstate paragraph 4 of the judgment under Fed. R. Civ. P. 60, to sanction ALS the same amount for the same alleged failures. In support of its position, Genlyte misstates and misquotes from the First Circuit decision in *Thibeault v. Square D Co.*, 960 F.2d 239 (1st Cir. 1992). In *Thibeault*, the court set forth a straightforward approach to ensure the spirit of open discovery. Under that approach, in judging whether discovery has been properly supplemented, the Court "should look to the conduct of the trial, the importance of the evidence to its proponent, and the ability of the [opposing party] to formulate a response." *Id.* at 244 (quoting *Johnson v. H.K. Webster, Inc.*, 775 F.2d 1, 8 (1st Cir.1985)). Genlyte ignores the required approach in its analysis. As discussed above, ALS properly supplemented its discovery responses. Genlyte ignored the information regarding sales through November 30, 2006, which had been produced by ALS, in presenting its case. The jury was able

to reasonably determine damages as instructed by the Court. Therefore, based upon the standard indicated in *Thibeault*, sanctions are not appropriate.

## CONCLUSION

For the reasons set forth above, Genlyte's motions should be denied in their entirety.

Respectfully submitted,

Dated: April 27, 2007

 s/ Brett N. Dorny
Brett N. Dorny, BBO# 628,977
Law Office of Brett N. Dorny
386 West Main Street, Suite 12A
Northborough, Massachusetts 01532
508-709-0501
bndorny@dornylaw.com
Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent by mail to those indicated as non-registered participants on April 27, 2007.

 s/ Brett N. Dorny
Brett N. Dorny

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GENLYTE THOMAS GROUP LLC,<br><br>    Plaintiff/Counterclaim Defendant,<br>v.<br><br>ARCHITECTURAL LIGHTING SYSTEMS, a division of ARCH LIGHTING GROUP INC.,<br><br>    Defendant/Counterclaimant. | Civil Action No.  05-CV-10945 WGY |

## DECLARATION OF PAUL B. NORTHRUP

I, Paul B. Northrup, hereby declare as follows:

1. I am controller of Defendant Arch Lighting Group, Inc. ("ALS"). I make this declaration in opposition to Plaintiff's Motion to Alter or Amend the Amended Judgment, to Reconsider Same, For Relief From Amended Judgment and/or for Sanctions. Unless indicated otherwise, all statements are made from my personal knowledge.

2. On November 27, 2006, Michael M. Bowman, a paralegal from Middleton Reutlinger, visited ALS's offices in Taunton, Massachusetts. I provided him access to all of ALS's customer files since 2001.

3. ALS's customer files include sales information for the MulTMed products, such as invoices and purchase orders.

4. Mr. Bowman finished reviewing files on December 1, 2006.

5. Mr. Bowman had numerous pages copied from ALS's customer files. He personally copied ten orders for MulTMed products which were open at that time so that ALS's operations would not be affected by the copying process.

2

6.       In February 2007, at the request of ALS' counsel, I reviewed invoices of ALS to determine sales of the MulTMed MT2A, MT2B, MT1D products between September 30, 2006 and February 1, 2007. I determined that 412 products had been sold. Of those products, 223 were on invoices dated before November 30, 2006; 189 were on invoices dated after November 30, 2006.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 26th day of April, 2007.

                                              _s/ Paul B. Northrup_____
                                              Paul B. Northrup

# EXHIBIT 2

Case 1:05-cv-10945-WGY    Document 90-3    Filed 04/27/2007    Page 1 of 4

                                                                  631

```
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MASSACHUSETTS
 2
                                              Civil Action
 3                                            No. 05-10945-WGY

 4

 5      * * * * * * * * * * * * * * * * * * *
        GENLYTE THOMAS GROUP LLC,            *
 6      a Delaware Limited Liability Company,*
                                             *
 7                  Plaintiff,               *  TRANSCRIPT OF THE
            v.                               *  EVIDENCE, JURY
 8                                           *  INSTRUCTIONS and
        ARCHITECTURAL LIGHTING SYSTEMS,      *  CLOSING ARGUMENTS
 9      a division of ARCH LIGHTING GROUP,   *     (Volume 6)
        a Rhode Island Corporation,          *
10                                           *
                    Defendant.               *
11      * * * * * * * * * * * * * * * * * * *

12

13

14            BEFORE:  The Honorable William G. Young,
                           District Judge, and a Jury
15

16
        APPEARANCES:
17
                MIDDLETON REUTLINGER (By James E. Milliman,
18        Esq., James R. Higgins, Jr., Esq. and Robert J.
          Theuerkauf, Esq.), 2500 Brown & Williamson Tower,
19        Louisville, Kentucky 40202-3410, on behalf of the
          Plaintiff
20
                LAW OFFICE OF BRETT N. DORNY (By Brett N.
21        Dorny, Esq.), 386 West Main Street, Suite 12A,
          Northborough, Massachusetts 01532, on behalf of
22        Defendant

23

24                                            1 Courthouse Way
                                              Boston, Massachusetts
25
                                              January 31, 2007
```

1    business or comparable business for the use of an invention
2    or inventions like this.
3            You may consider the portion of the profit that
4    arises from the invention itself as opposed to profit
5    arising from features unrelated to the patented invention,
6    such as the manufacturing process, the business risks,
7    significant features or improvements added by ALS.
8            So on this last point, you can consider is the ALS
9    product a better product.  Is that what's driving its
10   commercial success.
11           You consider all those different points to arrive
12   at a fair and reasonable royalty.
13           Now, Mr. Tate testified and he gave you figures,
14   and Mr. Tate's figures assume that you've got a checkmark
15   here against every product.
16           Now, again, let's say you do have a checkmark
17   against every product.  That does not mean you just buy
18   Mr. Tate's figures.  You may.  I let him testify.  I just
19   want to emphasize you don't have to.
20           If you don't really believe that, you don't believe
21   that's accurate and how he weighted things, you can discount
22   from that.  So long as you've got a principled reason for
23   figuring out what it is you're figuring out.
24           My reason for pausing on this is, suppose there
25   isn't a checkmark against every single product.  Well, then

678

1    you have something to figure.  Because the way Mr. Tate
2    figured it, he assumed all of them were infringed.  But
3    let's say you assume only some of them are infringed.  It
4    follows then that even if he got the royalty rate right, the
5    total amount necessarily has to be less.  But no one
6    suggests, and certainly I do not suggest, that he got it
7    right or he got it wrong.  That's up to you.  I'm saying if
8    you've got checkmarks there in the grid, figure out a
9    reasonable royalty and then apply that royalty to the
10   products that you think infringed over the time that you
11   think they were infringing up to today.  And in fairness,
12   you will recall that Mr. Tate said he stopped his analysis
13   back in September of last year.  So you figure out what the
14   damages are and you write them out there in subparagraph c.
15          Now, if ALS has won the case, I've already told
16   you, you stop before figuring any damages.  If there's no
17   checkmarks in the grid, ALS wins, you stop.  If there's a
18   checkmark in the grid, you figure out the damages.
19          And then, lastly, you come to subparagraph d there
20   on the second page.  You will have told me then that ALS
21   does infringe as to at least one product or more than one
22   product.
23          So I ask you, was that patent infringement wilful.
24   Well, okay.  What does that mean?
25          First of all, the burden of proof -- Genlyte says,