NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2007-1405, -1406

GENLYTE THOMAS GROUP LLC,

Plaintiff-Cross Appellant,

v.

ARCH LIGHTING GROUP, INC.
(doing business as Architectural Lighting Systems),

Defendant-Appellant.

James R. Higgins, Jr., Middleton Reutlinger, of Louisville, Kentucky, argued for plaintiff-cross appellant. With him on the brief were James E. Milliman and Robert J. Theuerkauf.

Brett N. Dorny, Law Office of Brett N. Dorny, of Northborough, Massachusetts, argued for defendant-appellant.

Appealed from: United States District Court for the District of Massachusetts

Judge William G. Young

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2007-1405, -1406

GENLYTE THOMAS GROUP LLC,

Plaintiff-Cross Appellant,

v.

ARCH LIGHTING GROUP, INC.,
(doing business as Architectural Lighting Systems),

Defendant-Appellant.

Appeal from the United States District Court for the District of Massachusetts, case no. 05-CV-10945, Judge William G. Young.

___

DECIDED: May 14, 2008

___

Before BRYSON, Circuit Judge, CLEVENGER, Senior Circuit Judge, and DYK, Circuit Judge.

BRYSON, Circuit Judge.

Genlyte Thomas Group owns U.S. Patent No. 5,038,254 ("the '254 patent"), which relates to lighting systems for use in hospital rooms. In 2005, Genlyte sued Arch Lighting Group, Inc., ("ALS") for infringement of the '254 patent. Following a six-day trial, the jury returned a verdict that one of ALS's products literally infringed claim 1 of

the '254 patent and two other products infringed claims 1 and 3 of the patent under the doctrine of equivalents.

Claim 1 of the '254 patent reads as follows:

1. A medical lighting system comprising:
   a body;
   means for ceiling-mounting said body;
   a first light fixture within said body oriented to direct light downwardly to a selected reading area under said body; [and]
   a second light fixture within said body oriented to direct light downwardly and outwardly to a vertical wall surface outwardly adjacent from said body whereby light is reflected back to a broad area under said body.

Claim 3 is the same as claim 1 except that it adds the following limitation: "a third light fixture within said body oriented to direct light downwardly under said body to a selected patient examination area."

ALS has appealed from the district court's denial of its motions for judgment as a matter of law (JMOL) and for a new trial. Genlyte has cross-appealed from the district court's denial of its motion for relief from the judgment. We affirm.

I

A

ALS argues that JMOL should be granted because the jury verdict is not supported by substantial evidence. In particular, ALS contends that there is no evidence that its products contain structure for mounting the body of the lighting system to the ceiling that is the same as or equivalent to structure in the specification corresponding to the "means for ceiling-mounting" in claims 1 and 3.

ALS initially raised the issue of the proper construction of "means for ceiling-mounting" at the Markman hearing. During the hearing, ALS agreed with the court that

resolution of that issue should be postponed until it filed its summary judgment motion. ALS, however, did not raise that issue in its summary judgment motion. In the Joint Pretrial Memorandum, ALS agreed that "the Court set forth the meaning of the claim terms in dispute during the June 20, 2005 Markman hearing," even though the court did not at that time construe the means for ceiling-mounting limitation. At trial, Dr. Ian Lewin, ALS's expert, conceded that the accused products satisfied the "means for ceiling-mounting" limitation. When asked whether his "opinion assumes and concedes the existence of all of the elements of claim 1 and 3, except the second light fixture," Dr. Lewin responded, "Yes." That statement acknowledged that the "means for ceiling-mounting" limitation was present in each of the accused products.

In addition to that evidence, Genlyte's expert, Thomas Lemons, testified that ALS's accused devices were all mounted to the ceiling by use of a lip or flange that rests on a T-bar ceiling grid like a conventional troffer. The patent described the invention as a "ceiling-mounted lighting system" in which the lighting fixtures are packaged in a two-foot by four-foot configuration so as to "replace a conventional troffer." '254 patent, col. 1, ll. 3-4; col. 3, ll. 12-14. Mr. Lemons testified that the reference to troffers would convey to a person of skill in the art the structure to be used to mount the light fixtures: "Every electrician would know, if you tell him you're going to install troffers he instantly knows that it's going to be a hung ceiling and you fit the fixture up into it and set it down on the T bar." According to Mr. Lemons, the accused products all contained lips or flanges that enabled them to be installed on a grid ceiling. That evidence was sufficient to satisfy the "means for ceiling-mounting" limitation.

B

ALS also asserts that Genlyte did not prove that the accused products satisfied the first and second light fixture limitations. The essence of ALS's argument is that the first and second light fixtures must be oriented to direct light in different directions, with the first fixture aiming more light to a reading area and the second fixture aiming more light to a wall.

The trial court adopted the construction of the first and second fixture limitations set forth in ALS's proposed jury instructions. For the first light fixture, the trial court instructed the jury that the phrase "oriented to direct light downwardly to a selected reading area under said body" means "set or arranged to direct or aim more light in a downward direction than in an upward or outward direction to a reading area." For the second light fixture, the court instructed the jury that the phrase "oriented to direct light downwardly and outwardly to a vertical wall surface outwardly adjacent from said body" means "set or arranged to direct or aim more light in a downward and outward direction than in an upward direction to a wall." Without objection, the court did not require the jury to find that the first and second light fixtures had any specific orientation relative to one another. ALS did not press for a different construction of the first and second light fixture limitations before the district court. Before us, counsel for ALS specifically disclaimed any argument that the jury instructions with regard to those limitations were incorrect. We therefore have no occasion to reach the question whether those instructions embodied a correct claim construction.

Under the court's claim construction, there is sufficient evidence that each of the accused devices satisfied the first and second light fixture limitations. As noted above,

ALS's expert conceded that only the second light fixture was in dispute. ALS also stipulated that the first fixture "has the same light distribution pattern in every ALS MulTmed product" and that the first fixture in the ALS products "direct[s] light downwardly to a selected reading area under the fixture." Genlyte's expert, Mr. Lemons, testified about experiments he performed using ALS products that showed that the reading light in the ALS products directed a substantial amount of light to the reading area of the bed. Thus, even without the concession of ALS's expert, there is legally sufficient evidence from which the jury could find that the first light fixture was present in the accused devices.

ALS stipulated that each of the second light fixtures in its accused devices "has the same light distribution pattern in every ALS MulTmed product" and "does not produce any upwardly directed light." Given the unchallenged construction of the second fixture limitation as "set or arranged to direct or aim more light in a downward and outward direction than in an upward direction to a wall," the only question is whether the second light fixture in the accused devices directs light "in a downward and outward direction . . . to a wall." Mr. Lemons testified that the second light fixture in the ALS devices directs light downwardly and outwardly to a wall. That testimony provided a legally sufficient basis for the jury to find that the claimed second light fixture was present in each of the accused devices.

C

ALS further asserts that upholding the jury's verdict of infringement under the doctrine of equivalents as to two of the accused products would eliminate a claim limitation. ALS's argument relies on the same premise as its challenge to the jury's

2007-1405,-1406                                5

verdict of literal infringement: that the first and second light fixtures must point in different directions. That argument fails for the same reasons that were given above, namely, that ALS requested and the court gave a claim construction that did not contain such a requirement. We therefore uphold the trial court's denial of JMOL as to both literal infringement and infringement under the doctrine of equivalents.

D

ALS next argues that it should be granted a new trial. First, ALS argues that the trial court improperly declined to instruct the jury as to the proper interpretation of the "means for ceiling-mounting" limitation. As noted above, ALS did not raise the issue of claim construction with respect to the "means for ceiling-mounting" limitation in the summary judgment proceedings (as the court directed), and its expert Dr. Lewis conceded that the "means for ceiling-mounting" limitation was satisfied. Based on the fact that ALS did not challenge the court's instructions with respect to the "means for ceiling-mounting" limitation and that its expert conceded that limitation was satisfied in the accused devices, the trial court did not err by not giving ALS's requested "means-plus-function" instruction.

ALS also argues that a new trial should be granted because the jury verdict was against the weight of the evidence. In support of that contention, ALS again relies on its two previous arguments: that the accused products do not have a means for ceiling-mounting equivalent to the structure disclosed in the specification and that the claims require the two light fixtures to direct light in different directions. As noted above, ALS conceded that the means for ceiling-mounting limitation was satisfied in the accused products, and Genlyte's evidence supported the jury's finding on that issue. The

evidence also supported the jury's finding that the second light fixture was in the accused products. The verdict was therefore not against the weight of the evidence, and district court did not err by refusing to grant a new trial.

II

Genlyte cross-appeals from the district court's denial of its motion under Fed. R. Civ. P. 60(b) fro relief from the judgment. As originally drafted, the judgment included paragraph 4, which would have required an accounting of infringing sales made between September 30, 2006, and the date of the judgment and would have required ALS to pay a royalty of $67 per infringing product on those sales. The trial court subsequently struck paragraph 4 from the judgment because it found that enforcing paragraph 4 would result in a double counting of the award for the period covered by that paragraph. The court reasoned that although the sales accounting evidence presented to the jury covered only sales up to September 30, 2006, the jury was instructed to "figure out a reasonable royalty and then apply that royalty to the products that you think infringed over the time that you think they were infringing up to today." Based on that instruction, the court concluded that the jury's award of damages was "properly considered to address damages for reasonable royalties up to and including the trial."

Genlyte then moved under Rule 60(b) to amend the judgment to reinstate paragraph 4 because of asserted discovery misconduct by ALS. Genlyte alleged that ALS had improperly failed to update its sales figures after September 30, 2006. Genlyte argued that ALS had a duty to update its sales figures under Fed. R. Civ. P. 26(e) and under Genlyte's first set of interrogatories and requests for documents. In

that document, Genlyte had stated that its requests "are deemed continuing" and that ALS should produce "any additional information requested which shall become available to ALS up to the time of trial pursuant to Rule 26(e) of the Federal Rules of Civil Procedure."

ALS disputes Genlyte's claim that it did not provide information about any of ALS's sales after September 30, 2006. ALS represented to the district court that Genlyte was given access to sales documents through November 30, 2006, and that those records reflected sales of 223 of the 412 products sold between September 30, 2006, and February 1, 2007. In addition, ALS represented that substantially all of the remaining 189 products sold during that period were identified in "open order" documents produced by ALS at that time.[1] In this court, Genlyte argues that providing access to sales documents was not sufficient to satisfy ALS's obligation to update its interrogatory answers. Genlyte does not point to anything in the record, however, to indicate that it objected to the form of ALS's production of materials, either prior to or during trial. Moreover, while the record contains an email message sent by Genlyte's counsel to ALS's counsel shortly before the end of the trial, asking for updated ALS sales records, the record does not reflect that Genlyte took any more formal steps to obtain additional materials from ALS pertaining to ALS's most recent sales.

---

[1] ALS has not argued that it had no obligation to update its interrogatory responses with information about sales made after its response to Genlyte's interrogatories; instead, it has argued that it satisfied its discovery obligations by making relevant documents available after the date of its interrogatory responses. We therefore do not decide whether ALS had an obligation, either under Fed. R. Civ. P. 26(e) or under the terms of Genlyte's discovery request, to supplement its interrogatory responses or document production with information and materials that were not in existence at the time of its initial discovery response.

2007-1405,-1406                          8

Genlyte thus did not raise any issue of discovery misconduct before the trial court prior to the verdict, even though it was aware that ALS's prior production of sales data only included sales of the accused products through September 2006. Moreover, although Genlyte now contends that the form of production of sales information for the period following September 30, 2006, was inadequate, Genlyte apparently did not raise any issue of the sufficiency of ALS's production with the district court prior to or during trial. Under these circumstances, Genlyte should have raised its discovery complaints earlier if it wished either to obtain the records in question or have the court decide whether production was inadequate and sanctions should be imposed for nonproduction. See Colon-Millin v. Sears Roebuck de Puerto Rico, Inc., 455 F.3d 30, 39 (1st Cir. 2006). For that reason and for the reasons given by the district court, we uphold the district court's denial of Genlyte's motion to reinstate the award of damages in paragraph 4 of the original judgment.

Each party shall bear its own costs for this appeal.

CERTIFIED COPY
I HEREBY CERTIFY THIS DOCUMENT IS A TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE.
UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT
By: _____ Date: 6/4/08